UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VICKI RONGEY WILLARD, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | |
| v. | CLASS ACTION COMPLAINT |
| UP FINTECH HOLDING LIMITED, TIANHUA WU, JOHN FEI ZENG, YONGGANG LIU, LEI FANG, DAVID ERIC FRIEDLAND, and VINCENT CHUN HUNG CHEUNG. | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Vicki Rongey Willard ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding UP Fintech Holding Limited ("Fintech" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Fintech American Depository Shares ("ADSs") pursuant and/or traceable to the Company's initial public offering conducted on or about March 20, 2019 (the "IPO" or "Offering"); or (b) Fintech securities between March 20, 2019 and May 16, 2019, both dates inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Fintech was founded in 2014 and is based in Beijing, China.  The Company provides online brokerage services focusing on Chinese investors and has developed a purported brokerage platform that can be accessed through its app and website.  The Company offers brokerage and value-added services, including trade order placement and execution, margin financing, account management, investor education, community discussion, and customer support.

3.     On February 22, 2019, Fintech filed a registration statement on Form F-1 with the SEC in connection with the IPO (Registration No. 333-229808), which, after several amendments, was declared effective by the SEC on March 19, 2019 (the "Registration Statement").  The Registration Statement was filed with respect to the underlying Class A ordinary shares represented by the ADSs to be sold in the IPO.

4.     On March 20, 2019, Fintech filed a prospectus for the IPO on Form 424B4 (the "Prospectus"), which incorporated and formed part of the Registration Statement (collectively, the "Offering Documents").  That same day, Fintech announced the pricing of its IPO of 13 million ADSs, each representing fifteen Class A ordinary shares of the Company, at $8.00 per

ADS.  The ADSs began trading the same day on the Nasdaq Global Select Market ("NASDAQ")

under the symbol "TIGR."  Fintech raised $104 million in proceeds from the IPO.

5.      The Offering Documents were negligently prepared and, as a result, contained

untrue statements of material fact or omitted to state other facts necessary to make the statements

made not misleading and were not prepared in accordance with the rules and regulations

governing their preparation.    Additionally, throughout the Class Period, Defendants made

materially false and misleading statements regarding the Company's business, operational and

compliance policies.   Specifically, in the Offering Documents and during the Class Period,

Defendants made false and/or misleading statements and/or failed to disclose that: (i) Fintech

was experiencing a material decrease in commissions because of a negative trend related to risk-

averse investors in the market; (ii) Fintech was unable to absorb costs associated with the rapid

growth of its business and its status as a publicly listed company on a U.S. exchange; (iii)

Fintech was incurring significant additional expenses related to, *inter alia*, employee headcount

and employee compensation and benefits; (iv) all of the foregoing had led to Fintech

significantly increasing operating costs and expenses; and (v) as a result, the Offering

Documents were materially false and/or misleading and failed to state information required to be

stated therein, and the Company's Class Period statements were likewise materially false and/or

misleading.

6.      On May 17, 2019, during pre-market hours, Fintech issued a press release

announcing its unaudited first quarter 2019 financial results—the Company's first quarterly

earnings announcement following the IPO (the "1Q19 Press Release").   In that press release,

Fintech disclosed a 4.1% decrease in commissions, noting that "[i]nvestors were relatively risk

averse at beginning of this year which leads to moderated trading activities and a slight decrease

in trading commission." The 1Q19 Press Release also disclosed, among other issues, that Fintech's operating costs and expenses and net loss attributable to the Company had begun to skyrocket as a result of increases in expenses related to employee headcount, employee compensation and benefits, and office space and leasehold improvements, as well as rapid customer growth, expanded market data usage for its customers, and additional professional expenses as a listed company.

7.      Specifically, with respect to Fintech's drastically increasing operating costs and expenses and net loss attributable to the Company, the 1Q19 Press Release disclosed that total operating costs and expenses for the first quarter of 2019 increased by 36.4% to $14.0 million from $10.3 million in the first quarter of 2018, and that employee compensation and benefits increased by 60.8% from $4.9 million in the first quarter of 2018 to $7.8 million in the first quarter of 2019.

8.      On this news, Fintech's ADS price fell $1.21 per share, or 17.34%, to close at $5.77 per share on May 17, 2019.

9.      As of the time this complaint was filed, Fintech ADSs continued to trade below the IPO price, damaging investors.

10.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Fintech' securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act

(15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13.     Venue is proper in this Judicial District pursuant to Section 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).   Fintech ADSs trade on the NASDAQ, located within this Judicial District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15.     Plaintiff, as set forth in the attached Certification, purchased Fintech ADSs pursuant and/or traceable to the Offering Documents issued in connection with the Company's IPO, and/or purchased or otherwise acquired Fintech securities at artificially inflated prices during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.     Defendant Fintech is organized under the laws of the Cayman Islands with principal executive offices located at 18/F, Grandyvic Building, No. 16 Taiyanggong Middle Road, Chaoyang District, Beijing, 100028, People's Republic of China.   Fintech ADSs trade in an efficient marker on the NASDAQ under the ticker symbol "TIGR."

