**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
Laurence M. Rosen
Jing Chen
275 Madison Ave, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
　　　lrosen@rosenlegal.com
　　　jchen@rosenlegal.com

*Lead Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VICKI RONGEY WILLARD, Individually and on Behalf of All Others Similarly Situated, | Case No: 1:19-cv-10326-JMF |
| Plaintiff, | |
| v. | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| UP FINTECH HOLDING LIMITED, TIANHUA WU, JOHN FEI ZENG, YONGGANG LIU, LEI FANG, DAVID ERIC FRIEDLAND, VINCENT CHUN HUNG CHEUNG, BINSEN TANG, XIN FAN, JIAN LIU, XIAN WANG, CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK SECURITIES INC., AMTD GLOBAL MARKETS LIMITED, CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, and TOP CAPITAL PARTNERS LIMITED. | CLASS ACTION<br><br>JURY TRIAL DEMANDED |
| Defendants. | |

1

Lead Plaintiff Jian Ren and named plaintiff Xiuhu Sun ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding UP Fintech Holding Limited ("UP Fintech" or the "Company"), interviews with former employees, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a securities class action on behalf of a class (the "Class") consisting of all persons and entities other than Defendants that purchased or otherwise acquired UP Fintech American Depository Shares ("ADSs") pursuant and/or traceable to the Company's initial public offering conducted on or about March 20, 2019 (the "IPO" or "Offering").[1]  Plaintiffs bring the claims on behalf of the Class under  Sections 11 and 15 of the Securities Act.

2.      UP Fintech is a China-based online brokerage firm incorporated under the laws of the Cayman Islands. It is headquartered in Beijing, China. UP Fintech operates one of the most-

---

[1] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of UP Fintech at all relevant times; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

utilized Chinese-language online securities brokerage platforms – the Tiger Trade App and related website, which allows Chinese-speaking investors to trade securities across multiple markets with multiple currencies. Its services include trade order placement and execution, margin financing, account management, investor education, community discussion and customer support.

3.      UP Fintech describes itself as the largest online broker focusing on global Chinese investors in terms of U.S. securities trading volume, with a market share of approximately 58.4% in 2017. In the first quarter of 2019, trading of U.S. equities contributed approximately 50% of UP Fintech's revenues, and trading of Hong Kong equities accounted for 20% of its revenues.

4.      UP Fintech generates revenues primarily from two sources: (i) customer commission fees for trading of securities, accounting for approximately 75% of revenues in 2018; and (ii) interest income or financing service fees relating to margin financing.

5.      The Company's revenues and profitability significantly depend on the trading volume on its platform.

6.      On March 20, 2019, UP Fintech completed its IPO. UP Fintech sold 13 million ADSs at a price of $8.00 per ADS, receiving total proceeds of $96.72 million after underwriting discounts and commissions. UP Fintech received an additional $14.508 million, after underwriting discounts and commissions, from the Underwriters' full exercise of their over-allotment option. In connection with the IPO, UP Fintech filed a registration statement and prospectus (together, the "Registration Statement") with the SEC.  In the Registration Statement, UP Fintech painted a rosy picture of the continuous and unfailing upward trend of its trading volume. The Company also touted continuous revenue growth for the eight quarters from January 1, 2017 to December 31, 2018 based on this increased trading volume and resulting commissions. It boasted that, "[d]riven by the continued increases in the number of customers making trades,

trading volume and margin financing balance, our revenues from both trading commissions and financing service fees increased substantially during these periods".

7.      Unbeknownst to investors, UP Fintech failed to disclose that since January 2019, ***three months before its IPO***, the Company had been experiencing a continuous downward trend in trading volume on its platform and a significant decline in commissions as a result. These declines would have a material unfavorable impact on UP Fintech's financial performance in the first quarter of 2019 ended March 31, 2019, 11 days after the IPO.

8.      Defendants failed to disclose this adverse trend until May 17, 2019 when the Company announced its financial results for the first quarter ended March 31, 2019.  Commission revenues were $6.4 million in the first quarter of 2019, a 9.63% decrease from $7.082 million in the previous quarter. The Company claimed the shortfall occurred because "[i]nvestors were relatively risk averse at beginning of this year which leads to moderated trading activities and a slight decrease in trading commission". Investors later learned that the trading volume for the first quarter of 2019 suffered a sharp decline from $36,895.2 million in the previous fourth quarter of 2018 to $27,862.8 million, a shocking 24% decrease.

9.      This adverse news caused a sharp decline in UP Fintech ADS price.  By the time this action was filed, UP Fintech's stock lost 49% of its value from the IPO price – devastating investors.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. § 77v).

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), and Section 22 of the Securities Act (15 U.S.C. § 77v), because certain of the acts and conduct complained of herein, such as the trading of UP Fintech ADSs on NASDAQ, occurred in this District.

13.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

**PARTIES**

14.     Lead Plaintiff Jian Ren ("Ren") purchased UP Fintech ADSs pursuant and traceable to the Registration Statement during the Class Period and was damaged thereby.  Ren's PSLRA certification was previously filed with the Court and is incorporated by reference herein. *See* Dkt. No. 11-2.

15.     Named plaintiff Xiuhu Sun ("Sun") purchased UP Fintech ADSs pursuant and traceable to the Registration Statement during the Class Period and was damaged thereby. Sun's PSLRA certification is attached as Exhibit 1.

