**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VICKEY RONGEY WILLARD, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:19-cv-10326-JMF |
| Plaintiff, | |
| v. | |
| UP FINTECH HOLDING LIMITED, TIANHUA WU, JOHN FEI ZENG, YONGGANG LIU, LEI FANG, DAVID ERIC FRIEDLAND, VINCENT CHUN HUNG CHEUNG, BINSEN TANG, XIN FAN, JIAN LIU, XIAN WANG, CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK SECURITIES INC., AMTD GLOBAL MARKETS LIMITED, CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, and TOP CAPITAL PARTNERS LIMITED. | CLASS ACTION |
| Defendants. | |

**MEMORANDUM OF LAW ON BEHALF OF DEFENDANTS**
**UP FINTECH HOLDING LIMITED, CITIGROUP GLOBAL MARKETS INC.,**
**AND DEUTSCHE BANK SECURITIES INC., IN SUPPORT OF**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ....................................................................................................................... 3

   A.   Parties.............................................................................................................................. 3

   B.   The Initial Public Offering and Related Offering Materials ............................................... 4

      1.   The Initial Public Offering ...................................................................................... 4

      2.   The Registration Statement Includes Robust Warnings About the Volatility and Risks Associated with Investing in the Company's ADS ............................................................... 4

         (a)   The Company warned investors about the volatility of its business......................... 4

         (b)   The Company's indisputably accurate historical financial disclosures notified investors that the Company's securities carried significant risk........................................ 6

         (c)   The Company disclosed commissions revenue for the first quarter of 2019, which indicated commissions were declining from the previous quarter.................................... 7

   C.   The May 17, 2019 Quarterly Financial Disclosures ......................................................... 7

   D.   The Amended Complaint................................................................................................... 8

LEGAL STANDARD................................................................................................................ 8

ARGUMENT............................................................................................................................. 9

I.     PLAINTIFFS FAIL TO PLEAD ACTIONABLE MISSTATEMENTS............................ 10

II.    PLAINTIFFS FAIL TO PLEAD ACTIONABLE OMISSIONS ........................................ 14

   A.   Plaintiffs Fail to Plead That the Company Had Any Obligation to Make Extraordinary Intra-Quarter Disclosures................................................................................................... 14

   B.   Any Purported Omission Is Immaterial in Light of the Extensive Warnings in the Registration Statement ........................................................................................................ 15

   C.   Plaintiffs Fail to Plead That UP Fintech Possessed Material Information That It Failed to Disclose................................................................................................................................ 17

   D.   Plaintiffs Fail to Plead Any Breaches of Obligations Under Items 303 or 503 ................. 18

CONCLUSION......................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

*Arfa v. Mecox Lane Ltd.*,
  2012 WL 697155 (S.D.N.Y. Mar. 5, 2012) ........................................................................ 18

*Asay v. Pinduoduo, Inc.*,
  2020 WL 1530745 (S.D.N.Y. Mar. 30, 2020) ................................................................ 14, 18

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).............................................................................................. 3

*In re Axis Hldgs. Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006).............................................................................. 11

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007).......................................................................................................... 9

*Blackmoss Inv. Inc. v. ACA Capital Holdings, Inc.*,
  2010 WL 148617 (S.D.N.Y. Jan. 14, 2010) ................................................................ 18, 19

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  506 F. App'x 32 (2d Cir. 2012) ................................................................................... 10, 11

*Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.*,
  114 F. Supp. 2d 316 (D.N.J. 2000) ................................................................................. 17

*Cohen v. Avanade, Inc.*,
  874 F. Supp. 2d 315 (S.D.N.Y. 2012)............................................................................. 9

*In re Coty Inc. Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ......................................................... 10, 11, 19

*DeMaria v. Anderson*,
  318 F.3d 170 (2d Cir. 2003)......................................................................................... 15, 16

*In re Focus Media Hldg. Ltd. Litig.*,
  701 F. Supp. 2d 534 (S.D.N.Y. 2010).............................................................................. 14

*Hutchinson v. Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011)............................................................................................. 19

*In re IPO Sec. Litig.*,
  358 F. Supp. 2d 189 (S.D.N.Y. 2004)............................................................................. 12

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)............................................................................. 9

*In re Jumei Int'l Holding Ltd. Sec. Litig.*,
  2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) ....................................................................... 17

*Kapps v. Torch Offshore, Inc.*,
  379 F.3d 207 (5th Cir. 2004) ........................................................................................... 19

*In re Lehman Bros. Mortgage-Backed Sec. Litig.*,
   650 F.3d 167 (2d Cir. 2011)........................................................................... 20

*Lin v. Interactive Brokers Grp.*,
   574 F. Supp. 2d 408 (S.D.N.Y. 2008)............................................................ 16

*Medina v. Tremor Videos, Inc.*,
   2015 WL 1000011 (S.D.N.Y. Mar. 5, 2015) ................................................. 17

*In re N2K, Inc. Sec. Litig.*,
   82 F. Supp. 2d 204 (S.D.N.Y. 2000).............................................................. 16

*Nadoff v. Duane Reade, Inc.*,
   107 F. App'x 250 (2d Cir. 2004) ................................................................... 10

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
   2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) ............................................... 19

*Nurlybayev v. ZTO Express (Cayman) Inc.*,
   2019 WL 3219451 (S.D.N.Y. July 17, 2019) ................................................ 10