17.     Defendant Tianhua Wu ("T. Wu") has served as Fintech's Chief Executive Officer and a Director at all relevant times.  Wu signed or authorized the signing of the Offering Documents filed with the SEC.

18.     Defendant John Fei Zeng ("Zeng") has served as Fintech's Chief Financial Officer at all relevant times.  Zeng signed or authorized the signing of the Offering Documents filed with the SEC.

19.     Defendants T. Wu and Zeng are sometimes referred to herein collectively as the "Exchange Act Individual Defendants."

20.     The Exchange Act Individual Defendants possessed the power and authority to control the contents of Fintech's SEC filings, press releases, and other market communications. The Exchange Act Individual Defendants were provided with copies of Fintech's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Fintech, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.   The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

21.     Fintech and the Exchange Act Individual Defendants are sometimes referred to herein collectively as the "Exchange Act Defendants."

22.     Defendant Yonggang Liu ("Liu") has served as Fintech's Vice President of Technology and a Director at all relevant times.  Liu signed or authorized the signing of the Offering Documents filed with the SEC.

23.    Defendant Lei Fang ("Fang") has served as a Director of Fintech at all relevant times.  Fang signed or authorized the signing of the Offering Documents filed with the SEC.

24.    Defendant David Eric Friedland ("Friedland") has served as a Director of Fintech at all relevant times.  Friedland signed or authorized the signing of the Offering Documents filed with the SEC.

25.    Defendant Vincent Chun Hung Cheung ("Cheung") has served as a Director of Fintech at all relevant times.  Cheung signed or authorized the signing of the Offering Documents filed with the SEC.

26.    The Exchange Act Individual Defendants and Defendants Liu, Fang, Friedland, and Cheung are sometimes referred to herein collectively as the "Securities Act Individual Defendants."

27.    As directors, executive officers and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Fintech ADSs in the IPO for their own benefit and the benefit of Fintech.  The Securities Act Individual Defendants were key members of the IPO working group and executives of Fintech who pitched investors to purchase the shares sold in the IPO, including in IPO road shows.

28.    The Exchange Act Defendants and the Securities Act Individual Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

29.    Fintech was founded in 2014 and is based in Beijing, China.  The Company provides online brokerage services focusing on Chinese investors and has developed a purported brokerage platform that can be accessed through its app and website.  The Company offers

brokerage and value-added services, including trade order placement and execution, margin financing, account management, investor education, community discussion, and customer support.

30.     On February 22, 2019, Fintech filed a registration statement on Form F-1 with the SEC in connection with the IPO (Registration No. 333-229808), which, after several amendments, was declared effective by the SEC on March 19, 2019.  The Registration Statement was filed with respect to the underlying Class A ordinary shares represented by the ADSs to be sold in the IPO.

31.     On March 20, 2019, Fintech filed a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement.  That same day, Fintech announced the pricing of its IPO of 13 million ADSs, each representing fifteen Class A ordinary shares of the Company, at $8.00 per ADS.  The ADSs began trading the same day on the NASDAQ under the symbol "TIGR."  Fintech raised $104 million in proceeds from the IPO.

**Materially False and Misleading Statements Issued in the Offering Documents**

32.     For Fintech's fiscal year ended December 31, 2018, the Offering Documents reported a net loss attributable to ordinary Fintech shareholders of $43.21 million, or $0.09 per diluted share, on total revenues of $33.56 million, compared to a net loss attributable to ordinary Fintech shareholders of  $7.51 million, or $0.02 per diluted share, on total revenues of $16.95 million for the fiscal year ended December 31, 2017, and a net loss attributable to ordinary Fintech shareholders of  $10.76 million, or $0.02 per diluted share, on total revenues of $5.48 million for the fiscal year ended December 31, 2016.  Additionally, for 2018, the Prospectus reported revenues from commissions in the amount of $26.04 million, as compared to $15.06 million in 2017, and $5.28 million in 2016.