16.     Defendant UP Fintech purports to be the largest online broker serving global Chinese investors in terms of U.S. securities trading volume. UP Fintech is incorporated under the laws of the Cayman Islands and its principal executive offices are located at18/F, Grandyvic Building, No. 1 Building, No. 16 Taiyanggong Middle Road, Chaoyang District, Beijing, 100020, People's Republic of China. UP Fintech's ADSs trade on the NASDAQ under the ticker symbol, "TIGR."

17.     Defendant Tianhua Wu ("Wu") was, at all relevant times, the Chief Executive Officer ("CEO") and a Director of UP Fintech. Prior to the IPO, Wu held 100% of UP Fintech's

Class B ordinary shares and 70.5% of UP Fintech's aggregate voting power. Immediately after the IPO, Wu held 80.5% of UP Fintech's aggregate voting power through his beneficial ownership of 16.9% of UP Fintech's Class B shares, each of which had ten votes per share. Defendant Wu participated in the road shows held in Hong Kong, New York, Boston and San Francisco to promote UP Fintech to investors in connection with its IPO.[2] Defendant Wu reviewed, signed and approved the Registration Statement.

18.     Defendant John Fei Zeng ("Zeng") was, at all relevant times, the Chief Financial Officer ("CFO") of the Company. Defendant Zeng reviewed, signed and approved the Registration Statement.

19.     Defendant Yonggang Liu ("Y. Liu") was, at all relevant times, the Vice President of Technology and a Director of the Company. Defendant Y. Liu reviewed, signed and approved the Registration Statement.

20.     Defendant Lei Fang ("Fang") was, at all relevant times, a Director of the Company. Defendant Fang reviewed, signed and approved the Registration Statement.

21.     Defendant David Eric Friedland ("Friedland") was, at all relevant times, a Director of the Company. Defendant Friedland reviewed, signed and approved the Registration Statement.

22.     Defendant Vincent Chun Hung Cheung ("Cheung") was, at all relevant times, a Director of the Company. Defendant Cheung reviewed, signed and approved the Registration Statement.

23.     Defendant Binsen Tang ("Tang") has served as a member of the Board since the March 19, 2019 effective date of the Registration Statement, as indicated in his February 22, 2019

---

[2] http://www.liecaijing.com/rwgd/641.html

consent, which was included as an exhibit to the Registration Statement. In that consent, Tang "consent[ed] to the reference of [his] name as a director of [the Company] effective immediately upon the effectiveness of the Company's registration statement on Form F-1." Additionally, Registration Statement identified Tang as a director appointee.

24.     Defendant Xin Fan ("Fan") has served as a member of the Board since the March 19, 2019 effective date of the Registration Statement, as indicated in his February 22, 2019 consent, which was included as an exhibit to the Registration Statement. In that consent, Fan "consent[ed] to the reference of [his] name as a director of [the Company] effective immediately upon the effectiveness of the Company's registration statement on Form F-1." Additionally, Registration Statement identified Fan as a director appointee.

25.     Defendant Jian Liu ("J. Liu") has served as a member of the Board since the March 19, 2019 effective date of the Registration Statement, as indicated in his February 22, 2019 consent, which was included as an exhibit to the Registration Statement. In that consent, J. Liu "consent[ed] to the reference of [his] name as a director of [the Company] effective immediately upon the effectiveness of the Company's registration statement on Form F-1." Additionally, Registration Statement identified J. Liu as a director appointee.

26.     Defendant Xian Wang ("Wang") has served as a member of the Board since the March 19, 2019 effective date of the Registration Statement, as indicated in his February 22, 2019 consent, which was included as an exhibit to the Registration Statement. In that consent, Wang "consent[ed] to the reference of [his] name as a director of [the Company] effective immediately upon the effectiveness of the Company's registration statement on Form F-1." Additionally, Registration Statement identified Wang as a director appointee.

27.     Defendants Wu, Zeng, Y. Liu, Fang, Friedland, Cheung, Tang, Fan, J. Liu, and Wang are collectively referred to hereinafter as the "Individual Defendants."

28.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter for the IPO. In the IPO, Citigroup purchased and later resold 4,615,000 of the Company's ADSs. Citigroup has offices located at 388 Greenwich Street, New York, NY 10013.

29.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") served as an underwriter for the IPO. In the IPO, Deutsche Bank purchased and later resold 5,265,000 of the Company's ADSs. Deutsche Bank has offices located at 60 Wall Street, 2nd Floor, New York, New York 10005.

30.     Defendant AMTD Global Markets Limited ("AMTD") served as an underwriter for the IPO. In the IPO, AMTD purchased and later resold, 391,000 of the Company's ADSs. AMTD has offices located at 23/F—25/F Nexxus Building, 41 Connaught Road Central, Hong Kong

31.     Defendant China Merchants Securities (HK) Co., Limited ("China Merchants") served as an underwriter for the IPO. In the IPO, China Merchants purchased and later resold 910,000 of the Company's ADSs. China Merchants has offices located at 48/F, One Exchange Square, 8 Connaught Place Central, Hong Kong.

32.     Defendant Top Capital Partners Limited ("Top Capital") served as an underwriter for the IPO. In the IPO, Top Capital purchased and resold 1,638,000 of the Company's ADSs. Top Capital has offices located at Level 4, 142 Broadway, Newmarket, Auckland, New Zealand 1023.

33.     Defendants Citigroup, Deutsche Bank, AMTD, China Merchants, and Top Capital are collectively referred to hereinafter as the "Underwriters."