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
   681 F.3d 114 (2d Cir. 2012)........................................................................... 18

*In re: Qudian Inc. Sec. Litig.*,
   2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019) ................................................ 9

*River Birch Capital, LLC v. Jack Cooper Holdings Corp.*,
   2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) ................................................. 11

*Schaffer v. Horizon Pharma PLC*,
   2018 WL 481883 (S.D.N.Y. Jan. 18, 2018) .................................................. 10

*Schoenhaut v. Am. Sensors, Inc.*,
   986 F. Supp. 785 (S.D.N.Y. 1997) ................................................................ 14

*In re Sofamor Danek Grp., Inc.*,
   123 F.3d 394 (6th Cir. 1997) ......................................................................... 10

*Stadnick v. Vivint Solar Inc.*,
   861 F.3d 31 (2d Cir. 2017).................................................................... 15, 16

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*,
   202 F. Supp. 2d 8 (S.D.N.Y. 2001)........................................................ 14, 15, 19

## Regulations

17 C.F.R. § 210.3-12(a).................................................................................. 15

Defendants UP Fintech Holding Limited ("UP Fintech" or the "Company"), Citigroup Global Markets Inc., and Deutsche Bank Securities Inc. respectfully submit this Motion to Dismiss the Amended Class Action Complaint ("Amended Complaint" or "AC") Pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state causes of action under Sections 11 and 15 of the Securities Act of 1933.

## PRELIMINARY STATEMENT

Defendant UP Fintech is an Internet-based securities trading platform that began operating in Beijing, China in August 2015 and launched an IPO in March 2019. Plaintiffs' case is premised on the assumption, unsupported by any law, that because UP Fintech disclosed *accurate*, mostly positive historical financial information, UP Fintech was also required, in its IPO Registration Statement, to disclose allegedly declining internal, non-final, unaudited financial results for a six-week period between January 31, 2019 and the IPO effective date of March 20, 2019. Securities law has, with good reason, long rejected liability theories that rely on the disclosure of *accurate* historical financial information.

Plaintiffs purport to have purchased the Company's American Depositary Shares ("ADS") pursuant or traceable to the March 2019 IPO, which launched about 10 days before the end of the first quarter of 2019. In May and August 2019, the Company disclosed that trading volume on its platform, and its commission revenues, had declined during the first quarter of 2019 by approximately 10.3% and 24.41%, respectively, from the fourth quarter of 2018. Plaintiffs claim the price of their ADS fell in response to these disclosures.

Plaintiffs' causes of action fail as a matter of settled law for the following reasons:

*First*, Plaintiffs fail to plead that the Company made any misstatements. Rather, Plaintiffs assert that the Company's *accurate* disclosures of quarterly trading volume and commissions misleadingly assured investors that the Company's results would always be positive.

But securities law long ago rejected the theory that prior positive results entitle investors to expect positive results in the future. And Plaintiffs identify not a single statement in the Registration Statement assuring investors that the Company's growth would continue. In fact, and by contrast, the very first paragraph of the Registration Statement's 50 pages of risk warnings says the Company "*cannot assure you*" that future results will match previous results.

In any case, the Company's historical results—particularly in the most recent quarters—were anything but uniformly positive. As Plaintiffs plead, trading volume for the second quarter of 2018—just months before the IPO—fell by approximately 24%, or almost precisely the decline in trading volume in the first quarter of 2019. The Registration Statement also reported commission revenue of $2.2 million for the period ending January 31, 2019—the first month of the first quarter of 2019. Any investor multiplying that figure by three could predict approximately $6.6 million in commissions for the quarter—or an 8% *decline* from the previous quarter, and very close to the actual reported decline of 10.3%. Any notion that UP Fintech tried to "assure" investors that its performance would always be positive is belied by the Registration Statement and Plaintiffs' own allegations about UP Fintech's prior performance.

*Second*, Plaintiffs fail to plead any actionable omissions. Plaintiffs allege no reason UP Fintech was required to make an extraordinary intra-quarter disclosure of trading volume or commissions during the six weeks between January 31, 2019 and the March 20, 2019 IPO. In particular, the risk warnings noted above, as well as the disclosure of commission revenues through January 31, 2019, rendered immaterial any such non-disclosure for that six-week period. Notably, Plaintiffs nowhere plead that UP Fintech was even capable of making accurate, aggregate disclosures about its trading volume or commissions effectively in real time.

*Finally*, Plaintiffs fail to plead, pursuant to Item 303 of Regulation S-K, an undisclosed

"trend, known to management" relating to first-quarter 2019 revenues that could materially affect the Company. In fact, the Company *disclosed*, as late as January 31, 2019—a third of the way through the first quarter—that commission revenues were declining, and Plaintiffs fail to plead facts suggesting the Company had any additional, undisclosed knowledge. Regardless, Plaintiffs cannot, as a matter of law, plead a "trend" that supposedly took place over just a few weeks. For similar reasons, and also because the Registration Statement included ample risk warnings and cautionary language, Plaintiffs' assertions relating to Item 503 of Regulation S-K likewise fail.

For the foregoing reasons, and those discussed below, Defendants respectfully seek dismissal of the Amended Complaint, with prejudice.