33.     The Prospectus attributed Fintech's purported leading position as an online broker that focused on global Chinese investors to its, *inter alia*, innovative products and services. Moreover, the Prospectus asserted the Company's innovative products enabled the Company to experience increasingly heavy investor trading volume and, consequently, commissions, which the Prospectus noted was a primary driver of the Company's revenues. Specifically, the Prospectus stated, in relevant part:

> We are a leading online brokerage firm focusing on global Chinese investors. We are the largest online broker focusing on global Chinese investors in terms of U.S. securities trading volume, with a market share of approximately 58.4% in 2017, according to the iResearch Report. Our proprietary trading platform enables investors to trade in equities and other financial instruments on multiple exchanges around the world. Our continuous focus on offering innovative products and services and a superior user experience has enabled us to become one of the most utilized and well-recognized online trading platforms for Chinese investors around the world. We have achieved RMB1.0 trillion cumulative trading volume on our platform within three years since the launch of our Tiger Trade APP, which represents the shortest timeframe among all online brokers focusing on global Chinese investors, according to the iResearch Report.

> * * *

> We generate revenues primarily by charging our customers commission fees for trading of securities as well as earning interest income or financing service fees arising from or related to margin financing provided by ourselves or third parties to our customers for trading activities. Our total revenues were $5.5 million, $16.9 million and $33.6 million in 2016, 2017 and 2018, respectively.

34.     In its "Recent Developments" section, the Prospectus touted that Fintech had "generated $2.9 million of revenues for the month ended January 31, 2019, including $2.2 million in commissions," while simultaneously downplaying the effect of a slow investment environment on the Company's business at the beginning of the year.  For example, in the same section, the Prospectus merely noted that the Company's "performance in January 2019 was **partially affected** by the generally quieter investment environment during the Chinese New Year

season, given the fact that the vast majority of [the Company's] client base are Chinese investors around the world" (emphasis added).

35.     The Prospectus further downplayed the effects of a risk-averse investor market at the beginning of the year in its "Factors Affecting Our Results of Operations" section of the Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A").   Specifically, the Prospectus highlighted the importance of commissions on Fintech's profitability, simultaneously touted the Company's "large and highly engaged customer base," and detailed a pattern of rapid revenue growth that purportedly resulted from increased customer accounts and engagement, stating, in relevant part:

> Our commissions largely depend on the number of customers on our trading platform and our customers' trading volume, which is the aggregate notional value of their transactions. The number of customers on our trading platform depends on the usability and popularity of our trading platform as well as the industry outlook of the online brokerage business. Our customers' trading volume is directly influenced by the demand for trading by individual investors, which is affected by the general social and economic conditions, as well as individual investors' preference for the choice of investment products. In addition, customers' trading activities are influenced by the trading price volatility of the relevant products.
>
> Additionally, *we have a large and highly engaged customer base, which drives our revenue growth*. Our ability to continue to effectively maintain and expand our customer base will affect the growth of our business and our revenues going forward. *Our total customer accounts increased from 78,946 as of December 31, 2016 to 204,965 as of December 31, 2017 and further increased to 502,352 as of December 31, 2018. The significant increase in total customer accounts led to the rapid growth in our revenues, which increased by 209.5% from $5.5 million in 2016 to $16.9 million in 2017, and further increased by 98.0% to $33.6 million in 2018. Furthermore, the level of customer engagement affects our commissions, interest income and financing service fees. Trading volume increased from $16.3 billion in 2016 to $63.3 billion in 2017 and further increased to $119.2 billion in 2018.* Our ability to expand our customer base, including expansion into new markets including the United States, Australia, Hong Kong, Singapore and India, as well as maintain and enhance customer engagement, depends on, among other things, our ability to continuously provide comprehensive and user-friendly online trading experience.

(Emphases added.)

36.     In the "Key Components of Results of Operations" section of the MD&A, the Prospectus stated the following with respect to commissions as part of Fintech's revenues:

*Commissions*

We earn commissions from the brokerage services we deliver for customers' fully disclosed accounts and consolidated accounts . . . . In 2016 and 2017, respectively, all and substantially all of commissions were generated from fully disclosed accounts on our platform. We charge commission fees based on the amount of transaction volume, or the number of shares, lots or contracts in each order, which generally vary in accordance with the type of products or services, timing of account activation, eligibility for discounts and other factors. In 2016, 2017 and 2018, the average rate of commissions over trading volume was 0.0323%, 0.0238% and 0.0272%, respectively, which is the ratio of the total commissions to the total trading volume in the same period. ***The gradual decrease in the average commission rates was primarily driven by the industry-wide decrease in commission rates.***

Pursuant to the agreement with our primary clearing agent, Interactive Brokers, we receive a portion of commission fees paid by our customers every time Interactive Brokers executes and clears a trade order. For consolidated accounts, we receive commissions from customers and pay the execution and clearing fees to our clearing agents. For fully disclosed accounts, every time Interactive Brokers executes and clears a trade, it collects the commissions, deducts a certain portion as execution and clearing fees and returns the rest of the commissions to us.

(Emphasis added.)  Here again, the Prospectus failed to disclose the material negative effects of a risk-averse investor market at the beginning of the year.   Instead, the Prospectus merely disclosed a "gradual decrease" in commissions over three years resulting from a vaguely-described "industry-wide decrease in commission rates."