34.     The Underwriter Defendants had the option, exercisable for 30 days from the date of the Prospectus, to purchase up to additional 1,950,000 ADSs from UP Fintech at the IPO price, less underwriting discounts and commissions of $0.56 per ADS. On March 21, 2019, Davis Polk and Wardwell LLP, counsel to the Underwriters, issued a press release stating that the Underwriters had "fully exercised the over-allotment option granted by Tiger Trade and purchased an additional 1,950,000 ADSs, for additional proceeds of $15.6 million [to UP Fintech]."

35.     Pursuant to the Securities Act, the Underwriters are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriters are investment banking firms that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared $8.372 million in fees collectively after their full exercise of over-allotment option. The Underwriters participated in drafting the Registration Statement, caused the Registration Statement to be filed with the SEC and to be declared effective in connection with the IPO, and participated in disseminating the Registration Statement and selling UP Fintech's registered, including to Plaintiffs and the other members of the Class.

(b)     The Underwriters failed to perform adequate due diligence in connection with their role as underwriters for the IPO and were negligent in failing to ensure that the Registration Statement was prepared properly and accurately, free of misstatements and omissions.

(c)     In addition, the Underwriters met with potential investors and presented highly favorable but incorrect and misleading information about the Company, its business, products, plans, and financial prospects, and omitted to disclose material information

required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

(d)     Representatives of the Underwriters also assisted the Company and the Individual Defendants in planning the IPO. They also purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their due diligence, the Underwriters had access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

(e)     In addition to having access to internal corporate documents, the Underwriters and/or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives to determine: (1) the strategy to best accomplish the Offering; (2) the terms of the Offering, including the price at which the Company's ADSs would be sold; (3) the language to be used in the Registration Statement; (4) what disclosures about the Company would be made in the Registration Statement; and (5) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those contacts and communications between the Underwriters' representatives and the Company's management and top executives, the Underwriters were, at a minimum, negligent in allowing dissemination of the material misstatements and omissions contained in the Registration Statement as detailed herein.

36.     The Underwriters' negligence and failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein and, pursuant to the Securities Act, they are liable for the materially false and misleading statements in the Registration Statement.

37.     Defendants UP Fintech, the Individual Defendants, and the Underwriters are collectively referred to herein as "Defendants."

## **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE REGISTRATION STATEMENT**

**UP Fintech's Business**

38.     UP Fintech was formed in 2014 at a time when the global Chinese population had grown increasingly wealthier. These wealthy Chinese – with their growing amount of investable assets – provided a strong demand for UP Fintech's securities trading platform and related brokerage services. Targeting this niche market, UP Fintech commenced its technology research and development in China in June 2014 through Ningxia Xiangshang Rongke Technology Development Co., LTD. To facilitate investment on its brokerage platform outside China, the Company incorporated UP Fintech in the Cayman Islands as an offshore holding company in January 2018.

39.     On UP Fintech's platform, Chinese speakers can trade equities and other financial instruments on multiple exchanges around the world via multiple currencies.

40.     By providing online Chinese-language brokerage services to Chinese-speaking investors world-wide through its Tiger Trade App and website, UP Fintech has quickly become one of the most utilized and well-recognized online trading platforms for Chinese investors around the globe. Within three years since the launch of its Tiger Trade App, UP Fintech achieved RMB1.0 trillion $140 billion) in cumulative trading volume, which made it the fastest growing of all online brokers focused on Chinese investors. UP Fintech's customer accounts grew from 18,697 as of March 31, 2016 to 502,352 as of December 31, 2018, representing a compounded quarterly growth rate of 34.9%.

41.     The U.S. stock market, being one of the most mature stock markets in the world with the largest market capitalization and the highest liquidity, has become an increasingly popular option among global Chinese investors. By catering to Chinese investors, UP Fintech became the largest online platform for trading U.S. securities by Chinese investors globally in terms of trading volume in 2017, with a market share of 58.4%.

42.     UP Fintech generates revenue primarily by charging its customers commission fees for trading of securities as well as earning interest income and financing service fees related to margin financing provided by UP Fintech or third parties to UP Fintech's customers. Commission fees have contributed to the vast majority of the Company's revenue. In 2016, 2017 and 2018, UP Fintech earned $5.5 million, $17.0 million, and $33.6 million in commissions respectively, accounting for 96.4%, 88.9% and 77.6% of UP Fintech's revenue for the respective years.

43.     UP Fintech's platform's trading volume on the U.S. and Hong Kong stock markets and related commissions are a significant driver of UP Fintech's financial performance.  In the first quarter of 2019, approximately 50% of UP Fintech's revenue was derived from trading on the U.S. stock market by its customers, and 20% of its revenue from Hong Kong stock market.

**UP Fintech's Registration Statement**

44.     On March 18, 2019, after a series of amendments, UP Fintech filed its final registration statement with the SEC on Form F-1/A. The registration statement was declared effective on March 19, 2019. Subsequently, on March 20, 2019, UP Fintech filed the final prospectus ("Prospectus") for the IPO, which forms part of the registration statement (the registration statement and Prospectus are collectively referred to herein as the "Registration Statement").