## BACKGROUND

### A.    Parties

UP Fintech, which began operating in 2015, is incorporated in the Cayman Islands and headquartered in Beijing, China. AC ¶ 2; Reg. at 16. The Company operates an online brokerage platform with a focus on Chinese-speaking investors. *Id.* ¶ 2; Reg. at 1.[1] UP Fintech's platform allows its customers to "trade in equities and other financial instruments on multiple exchanges around the world." *See also id.*; Reg. at 1.

Citigroup Global Markets, Inc. ("CGMI") and Deutsche Bank Securities Inc. ("DBSI," and with CGMI, the "Underwriter Defendants") are registered broker-dealers. CGMI is incorporated and headquartered in New York; DBSI is incorporated in Delaware and headquartered in New

---

[1] *See* Declaration of Michael B. Carlinsky ("Carlinsky Decl.") Ex. A (Registration Statement) (hereinafter "Reg."); *see also ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (the Court "may consider . . . documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

York. The Underwriter Defendants provided underwriting services in connection with UP Fintech's March 20, 2019 IPO. *See* AC ¶¶ 28-29.

Plaintiffs Jian Ren and Xiuhu Sun ("Plaintiffs") purportedly purchased the Company's ADS "pursuant and traceable to the Registration Statement" and claim to represent a putative class of similarly situated purchasers. AC ¶¶ 14-15.[2]

### B.    The Initial Public Offering and Related Offering Materials

### 1.    The Initial Public Offering

UP Fintech completed an IPO on March 20, 2019, pricing its ADS at $8 per share. AC ¶ 44. UP Fintech's IPO Registration Statement was declared effective by the SEC on March 19, 2019, and the Company filed a final Prospectus on March 20, 2019. *Id.*

### 2.    The Registration Statement Includes Robust Warnings About the Volatility and Risks Associated with Investing in the Company's ADS

### (a)    The Company warned investors about the volatility of its business.

The Registration Statement devotes more than 50 pages to disclosing the "high degree of risk" that comes with investing in the Company's ADS. *See, e.g.*, Reg. at Cover Page, 16-62 (detailing risks of investing). Of particular relevance to this case, the Company, which began operating in August 2015, warned investors that it had "*limited operating history*" such that its "*historical financial, operating results and growth rates may not be indicative of future performance.*" Reg. at 16 (emphasis in original).

The Company reported in the Registration Statement that it had experienced rapid growth prior to the IPO, but explicitly warned that "*[w]e cannot assure you* that we will grow at the same rate," that the Company might fail to keep pace with its "ever-changing industry," and that each

---

[2] Plaintiffs purport to assert causes of action against other individuals and entities. As of the date of this motion, we are not aware that these additional Defendants have been served.

investor should understand the "risks and uncertainties that a fast-growing company with a limited operating history may be exposed to or encounter." *Id.* (emphasis added).  The next paragraph disclosed that UP Fintech had never turned a profit, and that its net loss for 2018 was five times its loss for 2017. *Id.*  The Company also explicitly warned investors that increasing operating costs and labor-related expenses "*will* decrease our profitability, perhaps materially."  Reg. at 53, 84 (emphasis added).

The Registration Statement also specifically warned investors that the Company's trading volume and commissions were subject to substantial volatility.  The Registration Statement emphasized that the Company's "*revenues and profitability depend on trading volume and are prone to significant and unpredictable fluctuations.*"  *Id.* at 23 (emphasis in original).  The Company further warned that such fluctuations could result from "weakness in equity markets, such as a slowdown causing reduction in trading volume in the United States and Hong Kong stocks," and that such occurrences had previously "reduced transaction revenues and would have a material adverse effect on our business, financial condition and results of operations."  *Id.* Trading volume might also decline due to "investors' interest level in securities trading," "sustained downturn in general economic conditions or global equity markets," or "[s]evere market fluctuations or weak economic conditions."  *Id.*  Consequently, "period to period comparisons of our revenues and operating results *may not be meaningful*, and *future revenues and profitability may be subject to significant fluctuations or declines*."  *Id.* (emphasis added).  No investor could reasonably believe that the limited past performance of this Company, however favorable, could predict future performance.

       (b)      **The Company's indisputably accurate historical financial disclosures notified investors that the Company's securities carried significant risk.**

Plaintiffs do not dispute that UP Fintech's historical financial disclosures of trading volume and commissions for 2016 through 2018 were truthful and accurate. *See, e.g.*, AC ¶¶ 47-50, 61 (reporting statements in Registration Statement without alleging they are false). These results, as well as those for the first quarter of 2019, are summarized in the chart below at Paragraph 61 of the Amended Complaint:

| Quarter Ended | Trading Volume (US$mm) | Trading Volume % Change Quarter over Quarter | Commissions (US$mm) | Commissions % Change Quarter over Quarter |
|---|---|---|---|---|
| 31-Mar-2016 | 1,363.30 | | | |
| 30-Jun-2016 | 3,495.10 | 156.4% | | |
| 30-Sep-2016 | 5,085.70 | 45.5% | | |
| 31-Dec-2016 | 6,393.90 | 25.7% | | |
| 31-Mar-2017 | 12,494.00 | 95.4% | 2.166 | |
| 30-Jun-2017 | 13,988.40 | 12.0% | 3.229 | 49.1% |
| 30-Sep-2017 | 17,125.70 | 22.4% | 4.424 | 37.0% |
| 31-Dec-2017 | 19,687.80 | 15.0% | 5.244 | 18.5% |
| 31-Mar-2018 | 28,302.60 | 43.8% | 6.625 | 26.3% |
| 30-Jun-3018 | 21,395.30 | -24.4% | 5.182 | -21.8% |
| 30-Sep-2018 | 32,628.30 | 52.5% | 7.154 | 38.1% |
| 31-Dec-2018 | 36,895.20 | 13.1% | 7.082 | -1.0% |
| 31-Mar-2019 | 27,862.80 | -24.5% | 6.400 | -9.6% |