37.     Further, in the MD&A's section comparing the year ended December 31, 2018, with the year ended December 31, 2017, the Prospectus boasted that "[t]otal revenues increased by 98.0% from $16.9 million in 2017 to $33.6 million in 2018," specifically noting that "[t]his increase was driven by ***significant increases in both commissions and financing service fees,*** as

well as the increase in other revenues" (emphases added).   This section also noted that "[c]ommissions increased by 72.9% from $15.1 million in 2017 to $26.0 million in 2018, primarily due to a significant increase in the total trading volume on our platform which was primarily driven by the increase in the number of customers making trades"; that "[t]he total trading volume increased by 88.4% from $63.3 billion in 2017 to $119.2 billion in 2018"; and that "[t]he number of total customer accounts significantly increased by 145.1% from 204,965 as of December 31, 2017 to 502,352 as of December 31, 2018."  The foregoing statements signaled to investors the speed at which Fintech's business was growing as a result of increased commissions and increased customer activity, while failing to note the recent effects of a negative trend related to risk-averse investors in the market at the year's start.

38.    With respect to quarterly trends, the Prospectus's MD&A boasted that Fintech "ha[s] experienced continuous growth in revenues for the eight quarters from January 1, 2017 to December 31, 2018."  This section also touted that, "[d]riven by the continued increases in the number of customers making trades, trading volume and margin financing balance, our revenues from both trading commissions and financing service fees increased substantially during these periods," but that "[r]evenues from brokerage commissions slightly decreased in the second quarter of 2018 due to the slight decrease of our trading volume as a result of market volatility." This section of the MD&A disclosed the fact that Fintech's "results of operations are subject to fluctuation and changes in market conditions," including "influences from market factors such as market liquidity, interest rate and investor sentiment," but nonetheless downplayed this risk by noting in the same discussion that "[t]he impact of fluctuation and changes of market conditions, however, was not apparent historically due to the rapid growth of our business historically."

39.      With respect to possible slowdowns in securities trading, the Prospectus's "Risk

Factors" section stated, in relevant part:

> ***Our business may be harmed by global events beyond our control, including overall slowdowns in securities trading. Our revenues and profitability depend on trading volume and are prone to significant and unpredictable fluctuations.***
>
> Like other brokerage and financial services firms, our business and profitability are directly affected by elements that are beyond our control, such as economic and political conditions, broad trends in business and finance, changes in volume of securities transactions, changes in the markets in which such transactions occur and changes in how such transactions are processed. A weakness in equity markets, such as a slowdown causing reduction in trading volume in the United States and Hong Kong stocks and other financial instruments, has historically resulted in reduced transaction revenues and would have a material adverse effect on our business, financial condition and results of operations.
>
> Our revenues depend substantially on our customers' trading volume, which is influenced by the general trading activities in the securities trading market. Securities trading faces competition from other investment products, such as wealth management products and peer-to-peer lending. These alternative investment products may divert investors from or reduce their activity levels in securities trading, which may adversely affect our trading volume, revenues and business.
>
> In addition, general trading activities in our industry are also directly affected by factors such as economic and political conditions, macro trends in business and finance, investors' interest level in securities trading and legislative and regulatory changes. Any of these factors or other factors may reduce the trading activity level in securities trading industry and adversely affect our business and results of operations and cash flows. Events in global financial markets in recent years resulted in substantial market volatility and increased customer trading volume. However, any sustained downturn in general economic conditions or global equity markets could result in reduced customer trading volume and revenues. Severe market fluctuations or weak economic conditions could reduce our trading volume and revenues and have a material adverse effect on our profitability. As a result, period to period comparisons of our revenues and operating results may not be meaningful, and future revenues and profitability may be subject to significant fluctuations or declines.

(Emphasis in original.)  Plainly, this risk warning was a generic "catch-all" provision that was

not tailored to Fintech's actual known risks with respect to the risk-averse investor market the

Company was facing at the beginning of the year.  This type of risk warning was particularly

ineffective given the bright picture of investment activity that Defendants painted for investors throughout the Prospectus, as detailed in ¶¶ 32-38 above.

40.     The Prospectus also touted Fintech's substantial growth, stating, in relevant part:

We have achieved substantial growth since the launch of our trading platform in August 2015, as illustrated by the charts below.



41.     Despite Fintech eventually revealing in the 1Q19 Press Release that too many expenditures related to the Company's growth had actually inhibited Fintech's profitability, the "Our Strengths" section of the Prospectus Summary boasted that Fintech had, among other benefits, "[t]he platform of choice for trading U.S. securities online among global Chinese investors **with the fastest growth**" and a "[h]igh caliber customer base with **great growth potential**, engagement and stickiness" (emphases added).