45.     In the IPO, UP Fintech sold 13 million ADSs at a price of $8.00 per share. Each ADS represents 15 shares of Class A common stock.  UP Fintech raked in $111.228 million from the IPO, net of underwriting discounts and commissions. The Registration Statement contained untrue statements of material fact and omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

*The Registration Statement Failed to Disclose That the Company's Trading Volume and Commissions Had Materially Declined Before the IPO*

46.     In the Registration Statement, UP Fintech stressed that "[the Company's] revenues depend substantially on [its]customers' trading volume".[3]  "[UP Fintech's] ability to earn commission fees, interest income or financing service fees largely depends on the number of customers on [its] trading platform and their trading volume."

47.     It repeatedly touted itself as the "[t]he platform of choice for trading U.S. securities online among global Chinese investors with the fastest growth". It attempted to assure investors of the continuous and unfailing growth in its trading volume due to "its large and highly engaged customer base":

> "We have experienced significant growth in both number of customers and trading volume due to our reliable and secure trading platform, comprehensive brokerage and value-added services and superior user experience. The total customer accounts increased from 18,697 as of March 31, 2016 to 502,352 as of December 31, 2018, representing a compounded quarterly growth rate of 34.9%. The daily average trading volume increased from US$22.7 million during the first quarter of 2016 to US$542.6 million during the fourth quarter of 2018, representing a compounded quarterly growth rate of 33.4%."

---

[3] In the Registration Statement, trading volume is defined as the total value of securities traded during a specific period of time.

"The total trading volume increased by 287.4% from US$16.3 billion in 2016 to US$63.3 billion in 2017. The number of customer accounts increased by 159.6% from 78,946 as of December 31, 2016 to 204,965 as of December 31, 2017."

"The total trading volume increased by 88.4% from US$63.3 billion in 2017 to US$119.2 billion in 2018. The number of total customer accounts significantly increased by 145.1% from 204,965 as of December 31, 2017 to 502,352 as of December 31, 2018."

48.     When describing the Company's quarterly trend, UP Fintech also boasted its continued increase of commissions and revenues quarter over quarter since the launch of the Company's trading platform:

"We have experienced continuous growth in revenues for the eight quarters from January 1, 2017 to December 31, 2018. Driven by the continued increases in the number of customers making trades, trading volume and margin financing balance, our revenues from both trading commissions and financing service fees increased substantially during these periods."

"Commissions increased by 185.3% from US$5.3 million in 2016 to US$15.1 million in 2017, primarily due to a significant increase in the total trading volume on our platform in 2017, which was primarily driven by the increase in the number of customers making trades."

"Commissions increased by 72.9% from US$15.1 million in 2017 to US$26.0 million in 2018, primarily due to a significant increase in the total trading volume on our platform which was primarily driven by the increase in the number of customers making trades."

"The significant increase in total customer accounts led to the rapid growth in our revenues, which increased by 209.5% from US$5.5 million in 2016 to US$16.9 million in 2017, and further increased by 98.0% to US$33.6 million in 2018. Furthermore, the level of customer engagement affects our commissions, interest income and financing service fees."

49.     To reassure investors that the Company's customer base and trading volume would continuously grow quarter over quarter in a consistent and predictable manner, UP Fintech disclosed the details of the quarterly performance of trading volumes from 2016 through 2018 and commissions from 2017 to 2018. The below chart summarizes the relevant information disclosed in the Registration Statement:

| Quarter Ended | Trading Volume (US$mm) | Trading Volume % Change Quarter over Quarter | Commissions (US$mm) | Commissions % Change Quarter over Quarter |
|---|---|---|---|---|
| 31-Mar-2016 | 1,363.30 | | | |
| 30-Jun-2016 | 3,495.10 | 156.4% | | |
| 30-Sep-2016 | 5,085.70 | 45.5% | | |
| 31-Dec-2016 | 6,393.90 | 25.7% | | |
| 31-Mar-2017 | 12,494.00 | 95.4% | 2.166 | |
| 30-Jun-2017 | 13,988.40 | 12.0% | 3.229 | 49.1% |
| 30-Sep-2017 | 17,125.70 | 22.4% | 4.424 | 37.0% |
| 31-Dec-2017 | 19,687.80 | 15.0% | 5.244 | 18.5% |
| 31-Mar-2018 | 28,302.60 | 43.8% | 6.625 | 26.3% |
| 30-Jun-3018 | 21,395.30 | -24.4% | 5.182 | -21.8% |
| 30-Sep-2018 | 32,628.30 | 52.5% | 7.154 | 38.1% |
| 31-Dec-2018 | 36,895.20 | 13.1% | 7.082 | -1.0% |

50.     Although UP Fintech disclosed that its revenues from commissions "slightly decreased in the second quarter of 2018 due to the slight decrease of [its] trading volume as a result of market volatility", the Registration Statement immediately downplayed such market factors and stress again the strength of the company's business performance by stating that "[t]he impact of fluctuation and changes of market conditions, however, was not apparent historically due to the rapid growth of our business historically".

51.     To further boost investors' confidence in the uninterrupted upward trend that the

Company's trading volume had been and would continue to experience, UP Fintech also stated in the Registration Statement that "[the Company has] not experienced seasonality in [its] business", , meaning the Company's financial performance would not fluctuate from quarter to quarter as a result of seasonal differences in customer demand.

52. The Registration Statement, however, omits to disclose that at the time of IPO, just eight trading days before the end of the first quarter of 2019, the Company had already learned that its trading volume and commissions for the first quarter of 2019 were sharply declining. Rather than making a full disclosure of this known trend which was reasonably likely to have a material effect on UP Fintech's financial condition and results of operations for the first quarter of 2019, UP Fintech only briefly mentioned the Company's business performance for the first month of 2019 in the Recent Development section of the Registration Statement saying that "[the Company's] performance in January 2019 was partially affected by the generally quieter investment environment during the Chinese New Year season, given the fact that the vast majority of [its] client base are Chinese investors around the world".