These historical results for trading volume and commissions exhibit wide swings and variations from quarter to quarter, and leave no doubt they were subject to great volatility and risk. Contrary to Plaintiffs' assertion that the 24.5% decline in trading volume in the first quarter of 2019 was "shocking," AC ¶ 60, the Company's results for trading volume and commissions had declined by 24.4% and 21.8%, respectively, in the second quarter of 2018—just three quarters before the IPO. The same metrics jump by more than 50% and nearly 40% in the third quarter,

then increase by just 13% and *drop* by 1% in the fourth quarter.  In fact, as of the end of the first quarter of 2019, quarter-over-quarter commission revenue had increased *only once* in the *previous year*.[3]

**(c)**    **The Company disclosed commissions revenue for the first quarter of 2019, which indicated commissions were declining from the previous quarter.**

The "Recent Developments" section of the Registration Statement also put investors on notice of the Company's inherent volatility and risk by disclosing that the Company's commission revenue for the month of January 2019 was $2.2 million (which Plaintiffs do not dispute).  This figure reflected a *decline* from previous monthly commissions due, in part, to "the generally quieter investment environment during the Chinese New Year season, given the fact that the vast majority of our client base are Chinese investors around the world."  Reg. at 6-7.  Simple multiplication would predict that $2.2 million for January 2019 heralded approximately $6.6 million for the quarter, an 8% decline from the fourth quarter of 2018, which was just short of the actual 10.3% decline for the first quarter of 2019 that the Company timely disclosed in May 2019.  *See* AC ¶ 61.  That percentage decline, coupled with the narrative explanation, made clear that investors could not expect positive results in the first quarter of 2019 (or subsequent quarters).

**C.    The May 17, 2019 Quarterly Financial Disclosures**

On May 17, 2019, UP Fintech announced that commission revenues for the first quarter of 2019 had declined by 10.3% from the fourth quarter of 2018.  *See* AC ¶ 59.[4]  The Company

---

[3] In fact, following the May 17, 2019 disclosure of first-quarter 2019 financials, UP Fintech's commissions continued to exhibit similar volatility: they increased by approximately 7.1% from 1Q19 to 2Q19, *see* Carlinsky Decl. Ex. B at 2; declined by approximately 8.8% from 2Q19 to 3Q19, *id.* Ex. C at 3; then increased by approximately 17.7% from 3Q19 to 4Q19, *see id.* Ex. D at 3 (excerpts of Company Form 6-Ks for the second, third, and fourth quarters of 2019).

[4] Plaintiffs' assertion that commissions declined by 9.63% appears to be based on the rounded figure of $6.4 million for the first quarter of 2019.

7

subsequently disclosed that trading volume for the first quarter of 2019 had declined by 24.5% from the fourth quarter of 2018, as described in the chart above. *See id.* ¶ 60.

### D.    The Amended Complaint

Plaintiffs filed the initial complaint on November 6, 2019. ECF No. 1. On January 24, 2020, the Court appointed Lead Plaintiffs, ECF No. 24, who filed the Amended Complaint on March 24, 2020. ECF No. 32. Plaintiffs purport to represent a class of "all persons or entities that purchased or otherwise acquired UP Fintech American Depositary Shares ("ADSs") pursuant and/or traceable to the Company's IPO conducted on or about March 20, 2019," AC ¶ 94, and asserts claims under Sections 11 and 15 of the 1933 Securities Act.

Plaintiffs' initial complaint was filed approximately one month after the first of two plaintiffs filed very similar class actions in New York State Supreme Court,[5] and Plaintiffs' Amended Complaint was filed about three weeks after the March 6, 2020 amended complaint in the consolidated state action.[6] The New York State action asserts claims under Sections 11, 12, and 15 of the Securities Act of 1933, and alleges that UP Fintech and other defendants failed to disclose supposed downward trending trading volume and commissions during the first quarter of 2019. The putative class in the New York State action is "all persons or entities who purchased UP Fintech ADS pursuant and/or traceable to the Offering materials," which is substantively identical to the class alleged here.[7]

### LEGAL STANDARD

"In reviewing a Rule 12(b)(6) motion, 'the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.'" *In re:*

---

[5] *See, e.g.*, *In re UP Fintech Sec. Litig.*, No. 655882/2019, ECF No. 1.

[6] *See id.* ECF No. 19.

[7] *See id.* ¶ 1.

*Qudian Inc. Sec. Litig.*, 2019 WL 4735376, at *4 (S.D.N.Y. Sept. 27, 2019) (Furman, J.) (quoting *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319 (S.D.N.Y. 2012)).  Nonetheless, a plaintiff must "allege facts showing 'more than a sheer possibility that a defendant has acted unlawfully.'"  *Id.* (quoting *Cohen*, 874 F. Supp. 2d at 319).  Plaintiffs cannot meet this standard by pleading nothing more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  And where, as here, Plaintiffs fail to "'nudge[] [their] claims across the line from conceivable to plausible, [those claims] must be dismissed." *Id.* (quoting *Twombly*, 550 U.S. at 570).