42.     With respect to the risk that Fintech might fail to effectively manage its rapid growth, the Prospectus's "Risk Factors" section stated, in relevant part:

14

> ### *We may be unable to effectively manage our rapid growth.*
>
> The rapid growth of our business during our limited operation history has placed significant demands on our management and other resources. As we grow, we may also need to enhance the reliability and scalability of our proprietary technology, network infrastructure and other aspects of our IT systems. We may need to hire additional professionals in such areas as sales and marketing, customer support and risk management as well as other personnel to serve the enlarged customer base. Implementation of new business arrangements, expansion of technology infrastructure and increase in the number of employees may further increase our operational complexity and impose higher standards on every aspect of our operations. Our management team may fail to effectively cope with the increased operational complexity, and we may fail to integrate new resources into our existing operation system. Therefore, we may not be able to maintain current growth rate or manage our growth effectively.

Plainly, this risk warning, too, was a generic "catch-all" provision that was not tailored to Fintech's actual known risks with respect to its rapid growth.  While noting a multitude of issues that "may" occur in the future, the Prospectus completely failed to account for expenses Fintech had already incurred,[1] which would cause the Company's operating costs and expenses and net loss attributable to the Company to skyrocket ***by the first fiscal quarter of the same year*** the Company conducted the IPO.

43.    The Prospectus further downplayed the risk of increased costs attributed to increased growth by representing that Fintech would use the proceeds from the IPO (which, as discussed above, totaled $104 million) to invest back in the Company's business and operations, stating, in  relevant part:

---

[1] As already discussed, Fintech conducted the IPO at the end of March 2019, and therefore was contemporaneously aware of expenses the Company had or was already incurring as reported in the 1Q19 Press Release, which announced the Company's unaudited financial results for the first quarter ended March 31, 2019.  As discussed below in this Complaint's "The Truth Begins to Emerge" section, heavy expenses were revealed to investors in the 1Q19 Press Release, disclosing, among other expenses, increases in expenses related to employee headcount, employee compensation and benefits, and office space and leasehold improvements, as well as rapid customer growth, expanded market data usage for its customers, and additional professional expenses as a listed company.

The primary purposes of this offering are [among others] to . . . retain talented employees by providing them with equity incentives, and obtain additional capital. We plan to use the net proceeds of this offering and the Concurrent Private Placement, as follows:

- approximately 40% for general corporate purposes, which may include investment in product and technology research and development, sales and marketing activities, technology infrastructure, capital expenditures, and other general and administrative matters;

- approximately 15% to set up entities and apply for operating licenses in multiple jurisdictions to expand our customer base and better serve them with global investment products;

- approximately 15% to satisfy the increased capital adequacy requirements pursuant to the New Zealand Stock Exchange or regulators in other jurisdictions; and

- approximately 30% for the acquisition of, or investment in, technologies, solutions or businesses that complement our business, although we have no present commitments or agreements to enter into any acquisitions or investments.

44.     Additionally, the Prospectus assured investors that "[t]he amounts and timing of any expenditures will vary depending on the amount of cash generated by our operations, and the rate of growth, if any, of our business," and that Fintech's "management will have significant flexibility in applying the net proceeds of the offering and the Concurrent Private Placement." The Prospectus also represented that "[i]f an unforeseen event occurs or business conditions change, [Defendants] may use the proceeds of this offering and the Concurrent Private Placement differently than as described in this prospectus."

45.     Also, in the section of the Prospectus's MD&A entitled "Our ability to operate in a cost-effective manner," the Prospectus assured investors that, "[d]espite . . . increases in operating cost and expenses, *the marginal costs for the business expansion have been decreasing and the growth of [the Company's] revenues has greatly outpaced the increase in operating cost and expenses*" (emphasis added), thereby assuring investors that the Company

could absorb costs and expenses associated with its expanding business. Specifically, this discussion in the Prospectus read, in relevant part:

> Our ability to control costs and expenses relating to our operations affects our profitability. With the expansion of our business, we expect our operating cost and expenses to continue to increase, including employee compensation and benefits, marketing and branding and other costs and expenses. The salary level in the fintech industry in and outside China has generally increased in recent years, and we offer competitive wages and other benefits to recruit and retain quality professionals. Employee compensation and benefits increased from $8.4 million in 2016 to $12.0 million in 2017, and further increased to $55.7 million in 2018. In addition, we utilize various marketing tools, including branding on online channels, collaborating with business partners, hosting branding events and circulating branding materials, to attract new customers, retain our existing customers and increase our revenues. Our marketing and branding expenses were $3.5 million, $6.3 million and $10.5 million in 2016, 2017 and 2018, respectively, accounting for 63.4%, 37.1% and 31.4%, respectively, of our total revenues for the same periods. ***Despite the increases in operating cost and expenses, the marginal costs for the business expansion have been decreasing and the growth of our revenues has greatly outpaced the increase in operating cost and expenses.***

(Emphasis added.)