53. Specifically, as the Company would later disclose, its trading volume had plummeted by more than 24% during the first quarter of 2019, compared to a 13% quarter-over-quarter increase in trading volume the Company experienced in the fourth quarter of 2018 – immediately prior to the IPO.

54. UP Fintech could have provided up-to-date disclosure of its commissions and trading volume in the Registration Statement, as it is information instantaneously available to the Company.

55. Indeed, as stated in the Registration Statement, UP Fintech offers two types of

accounts on its platform – "consolidated accounts" and "fully disclosed accounts." [4] For consolidated accounts, according to the Registration Statement, "commission fees are deducted from the customer's account at the time of trade order initiation and a pre-determined portion is directed to the broker." As to fully disclosed accounts, as reported in the Registration Statement, "every time the broker executes and clears a trade, the broker collects the commissions, deducts its pre-determined portion and returns the rest of the commission fees to the Group."[5]

56.     Further, UP Fintech stated in the Registration Statement that "[w]e as well as our clearing agents, conduct ***ongoing customer due diligence and account monitoring*** as well as other internal controls procedures to comply strictly with applicable rules in relevant jurisdictions" and that "we also ***continuously monitor customer accounts*** to detect excessive concentration, large orders or positions, patterns of day trading, high frequency trading, inactive accounts, trading that has no economic purpose, trading in illiquid securities and other activities that indicate increased risk to us."

57.     In addition, the Registration Statement also indicated that the Company "regularly review[ed] a number of metrics to evaluate our business, ***measure our performance, identify trends***, formulate financial projections and make strategic decisions," including, *inter alia*, total revenues, trading volume, and daily average trading volume.

58.     Thus, as the Registration Statement confirms, UP Fintech had access to real-time information regarding trading volume and commissions before and as of the IPO, but nonetheless

---

[4] According to the Registration Statement, with consolidated accounts, UP Fintech's customers open accounts and place trades with the Company's platform. For fully disclosed accounts, UP Fintech provides a trading interface and engages Interactive Brokers LLC – a shareholder of the Company – to perform execution, clearing and settlement services.
[5] The "Group" refers to UP Fintech and its subsidiaries, consolidated variable interest entities, and other affiliates.

omitted to disclose such material declining trend for the first quarter of 2019 in Registration Statement. [6]

## **THE TRUTH IS REVEALED CAUSING PLAINTIFFS' LOSSES**

59.    On May 17, 2019, before the market opened, UP Fintech announced its unaudited financial results for the first quarter ended March 31, 2019 ("2019Q1 Press Release"), disclosing for the first time that the Company's commissions were only $6.4 million in the first quarter of 2019, a 9.63% decrease from the $7.082 million reported in the previous quarter – a sharp contrast to the rosy upward trend painted in the Registration Statement.

60.    UP Fintech admitted in the 2019Q1 Press Release that during the first quarter of 2019, the trading volume was lower, which caused a decrease in its commissions. UP Fintech stated that "[i]nvestors were relatively risk averse at beginning of this year which leads to moderated trading activities and a slight decrease in trading commission". However, UP Fintech minimized the reduction and didn't disclose the exact amount of trading volume for the first quarter of 2019 in the 2019Q1 financial results. Based on the quarterly financial results for the second quarter of 2019 in UP Fintech's Form 6-K, the trading volume for the first quarter of 2019 had declined to $27,862.8 million, a shocking 24.5% drop from the previous quarter's $36,895.2 million.

61.    The information through December 31, 2018 in the following chart is the same as in ¶49 *supra*, and is taken from the Registration Statement. The only addition is the trading volume

-------

[6] UP Fintech's commissions information also would have been available because SEC regulations require almost all broker-dealer securities transaction to be settled within two business days. On March 22, 2017, the SEC announced an amendment to Rule 15c6-1 under the Securities Exchange Act of 1934, shortening the standard settlement cycle for most broker-dealer securities transactions from three business days after the trade date to two business days after the trade date.

and commissions for the first quarter of 2019 ended on March 31, 2019. UP Fintech conducted the IPO on March 20, 2019, 11 days before the end of the first quarter of 2019. It had access to the real-time information of trading volume and commissions on its platform, as stated above. However, UP Fintech failed to disclose the known downward trend that the Company was experiencing at the time of the IPO in the Registration Statement. UP Fintech failed to alert investors about inconsistencies between the decline in the trading volume and commissions and the upward trend that UP Fintech depicted in the Registration Statement.

| Quarter Ended | Trading Volume (US$mm) | Trading Volume % Change Quarter over Quarter | Commissions (US$mm) | Commissions % Change Quarter over Quarter |
|---|---|---|---|---|
| 31-Mar-2016 | 1,363.30 | | | |
| 30-Jun-2016 | 3,495.10 | 156.4% | | |
| 30-Sep-2016 | 5,085.70 | 45.5% | | |
| 31-Dec-2016 | 6,393.90 | 25.7% | | |
| 31-Mar-2017 | 12,494.00 | 95.4% | 2.166 | |
| 30-Jun-2017 | 13,988.40 | 12.0% | 3.229 | 49.1% |
| 30-Sep-2017 | 17,125.70 | 22.4% | 4.424 | 37.0% |
| 31-Dec-2017 | 19,687.80 | 15.0% | 5.244 | 18.5% |
| 31-Mar-2018 | 28,302.60 | 43.8% | 6.625 | 26.3% |
| 30-Jun-3018 | 21,395.30 | -24.4% | 5.182 | -21.8% |
| 30-Sep-2018 | 32,628.30 | 52.5% | 7.154 | 38.1% |
| 31-Dec-2018 | 36,895.20 | 13.1% | 7.082 | -1.0% |
| 31-Mar-2019 | 27,862.80 | -24.5% | 6.400 | -9.6% |