To plead a Section 11 claim, Plaintiffs must allege that Defendants made a material misstatement or omission in a registration statement.  *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005); *see also Qudian*, 2019 WL 4735376, at *5 ("Section 11(a) provides that any signatory to a registration statement, director of the issuer, or underwriter may be held liable to purchasers of registered securities if the registration statement contains 'an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'") (Furman, J.) (quoting 15 U.S.C. § 77k(a)).

## ARGUMENT

Plaintiffs' essential claim is that the Company was obligated to make an extraordinary, intra-quarter disclosure in the Registration Statement of trading volume and commission data for the six-week period between January 31, 2019 and the March 20, 2019 IPO.  *See* AC ¶ 52. Plaintiffs purport to justify this demand by alleging that the Company, by disclosing historical financial information that Plaintiffs *do not plead was false*, somehow misled investors that the Company's financial picture in the first quarter of 2019, and going forward, would be positive. This theory is unrecognized in securities law and, in any case, completely unworkable.

Furthermore, Plaintiffs fail to plead that UP Fintech *could* have made the disclosures Plaintiffs demand. Plaintiffs assert that, as of March 20, 2019, "the Company had already learned" about the first quarter 2019 results that it did not disclose until May 2019. AC ¶ 52. Plaintiffs' support for this claim, however, consists only of out-of-context fragments from the Registration Statement, which do not remotely indicate that UP Fintech—uniquely among issuers—could instantly assemble and aggregate accurate financial information. *See id.* ¶ 54.

## I.   PLAINTIFFS FAIL TO PLEAD ACTIONABLE MISSTATEMENTS

It is settled law in the Second Circuit that "[a]ccurate statements about past performance are self-evidently not actionable under the securities laws." *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004); *see also Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *9 (S.D.N.Y. Jan. 18, 2018) ("[I]t is well established that 'a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data.'") (internal citation omitted).[8]

Plaintiffs identify several statements from the Registration Statement concerning UP Fintech's historical performance. *See, e.g.*, AC ¶ 47 ("The total customer accounts increased from 18,697 as of March 31, 2016 to 502,352 as of December 31, 2019 . . . .") (quoting Reg. at 131); *id.* ¶ 49 (listing historical trading volume and commissions). Plaintiffs nowhere allege, however, that any of these statements was inaccurate. *See In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401

---

[8] *See also Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012) (no liability from "reporting of unmanipulated corporate earnings"); *Nurlybayev v. ZTO Express (Cayman) Inc.*, 2019 WL 3219451, at *5 (S.D.N.Y. July 17, 2019) (rejecting Section 11 claim "[t]o the extent . . . premised on ZTO's disclosure of accurate historical financial data"); *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *8 (S.D.N.Y. Mar. 29, 2016) (Section 11 case) ("Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy.") (internal citation omitted) (collecting cases).

(6th Cir. 1997) (financials are "'hard' numbers, the accuracy of which has never been challenged by Plaintiffs").[9]

Unable to plead that the disclosures in the Registration Statement were false, Plaintiffs instead plead that UP Fintech reported its historical financial information in order to "assure investors of the continuous and unfailing growth of [the Company's] trading volume," AC ¶ 47, to "reassure investors that the Company's customer base and trading volume would continuously grow quarter over quarter in a consistent and predictable manner," *id.* ¶ 49, and to "boost investors' confidence in the uninterrupted upward trend that the Company's trading volume had been and would continue to experience." *Id.* ¶ 50.

Plaintiffs do not, and cannot, allege a single statement by which the Company purported to assure investors that UP Fintech would experience continuous growth and positive results, much less in an "uninterrupted" or "consistent and predictable manner." And it is well-settled that investors may not rely on prior disclosures to assure future results. "Section 11 does not recognize such a theory of liability, or require corporations to downplay or derogate their accurate historical results." *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *8 (S.D.N.Y. Mar. 29, 2016); *see also In re Axis Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006) ("As a matter of law, no statements regarding AXIS's accurately reported revenue and income have been rendered materially misleading by failing to disclose that such income was 'unsustainable.'").[10]

---

[9] Plaintiffs also quote the Company's reference to its "large and highly engaged customer base." AC ¶ 47. Plaintiffs nowhere allege that the Company's customer base was not either large or highly engaged, nor does the Amended Complaint again refer to that statement. Plaintiffs therefore fail to plead this statement was inaccurate or false, much less materially so.

[10] *See also Boca Raton*, 506 F. App'x at 38 ("[E]asily rejected" plaintiff's argument that a defendant's "statements about its earnings were actionable, even though literally true, because they did not acknowledge the long-term unsustainability of its business model."); *River Birch Cap., LLC v. Jack Cooper Holdings Corp.*, 2019 WL 1099943, at *4 (S.D.N.Y. Mar. 8, 2019) ("Judges

Plaintiffs' assertions that UP Fintech reported accurate financial results as a ploy to "assure" investors of perpetual success are also contrary to the Registration Statement's express warnings—through cautionary language *and* disclosure of historical financial information—about the volatility of the Company's business and the significant potential for down quarters in the future. Indeed, the *first paragraph* of the "Risk Factors" section says "[w]e *cannot assure you* that we will grow at the same rate" as in prior years. Reg. at 16. The next paragraph also discloses that the Company had never been profitable, and that its net loss in 2018 *quintupled* over 2017. *Id.* And the Company accurately reported the wide variation in its results from quarter to quarter, *see* AC ¶ 61 (chart), including a 22% decline in commissions for the second quarter of 2018, just three quarters before the IPO. Indeed, between the first quarter of 2018 and first quarter of 2019, quarter-over-quarter commission revenues increased only once. *See* Background § B.2(b).