46.     Additionally, the Prospectus assured investors that Fintech was "an 'emerging growth company' under applicable U.S. federal securities laws" and, thus, was "eligible for reduced public company reporting requirements," which would presumably reduce its costs and expenses related to those requirements. Notwithstanding the foregoing, the Prospectus's "Risk Factors" section stated the following with respect to Fintech's increased costs as a result of becoming a public company:

> ***We will incur increased costs as a result of being a public company, particularly after we cease to qualify as an "emerging growth company."***
>
> Upon completion of this offering, we will become a public company and expect to incur significant legal, accounting and other expenses that we did not incur as a private company. The Sarbanes-Oxley Act, as well as rules subsequently implemented by the SEC and Nasdaq, imposes various requirements on the corporate governance practices of public companies. We expect these rules and regulations to increase our legal and financial compliance costs and to make some

corporate activities more time-consuming and costly. After we are no longer an "emerging growth company," we expect to incur significant expenses and devote substantial management effort toward ensuring compliance with the requirements of Section 404 of the Sarbanes-Oxley Act and the other rules and regulations of the SEC. For example, as a result of becoming a public company, we will need to increase the number of independent directors and adopt policies regarding internal controls and disclosure controls and procedures. We also expect that operating as a public company will make it more difficult and more expensive for us to obtain director and officer liability insurances, and we may be required to accept reduced policy limits and coverages or incur substantially higher costs to obtain the same or similar coverage. In addition, we will incur additional costs associated with our public company reporting requirements. It may also be more difficult for us to find qualified persons to serve on our board of directors or as executive officers. We are currently evaluating and monitoring developments with respect to these rules and regulations, and we cannot predict or estimate with any degree of certainty the amount of additional costs we may incur or the timing of such costs.

Plainly, this was yet another risk warning that constituted another generic "catch-all" provision that was not tailored to Fintech's actual known risks related to becoming a public company. This is especially true in light of the fact that the Prospectus attributed most of this risk to when Fintech eventually loses its "emerging growth company" status—a status which existed at the time the Prospectus was filed on March 20, 2019, and presumably still existed by the end of the Class Period.[2]

47.     The statements referenced in ¶¶ 32-46 were materially false and misleading because the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading and were not prepared in accordance with the rules and regulations governing

---

[2] According to the Prospectus:

> [Fintech] will remain an emerging growth company until the earliest of (a) the last day of the fiscal year during which we have total annual gross revenues of at least US$1.07 billion; (b) the last day of our fiscal year following the fifth anniversary of the completion of this offering; (c) the date on which we have, during the preceding three-year period, issued more than US$1.0 billion in non-convertible debt; or (d) the date on which we are deemed to be a "large accelerated filer" under the Securities Exchange Act of 1934, as amended, or the Exchange Act, which would occur if the market value of our ADSs that are held by non-affiliates exceeded US$700 million as of the last business day of our most recently completed second fiscal quarter.

their preparation.  Specifically, the Offering Documents made false and/or misleading statements and/or failed to disclose that: (i) before and/or at the time of the IPO, Fintech was experiencing a material decrease in commissions because of a negative trend related to risk-averse investors in the market; (ii) Fintech was unable to absorb costs associated with the rapid growth of its business and its status as a publicly listed company on a U.S. exchange; (iii) all of the foregoing had led to Fintech significantly increasing operating costs and expenses and net loss attributable to the Company; and (iv) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

### Materially False and Misleading Statements Issued During the Class Period

48.     The Class Period begins on March 20, 2019, when Fintech securities began publicly trading on the NASDAQ pursuant to the false or misleading statements or omissions contained in the Offering Documents.  Following the IPO, and prior to issuing the 1Q19 Press Release, Fintech filed a total of one Report of Foreign Private Issuer on Form 6-K with the SEC, which was filed on April 16, 2019, and included a press release from the Company, which was appended as an exhibit (the "April 2019 Press Release").  This press release, far from correcting inaccuracies in the Offering Documents, rather served to reinforce confidence in Fintech's financial reporting by announcing the appointment of Katherine Wei Wu ("K. Wu") as Fintech's Global Chief Compliance Officer, a new position in the Company.  This new appointment signaled to investors that Fintech was committed to providing accurate compliance measures now that Fintech was not only a publicly-traded company, but also subject to both U.S. and Chinse regulations and financial reporting requirements.  Specifically, the April 2019 Press Release stated, in relevant part:

Fintech . . . today announced the appointment of Katherine Wei Wu as its Global Chief Compliance Officer, a new position in the Company. Ms. Wu will oversee the group's corporate compliance function.