62.     During the Company's earnings call held on the same day as the 2019Q1 Press Release, Defendant Zeng attempted to blame the decline in commissions on market-wide conditions, but his response was called into question by an analyst from Citibank. That exchange went, in pertinent part, as follows:

**Daphne Poon – Citibank - Analyst**

And lastly, the first [sic] question is regarding the outlook on your commission income or maybe your trading volume over the rest of the year. So we see Q1, it's a little bit slow. As you explained, it's due to the weaker current sentiment, but actually in Q1 we see the US and Hong Kong market both performed quite well.

**John Zeng – UP Fintech Holding Limited - CFO**

. . . For your third question on the outlook of the transaction volume, so you are right, the transaction value if you just look at the market -- January, especially the second half of January, the market in Hong Kong and the US and US do pick up. For our transaction volumes it's a little bit slower to pick up. I think there is a lagging effect plus there is a Chinese holiday in February, so that is why our commission revenue was a little bit decreased or slow versus the last quarter.

63.     Although Defendant Zeng partly attempted to pin the major decline in commission revenue in the first quarter of 2019 on the fact that the Chinese New Year took place, in the first quarter of 2017 – in which the Chinese New Year also took place, as it does every year – UP Fintech experienced significant quarter-over-quarter increases in trading volume (+95.4%) compared to the previous fourth quarter of 2016.  Again, in the first quarter of 2018 – in which the Chinese New Year took place – UP Fintech experienced another significant quarter-over-quarter increase in both commissions (+26.3%) and trading volume (+43.8%) as compared to the fourth quarter of 2017.

64.     Regardless of Defendants' shifting explanations as to why UP Fintech's commissions had declined, nothing in the Registration Statement alerted investors that the Company's primary source of revenue had already fallen in the substantially complete first quarter as of the IPO.

*65.*     Moreover, defendant Zeng directly acknowledged the Company's ease of access to its then-current commissions and trading volume on the earnings call. Specifically, in response to an analyst's question about the potential impact of the trade war between the U.S. and China impacting the Company in the second quarter and the rest of the year, Zeng responded by stating

that "looking forward to trade wars, so far we think, that just by looking at the management accounts or some numbers, we think it's going okay. The transaction volume and also in terms of trading commissions . . . But so far I think we are on the right track."

66.     The trading price of the UP Fintech ADSs fell from $6.98 per share on May 16, 2019, to close at $5.77 per share on May 17, 2019 – a decline of more than 17%. This constituted a decline of 28% from the $8 IPO price. By the time this action was filed on November 6, 2019, UP Fintech's stock lost 49% of its value from the IPO price – devastating investors.

**SEC Regulation S-K Required UP Fintech to Disclose Known Trends and Uncertainties in The Registration Statement.**

*Item 303 demands disclosure*

67.     SEC Regulation S-K (27 CFR 229.10) provides that registration statements such as the one filed by UP Fintech on Form F-1 comply with the other requirements of Regulation S-K "to the extent provided in the forms to be used for registration under the [Securities] Act." 17 C.F.R. 229.10. Form F-1 requires registrants to furnish the information required by Part I of Form 20-F.

68.     Part I, Item 5(d) Form 20-F, in turn, requires registrants to:

[D]iscuss, for at least the current financial year, any known trends, uncertainties, demands, commitments or events that are reasonably likely to have a material effect on the company's net sales or revenues, income from continuing operations, profitability, liquidity or capital resources, or that would cause reported financial information not necessarily to be indicative of future operating results or financial condition.

69.     Item 5(d) of Form 20-F "call[s] for the same disclosure as Item 303 of Regulation S-K". *In Re Comm'n Guidance Regarding MD&A of Fin. Condition & Results of Operation*, Release No. 8350 (Dec. 19, 2003) (the "2003 Guidance") available at 2003 WL 22996757, *1 n.1.

70.     Regulation S-K provides that the discussion of known trends, uncertainties, and events should appear in the section of an issuer's registration statement reporting "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A").

71.     In a 1989 Interpretive Release, the SEC described the purposes of MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

> *Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.[7]

72.     Item 5(d) requires disclosure based on "currently known trends, events, and uncertainties that are reasonably expected to have material effects." *Id.* at *4.

73.     Item 303 demands disclosure of known trends unless management determines that a material effect on financial condition or results of operations is not likely to appear. The 1989 Interpretive Release provides the following test to determine if disclosure under Item 303(a) or Part I, Item 5 of Form 20-F is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required. (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management

---

[7] The 1989 Interpretive Guidance applies to Item 5(d) of Form 20-F. Form 20-F, Instruction 5 (stating that issuers should refer to the 1989 Interpretive Guidance); 2003 Guidance, at 2003 WL 22996757, *1 n.1 (same).

determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

*1989 Interpretive Release, 1989 WL 1092885, at \*6*

74.     Issuers must disclose regulatory actual or contemplated regulatory action, as shown by an example provided by the 1989 Interpretive Release:

Facts: A registrant has been correctly designated a PRP by the EPA with respect to cleanup of hazardous waste at three sites. No statutory defenses are available. The registrant is in the process of preliminary investigations of the sites to determine the nature of its potential liability and the amount of remedial costs necessary to clean up the sites. Other PRPs also have been designated, but the ability to obtain contribution is unclear, as is the extent of insurance coverage, if any. Management is unable to determine that a material effect on future financial condition or results of operations is not reasonably likely to occur.