The Registration Statement included numerous other warnings that those looking for safe investments should look elsewhere. The Registration Statement warned investors that UP Fintech—which had begun operating only in the summer of 2015, Reg. at 2—had "limited operating history" that "may not be indicative of future performance," that "revenues and profitability" would be "prone to significant and unpredictable fluctuations," that such occurrences "would have a material adverse effect" on the Company, and that, consequently, "*period to period comparisons of our revenues and operating results may not be meaningful*, and future revenues and profitability may be subject to significant fluctuations or declines." Reg. at 23 (emphasis

---

in this district have consistently rejected Section 10(b) and Rule 10b-5 liability for literally true historical statements that 'create an implicit promise' as to future company success.") (collecting cases); *In re IPO Sec. Litig.*, 358 F. Supp. 2d 189, 210 (S.D.N.Y. 2004) ("The disclosure of accurate historical data does not become misleading even if less favorable results might be predicted by the company in the future.") (internal citation and quotation marks omitted).

12

added).  Accordingly, no reasonable investor could believe that the limited past performance of this Company, however favorable, guaranteed future performance.

The Registration Statement's discussion of the Company's January 2019 commissions likewise warned investors that revenue for the first quarter of 2019 was likely to be lower than in the fourth quarter of 2018.  Commissions for January 2019 were approximately $2.2 million.  *See* Background § B.2(c).  Multiplying that result by three—for the three months that comprise the first quarter of 2019—results in commissions of $6.6 million, or a *decline* of approximately 8% from the prior quarter's $7.082 million (which was itself a decline from the third quarter's $7.154 million).  And this 8% back-of-the-envelope calculation that any investor could have performed was close to the actual 10.3% decline in commissions in the first quarter of 2019.  The January 31, 2019 data therefore disclosed the likelihood that commissions for the first quarter of 2019 would *decline* from the previous quarter.

Plaintiffs argue that the Company was "downplay[ing]" the trading volume and commission decline that occurred during the second quarter of 2018 by stating that "[t]he impact of fluctuation and changes of market conditions, however, was not apparent historically due to the rapid growth of our business historically."  AC ¶ 50.  This statement does the opposite: it *warns* investors that *more* declines could occur in the future.  The full paragraph in which this quotation appears actually states (Plaintiffs' selected quotation in **bold**):

> Our results of operations are subject to fluctuation and changes in market conditions. Our business is subject to influences from market factors such as market liquidity, interest rate and investor sentiment. **The impact of fluctuation and changes of market conditions, however, was not apparent historically due to the rapid growth of our business historically**.  Due to our limited operating history, the trends that we have experienced in the past may not apply to, or be indicative of, our future operating results.

13

Reg. at 102.    In context, Plaintiffs' quoted statement informs investors that although the Company's limited operating results have thus far been (mostly) positive, investors should anticipate more quarters like the second quarter of 2018, when trading volume and commissions declined substantially over the prior quarter.

Plaintiffs' theory that UP Fintech misled investors by making accurate disclosures is not recognized in securities law.  Plaintiffs' claim that UP Fintech sought to *assure* investors that its (mostly) positive historical results would continue indefinitely is nonsense.

## II.    PLAINTIFFS FAIL TO PLEAD ACTIONABLE OMISSIONS

### A.    Plaintiffs Fail to Plead That the Company Had Any Obligation to Make Extraordinary Intra-Quarter Disclosures

"The disclosure structure set out by the SEC and the case law recognizes how unworkable and potentially misleading a system of instantaneous disclosure outside the normal reporting periods would be."  *See, e.g.*, *In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001); *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 539-40 (S.D.N.Y. 2010) (Defendant not required to disclose financial information about quarter before it concluded); *Schoenhaut v. Am. Sensors, Inc.*, 986 F. Supp. 785, 791 (S.D.N.Y. 1997) ("[C]ourts have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress.").  Indeed, this Court recently rejected an omission claim against a Chinese company that arose from the company's failure to disclose quarterly results in IPO offering materials even where the offering materials were published a month *after* the quarter closed, because the quarterly results could *still* be "audited or . . . subject to significant revision."  *Asay v. Pinduoduo, Inc.*, 2020 WL 1530745, at *9 (S.D.N.Y. Mar. 30, 2020) ("Plaintiffs cite no SEC requirement or guidance that quarterly results for the second quarter should have been reflected in the registration statement.").  Plaintiffs' demand for real-time disclosure would excessively overburden public

14

companies and deny the investing public "the benefit of reflection or certainty provided by the traditionally recognized reporting periods." *In re Turkcell*, 202 F. Supp. 2d at 13.

Plaintiffs offer no reason to impose upon UP Fintech the extraordinary burden of an intra-quarter disclosure, which in this case would encompass financial data for the six-week period between January 31, 2019[11] and the IPO launch on March 20, 2019. As discussed above, the disclosure of accurate, historical financial information cannot support claims under the Securities Act, and certainly cannot impose on the Company the obligation to make up-to-the-minute disclosures, even if they might differ from some (but by no means all) of those historical results. Such an unprecedented requirement of "instantaneous disclosure" would be "unworkable and potentially misleading." *In re Turkcell*, 202 F. Supp. 2d at 13. In particular, in light of the multiple warnings provided to investors, Plaintiffs offer no reason for such an extraordinary departure from the established disclosure regime.