Ms. Wu has 20 years' experience in compliance including various compliance management positions in a number of leading international financial institutions such as Mitsubishi UFJ Securities (USA), RBS Securities Inc, Barclays Capital Inc, etc. Ms. Wu is an expert of financial market laws and regulations in the U.S., Europe and Hong Kong. She holds a Juris Doctor (JD) degree from Fordham University School of Law and a Bachelor of Arts degree in economics from Mount Holyoke College.

49.     The April 2019 Press Release also quoted Defendant T. Wu, who assured investors that K. Wu's "background as a senior compliance executive comes with a stellar reputation," and that Defendants were "confident that with her extensive industry experience, [K. Wu] will help us uphold the highest professional standards and propel our company to the next level of growth."

50.     In addition to the materially false and misleading statements made in the Offering Documents, the Exchange Act Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies in the April 2019 Press Release. Specifically, the Exchange Act Defendants made false and/or misleading statements and/or failed to disclose that:   (i) Fintech was experiencing a material decrease in commissions because of a negative trend related to risk-averse investors in the market; (ii) Fintech was unable to absorb costs associated with the rapid growth of its business and its status as a publicly listed company on a U.S. exchange; (iii) Fintech was incurring significant additional expenses related to, *inter alia*, employee headcount and employee compensation and benefits; (iv) all of the foregoing had led to Fintech grossly increasing operating costs and expenses; and (v) as a result, the Company's Class Period

statements were materially false and/or misleading and failed to state information required to be stated therein.

## The Truth Begins to Emerge

51.      On May 17, 2019, during pre-market hours, Fintech issued a press release announcing its unaudited first quarter 2019 financial results—the Company's first quarterly earnings announcement following the IPO.  In that press release, Fintech disclosed a 4.1% decrease in commissions, noting that "[i]nvestors were relatively risk averse at beginning of this year which leads to moderated trading activities and a slight decrease in trading commission." The 1Q19 Press Release also disclosed, among other issues, that Fintech's operating costs and expenses and net loss attributable to the Company had begun to skyrocket as a result of increases in expenses related to employee headcount, employee compensation and benefits, and office space and leasehold improvements, as well as rapid customer growth, expanded market data usage for its customers, and additional professional expenses as a listed company.

52.      Specifically, with respect to Fintech's drastically increasing operating costs and expenses and net loss attributable to the Company, the 1Q19 Press Release stated, in relevant part:

*OPERATING COSTS AND EXPENSES*

Total operating costs and expenses for the first quarter of 2019 increased by 36.4% to $14.0 million from $10.3 million in the first quarter of 2018, primarily attributable to the increase in employee compensation and benefits.

Employee compensation and benefits increased by 60.8% from $4.9 million in the first quarter of 2018 to $7.8 million in the first quarter of 2019. This increase was primarily because the number of employees has nearly doubled, a general increase in the compensation package offered to employees and a significant increase of share-based compensation expense. [. . . .]

Occupancy, depreciation and amortization expenses increased by 14.5% from $0.5 million in the first quarter of 2018 to $0.6 million in the first quarter of 2019, due to an increase in office space and relevant leasehold improvements.

Communication and market data expenses increased by 87.4% from $0.6 million in the first quarter of 2018 to $1.2 million in the first quarter of 2019. This increase was caused by rapid customer growth and expanded market data usage for our customers.

\* \* \*

General and administrative expenses increased by 39.2% from $1.6 million in the first quarter of 2018 to $2.2 million in the first quarter of 2019. This increase was primarily due to additional professional expenses as a listed company, an increase in office expenses as well as human resource management expenses caused by the significant increase in headcount.

*NET LOSS ATTRIBUTABLE TO UP FINTECH HOLDING LIMITED*

Net loss attributable to UP Fintech Holding Limited in the first quarter of 2019 was $2.9 million, as compared to a net loss of $2.0 million in the first quarter of 2018. Net loss per diluted ADS[] in the first quarter of 2019 was $0.06, as compared to net loss per diluted ADS of $0.07 in the first quarter of 2018.

Non-GAAP net loss attributable to UP Fintech Holding Limited in the first quarter of 2019, which excluded share-based compensation, was $2.0 million, as compared to non-GAAP net loss attributable to UP Fintech Holding Limited $1.7 million in the first quarter of 2018. Non-GAAP net loss per basic and diluted ADS in the first quarter of 2019 was $0.04, as compared to non-GAAP net loss per basic and diluted ADS $0.06 in the first quarter of 2018.

53.     On this news, Fintech's ADS price fell $1.21 per share, or 17.34%, to close at $5.77 per share on May 17, 2019.

54.     As of the time this complaint was filed, the price of Fintech ADSs continues to trade below the IPO price, damaging investors.