Based upon the facts of this hypothetical case, MD&A disclosure of the effects of the PRP status, quantified to the extent reasonably practicable, would be required. [Footnote omitted]. For MD&A purposes, aggregate potential cleanup costs must be considered in light of the joint and several liability to which a PRP is subject. Facts regarding whether insurance coverage may be contested, and whether and to what extent potential sources of contribution or indemnification constitute reliable sources of recovery may be factored into the determination of whether a material future effect is not reasonably likely to occur.

*Id.* at \*6.

75.     Issuers must disclose both (a) known trends and uncertainties and (b) any potential material impact of known trends and uncertainties on their own operations even if the trends are a matter of public knowledge. 1989 Interpretive Release, 1989 WL 1092885 at \*6. *See also Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 721 (2d Cir. 2011).

76.     Accordingly, UP Fintech had an affirmative obligation to disclose facts in the Registration Statement required by Item 303 of Regulation S-K in the Registration Statement, including information regarding known trends, uncertainties or events.

<u>Item 503 demands disclosure</u>

77.     Item 503 is intended to "provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." *Sec. Offering Reform,* S.E.C. Release

No. 8501, 2004 WL 2610458, at *6 (Nov. 3, 2004).  Accordingly, Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. §229.503(c).  The discussion of risk factors must be specific to the particular company and its operations and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell investors how risks may affect their investment. *Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers,* 1998 WL 425894, at *14 (July 29, 1998).

78.     In violation of Item 503, the Registration Statement omitted to disclose that the declining trading volume and commissions, as discussed above, could have material adverse effects on UP Fintech's financial performance.

## THE UNDERWRITERS' VIOLATIONS OF THE SECURITIES ACT

79.     Section 11 of the Securities Act provides that underwriters are liable for any false statements of material facts or the omission to state a material fact in a registration statement.  15 U.S.C. § 77k(a)(5).

80.     The Underwriters offered or sold UP Fintech ADSs. The Prospectus indicated that UP Fintech engaged Citigroup, Deutsche Bank, AMTD, China Merchants, and Top Capital to underwrite and manage the IPO.

81.     Section 11 of the Securities Act provides that underwriters are liable for damages resulting from materially false misstatements contained in the Registration Statement.

82.     It is commonly understood in the underwriting industry that the underwriter "prepare[s] disclosure and conduct[s] marketing" of the prospectus and registration statement. Goldman Sachs, *Report of the Business Standards Committee, January 2011*, at 13, *available at*

<http://www.goldmansachs.com/who-we-are/business-standards/committee-report/business-standards-committee-report-pdf.pdf> (last visited October 25, 2019). Underwriters "assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id*.

83.     As gatekeepers, underwriters must *independently* verify all material facts in offering documents, such as the Registration Statement. To conduct a proper due diligence, underwriters must take an *adverse* role to the issuer during the diligence process. In other words, underwriters are required to play "devil's advocate" to the issuer to ensure that the offering documents accurately reflect the financial and business condition of the issuer.

84.     It is well understood in the investment banking industry and in the financial community generally, and confirmed in SEC literature and jurisprudence, that an investment bank selling securities to investors has a duty to perform a reasonable due diligence investigation of the company for which it is selling securities to investors.

85.     It is also well understood within the investment banking and financial communities that an investment bank's role and duty as an underwriter is to ensure that all material information is included in the offering documents (in this case the Registration Statement for UP Fintech's IPO) and that no material information is omitted that is needed to make the information provided therein not misleading.

86.     In the area of selling securities to investors and performing a reasonable due diligence investigation, investment banks are often referred to as "gatekeepers." Underwriters control both what information is in offering documents and also the dissemination of that information to potential investors. There is much literature that supports the premise of investment banks being gatekeepers. For example, the investment bank Goldman Sachs published the *Report*

*of the Business Standards Committee*, dated January 2011, describing its role as an underwriter by stating: it "[p]repare[s] [the] disclosure" in a prospectus, and will "[c]onduct appropriate and thorough due diligence on [the] issuer" and will "[e]ndeavor to ensure there is no material misstatement/omission in [the] disclosure." *Id*. Goldman Sachs also acknowledges its role as a gatekeeper stating: "An underwriter of financial instruments works with the issuer in connection with offering financial instruments to investors. In this context, the securities laws effectively impose a gatekeeper role on Goldman Sachs: as an underwriter, the firm is expected to assist the issuer in providing an offering document to investors that discloses all material information relevant to the offering." *Id*. at 14.