**B.    Any Purported Omission Is Immaterial in Light of the Extensive Warnings in the Registration Statement**

The rare imposition of an intra-quarter disclosure requirement occurs only where a "reasonable investor would view the omission as 'significantly alter[ing] the "total mix" of information made available.'" *Stadnick v. Vivint Solar Inc.*, 861 F.3d 31, 36 (2d Cir. 2017) (quoting *DeMaria v. Anderson*, 318 F.3d 170, 180 (2d Cir. 2003) (internal citation and quotation marks omitted)). This determination must be made, however, by evaluating the Registration Statement "as a whole." *DeMaria*, 318 F.3d at 180 (rejecting need for intra-quarter disclosure prior to IPO) (quotation omitted). Here, no reasonable investor "could have assumed—in view of

---

[11] UP Fintech had no obligation even to make this disclosure, but did so "for the purpose of providing investors with the most current information that our company is able to provide under the time constraints." Reg. at 7; *see also* 17 C.F.R. § 210.3-12(a), (g) (Regulation S-K) (Registration Statement need not include financial statements that are less than 135 days old).

all of the disclosures made, including the characterization of the [revenue as prone to unpredictable fluctuations]—that Defendants were offering investors an insurance policy against future market loss." *Lin v. Interactive Brokers Grp.*, 574 F. Supp. 2d 408, 420 (S.D.N.Y. 2008).

The Company's historical financials, the disclosure of declining commissions in January 2019, and the Registration Statement's myriad warnings, detailed above, made clear that UP Fintech's financial results were volatile and unpredictable, and had swung from very positive to very negative during 2018 alone. And the Company repeatedly and forcefully warned that it *could not assure* investors that recent successes somehow immunized the Company from down quarters in the future. *Id.* Even if the Company could have disclosed reliable information about February 2019 in its Registration Statement—and Plaintiffs plead nothing suggesting it could have—any omission is immaterial in light of other available information. *See DeMaria*, 318 F.3d at 181-82 (accurate disclosure of prior losses and risk warnings of future losses obviated any need to disclose interim financial information prior to IPO); *Stadnick*, 861 F.3d at 38-39 (no interim disclosure obligation in light of risk warnings about revenue fluctuations and accurate disclosure of prior net losses); *In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 209 (S.D.N.Y.), *aff'd*, 202 F.3d 81 (2d Cir. 2000) (rejecting omission claim because "N2K's prospectus is replete with warnings and explanations of risks associated with the company's past financial history and future expectations."). Notably, in affirming dismissal in *DeMaria*, the Second Circuit specifically cited warnings in the Prospectus at issue that "period-to-period comparisons of [the issuer's] results of operations may not be meaningful, and you should not rely on past periods as indicators of future performance," 318 F.3d at 182—language nearly identical to UP Fintech's warning that "period to period comparisons of our revenues and operating results may not be meaningful, and future revenues and profitability may be subject to significant fluctuations or declines." Reg. at 23.

16

**C.      Plaintiffs Fail to Plead That UP Fintech Possessed Material Information That It Failed to Disclose**

Plaintiffs' claims fail for the independent reason that they allege no facts "showing the 'allegedly omitted facts both existed and were known or knowable, at the time of the offering.'" *Lin*, 574 F. Supp. 2d at 416 (quoting *Castlerock Mgmt. Ltd. v. Ultralife Batteries, Inc.,* 114 F. Supp. 2d 316, 323 (D.N.J. 2000)).  In particular, the results of the first quarter of 2019 cannot be used in hindsight to show that the Company had knowledge of those results while the quarter was still in progress.  *See, e.g., In re Jumei Int'l Holding Ltd. Sec. Litig.*, 2017 WL 95176, at *4 (S.D.N.Y. Jan. 10, 2017) (rejecting inference that defendant had knowledge of its business strategy change and impact on financials where the strategy change occurred soon after the IPO); *Medina v. Tremor Videos, Inc.*, 2015 WL 1000011, at *2–3 (S.D.N.Y. Mar. 5, 2015) ("[K]nowledge on day-120 does not mean Defendants[] 'knew' or 'must have known' on day-1.").

Plaintiffs try to evade this well-established principle of rejecting hindsight liability by asserting that UP Fintech "had already learned that its trading volumes and commissions for the first quarter of 2019 were sharply declining," AC ¶ 52, and that UP Fintech "could have provided up-to-date disclosures of its commissions and trading volume in the Registration Statement," AC ¶ 54.  But Plaintiffs' purported support for its claim that UP Fintech could—uniquely among issuers—produce accurate, aggregate financial information in real time consists of unremarkable statements in the Registration Statement that Plaintiffs take out of context.  For instance, Plaintiffs note that the Company deducts commissions from customer accounts either at trade initiation or execution, AC ¶ 55 (quoting Reg. at 128), which says nothing about when or how UP Fintech aggregates commission or trading volume data for accounting or reporting purposes. The Company's statement that it conducted "ongoing customer due diligence and account monitoring" and "continuously monitor[s] customer accounts" for suspicious trading addresses regulatory

17

compliance and risk mitigation, not financial reporting. *Compare* AC ¶ 56 *with* Reg. at 112. And the Company's statement that it "regularly reviews a number of metrics" is followed directly by a chart showing that "regularly" means *quarterly*. *Compare* AC ¶ 66 *with* Reg. at 84. Plaintiffs fail to plead UP Fintech was even capable of making the disclosures it now demands.