55.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Fintech' securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired: (a) Fintech ADSs in the IPO or purchased Fintech ADSs thereafter in the stock market pursuant and/or traceable to the Company's Offering Documents issued in connection with the IPO; or (b) Fintech securities during the Class Period; and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

57.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Fintech securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Fintech or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

58.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

59.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

60.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Offering Documents for the IPO, or during the Class Period, misrepresented material facts about the business, operations and management of Fintech;

- whether the Securities Act Individual Defendants negligently prepared the Offering Documents for the IPO and, as a result, the Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation;

- whether the Exchange Act Individual Defendants caused Fintech to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Fintech securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

61.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

62.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Fintech  securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Fintech securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

63.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

64.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 11 of the Securities Act Against All Defendants)

65.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

66.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendants.

67.     The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

68.     Fintech is the registrant for the IPO.  Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

69.     As issuer of the shares, Fintech is strictly liable to Plaintiff and the Class for the misstatements and omissions in the Offering Documents.

70.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

71.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

72.     Plaintiff acquired Fintech shares pursuant and/or traceable to the Offering Documents for the IPO.

73.     Plaintiff and the Class have sustained damages.  The value of Fintech ADSs has declined substantially subsequent to and because of Defendants' violations.

## COUNT II

**(Violations of Section 15 of the Securities Act Against the Securities Act Individual Defendants)**

74.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

75.     This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

76.     The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Fintech within the meaning of Section 15 of the Securities Act.   The Securities Act Individual Defendants had the power and influence and exercised the same to cause Fintech to engage in the acts described herein.

77.     The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

78.     By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants)**

79.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

80.     This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

81.     During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Fintech securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Fintech securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

82.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Fintech securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Fintech's finances and business prospects.

83.     By virtue of their positions at Fintech, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants.  Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth.  In addition, each of the Exchange

Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

84.     Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control.  As the senior managers and/or directors of Fintech, the Exchange Act Individual Defendants had knowledge of the details of Fintech's internal affairs.

85.     The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Fintech.  As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Fintech's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Fintech securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Fintech's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Fintech securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

86.     During the Class Period, Fintech securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or

caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Fintech securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Fintech securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Fintech securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

87.     By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

88.     As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT IV

### (Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)

89.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

90.     During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Fintech, and conducted and participated, directly and

indirectly, in the conduct of Fintech's business affairs.  Because of their senior positions, they knew the adverse non-public information about Fintech's misstatement of income and expenses and false financial statements.

91.     As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Fintech's financial condition and results of operations, and to correct promptly any public statements issued by Fintech which had become materially false or misleading.

92.     Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Fintech disseminated in the marketplace during the Class Period concerning Fintech's results of operations.  Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Fintech to engage in the wrongful acts complained of herein.  The Exchange Act Individual Defendants therefore, were "controlling persons" of Fintech within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Fintech securities.

93.     Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Fintech.  By reason of their senior management positions and/or being directors of Fintech, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Fintech to engage in the unlawful acts and conduct complained of herein.  Each of the Exchange Act Individual Defendants exercised control over the general operations of Fintech and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

94.     By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Fintech.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  November 6, 2019                     Respectfully submitted,

                                            POMERANTZ LLP

                                            */s/ Jeremy A. Lieberman*
                                            Jeremy A. Lieberman
                                            J. Alexander Hood II
                                            600 Third Avenue, 20th Floor
                                            New York, New York 10016
                                            Telephone: (212) 661-1100
                                            Facsimile: (212) 661-8665
                                            Email: jalieberman@pomlaw.com
                                            Email: ahood@pomlaw.com

                                            POMERANTZ LLP
                                            Patrick V. Dahlstrom
                                            10 South La Salle Street, Suite 3505

Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.     I, _Vicki Rongey Willard_, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.     I have reviewed a Complaint against UP Fintech Holding Limited ("UP Fintech" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.     I did not purchase or acquire UP Fintech securities at the direction of plaintiffs counsel, or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.     I am willing to serve as a representative party on behalf of a class of investors who purchased or acquired UP Fintech securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.     To the best of my current knowledge, the attached sheet lists all of my transactions in UP Fintech securities during the Class Period as specified in the Complaint.

6.     During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.     I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro-rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.

Executed ___10/21/2019___
(Date)

_Vicki Rongey Willard_
(Signature)

_Vicki  Rongey  Willard_
(Type or Print Name)

**UP Fintech Holding Limited  (TIGR)**                                              **Willard, Vicki Rongey**

### List of Purchases and Sales

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|------|------------------|-----------------------|----------------------|
| 4/22/2019 | Purchase | 600 | $15.9900 |