87.     In recognizing the importance of a reasonable due diligence investigation, the SEC has observed that, in enacting Section 11 of the Securities Act, "Congress recognized that underwriters occupied a *unique position* that enabled them to discover and compel disclosure of essential facts about the offering. Congress believed that subjecting underwriters to the liability provisions [of the Act] would provide the necessary incentive to ensure their *careful investigation* of the offering." (Emphasis added). Regulation of Securities Offerings, SEC Release No. 7606A, 63 Fed. Reg. 67174, 67230, Dec. 4, 1998. In other words, underwriters, such as the Underwriters here, have ultimate control over the contents and dissemination of the disclosure document, *i.e.* the Registration Statement. Underwriters must make full disclosure or not underwrite the offering if full disclosure is not provided. The Underwriters had this role and duty in underwriting UP Fintech's ADSs. Indeed, without an investment bank having performed a reasonable due diligence investigation of an issuer, it would not be possible to make full disclosure in the Prospectus.

88.     Because investment banks have ultimate control over the contents and dissemination of the disclosure document, *i.e.*, the Prospectus, an investment bank must make full

disclosure, or not sponsor the financing if full disclosure is not to be provided.  If other participants in a financing refuse to provide or disclose important information, an investment bank should withdraw from the financing.  When an investment bank allows its name to appear on the cover of a prospectus, it is communicating to potential investors that it is in fact satisfied, based on its reasonable due diligence investigation, that the prospectus being used for the stock offering is accurate and not misleading. This is a fundamental and basic expectation of investors – and investors rely on this expectation when purchasing securities.

89.     The due diligence process by an investment bank is generally rigorous and thorough, with professional skepticism to be applied. The due diligence process is not just a "ho-hum" exercise of accepting a company's/management's views or its auditor's opinion at face value. The due diligence process is just the opposite. The investment bank should act as a "devil's advocate" by digging and probing within a company. The investment bank should cross examine participants by asking many questions; should obtain and analyze various information concerning all aspects of the issuer's business; and should follow-up with more work as appropriate depending upon what is learned and what "red flags" surface, if any.

90.     An issuer's financial health, including the issuer's total assets and whether the issuer was embroiled in lawsuits, are all material facts requiring inquiry and independent verification by underwriters. With respect to the importance of performing a reasonable due diligence investigation in regard to an issuer's financial condition, which investigation would clearly include such things as the appropriate checking of litigation involving the issuer, it is accepted practice within the investment banking community that the statements by the issuer about its own financial condition are not accepted by the investment bank at face value without adequately questioning the company's auditors and its accounting and financial officers, as well

as independently verifying information with third parties.

91.     Any reasonable due diligence investigation by an investment bank should include extensive and thorough interviews with both a company's chief financial officer and its auditor – separately, and not together, or in addition to being together. All areas of concern that an auditor may have about the company and/or its accounting decisions should be discussed, with follow-up questioning if deemed necessary.

92.     The Underwriters did not conduct anything close to a reasonable due diligence investigation in regard to UP Fintech's IPO. In particular, the Underwriters, had they performed proper due diligence, would have discovered that immediately before the IPO, UP Fintech's trading volume and commissions were experiencing a sharp decline for the first quarter of 2019. A reasonable due diligence would have uncovered these facts.

93.     As a result of the Underwriters not performing a reasonable due diligence investigation and/or not performing any due diligence investigation, the Prospectus misrepresented material information and omitted material information, rendering it misleading.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

94.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all persons or entities that purchased or otherwise acquired UP Fintech American Depository Shares ("ADSs") pursuant and/or traceable to the Company's IPO conducted on or about March 20, 2019.[8]

---

[8] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of UP Fintech at all relevant times; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

95.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by UP Fintech or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

96.     Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

97.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

98.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the federal securities laws;

b)      whether the Registration Statement omitted and/or misrepresented material facts about the Company's business, operations, and prospects; and

c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

99.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of Section 11 of the Securities Act

### Against All Defendants

100.    Plaintiffs repeat and re-allege the foregoing contained above as if fully set forth herein. Plaintiffs further disclaim any allegation of fraud, recklessness or intentional misconduct.

101.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

102.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

103.    The Defendants named in this Count were responsible for the contents and dissemination of the Registration Statement; signed the Registration Statement; and/or were directors, underwriters or selling stockholders who are appropriate defendants in this Count.

104.    Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions in the Registration Statement.

105.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

106.    The Underwriters owed to the holders of the ADS acquired through the Registration Statement the duty to make a reasonable and diligent investigation of the statements

contained in the Registration Statement at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

107.    Plaintiffs acquired UP Fintech ADSs pursuant to the Registration Statement.

108.    At the time of their purchases of UP Fintech ADSs, Plaintiffs and members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

109.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

## COUNT II

### Violations of §15 of the Securities Act

### Against the Individual Defendants

110.    Plaintiffs repeat and re-allege the foregoing contained above as if fully set forth herein. Plaintiffs further disclaim any allegation of fraud, recklessness or intentional misconduct.

111.    This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against the Individual Defendants, each of whom was a control person of UP Fintech during the relevant period.

112.    The Individual Defendants were in positions to control and did control, the false and misleading statements and omissions contained in the Registration Statement.

113.    None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were

accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

114.     Plaintiffs and the Class have sustained damages.  The value of UP Fintech ADSs has declined substantially due to the Securities Act violations alleged herein.

115.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Registration Statement that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement. It is therefore timely.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives;

(b)     Awarding damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)     Awarding Plaintiffs and the other members of the Class prejudgment and post-interest; and

(d)     Awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demands a trial by jury.


Dated: March 24, 2020                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Phillip Kim
Phillip Kim
Laurence M. Rosen
Jing Chen
275 Madison Ave, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
          lrosen@rosenlegal.com
          jchen@rosenlegal.com

*Lead Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2020, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.


/s/Phillip Kim