> **D.    Plaintiffs Fail to Plead Any Breaches of Obligations Under Items 303 or 503**

Plaintiffs also purport to identify a duty to disclose pursuant to Item 303 of Regulation S–K, which "imposes a disclosure duty 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations." *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012) (quotation omitted). Furthermore, although "Section 11 claims generally do not require pleading scienter, Item 303's requirement of knowledge requires that a plaintiff plead, with some specificity, facts establishing that the defendant had *actual knowledge* of the purported trend." *Blackmoss Inv. Inc. v. ACA Capital Holdings, Inc.*, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010) (emphasis added). Plaintiffs fail to plead any obligation under Item 303.

To start, the Company expressly disclosed the very declines about which Plaintiffs now complain. The Registration Statement reported declines in commissions between the third and fourth quarters of 2018 and as of January 2019. *See* Background § B.2(b)-(c). Even if the Company were required to make disclosures under Item 303, it satisfied those obligations. *See Arfa v. Mecox Lane Ltd.*, 2012 WL 697155, at *9-10 (S.D.N.Y. Mar. 5, 2012) (dismissing Item 303 claims where the registration statement disclosed declining growth rates in company's online platform, increasing expenses, and decreasing gross margins); *Pinduoduo, Inc.*, 2020 WL 1530745, at *10 (rejecting Item 303 claim because "Pinduoduo's disclosures left no doubt that its sales and marketing expenses had grown exponentially, that they could continue to grow, and that the

18

Company could be materially and adversely affected if its customer growth failed to keep pace.").

Regardless, Plaintiffs fail to allege any disclosure obligations under Item 303. At most, Plaintiffs' alleged undisclosed "trends" consisted of a decline in trading volume and commissions between February 1, 2019 and March 19, 2019, or about six weeks. Courts regularly hold that longer periods of time fall short, as a matter of law, of establishing a reportable trend. *See, e.g.*, *Blackmoss*, 2010 WL 148617, at *10 (two months insufficient "[a]s a matter of law"); *In re Noah*, 2010 WL 1372709, at *6 (two-month cost spike does not create "a plausible inference that this was a trend rather than an isolated event"); *Turkcell*, 202 F. Supp. 2d at 13 (single quarter decline in operating income insufficient); *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 218 (5th Cir. 2004) (five-month drop in price of natural gas was not a trend).

Furthermore, Plaintiffs nowhere plead facts suggesting actual knowledge on the part of the Company of declines in trading volume or commission revenue beyond those disclosed in the Registration Statement. *See* Argument § II.C; *see also In re Coty*, 2016 WL 1271065, at *7 (dismissing Item 303 claims where company management lacked knowledge of "any particular decline in sales" despite allegations that the company monitored inventory in real-time). Nor do Plaintiffs plead any facts suggesting the Company had knowledge of what the results of the first quarter would be until that quarter had concluded—which was after the IPO became effective. Plaintiffs thus fail to plead any obligation under Item 303.

Furthermore, beyond a generic assertion that the Company's risk warnings were "boilerplate"—which is easily dispelled by reviewing the nearly 50 pages of specific risk warnings included in the Registration Statement and detailed throughout this Memorandum—Plaintiffs offer no support for their assertions that Defendants somehow failed to fulfill any obligations under Item 503. *See* AC ¶¶ 77-78; *see also Hutchinson v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 n.4 (2d

19

Cir. 2011) (alleged non-disclosure did not violate Item 503 for the same reasons that it was not reasonably likely to be material under Item 303).[12]

## CONCLUSION

For the reasons discussed herein, UP Fintech and the Underwriter Defendants respectfully seek dismissal of the Amended Class Action Complaint, with prejudice.

Dated: May 8, 2020
New York, New York

By: */s/ Michael B. Carlinsky*
    Michael B. Carlinsky
    Jacob J. Waldman
    **QUINN EMANUEL URQUHART**
    **& SULLIVAN, LLP**
    51 Madison Avenue, 22nd Floor
    New York, NY 10010
    Telephone:  (212) 849-7000
    michaelcarlinsky@quinnemanuel.com
    jacobwaldman@quinnemanuel.com

*Attorneys for Defendant UP Fintech Holding Limited*

By: */s/ Susannah S. Geltman*
    Susannah S. Geltman
    Anthony C. Piccirillo
    **SIMPSON THACHER &**
    **BARTLETT LLP**
    425 Lexington Avenue
    New York, NY 10017
    Telephone:  (212) 455-2000
    sgeltman@stblaw.com
    anthony.piccirillo@stblaw.com

*Attorneys for Defendants Citigroup Global Markets Inc. and Deutsche Bank Securities Inc.*

---

[12] Because Plaintiffs fail to plead a violation of Section 11, they also fail to allege a violation of Section 15. *In re Lehman Bros. Mortgage-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) ("To establish § 15 liability, a plaintiff must show 'a primary violation' of § 11 and control of the primary violator by defendants.") (internal citation omitted).