# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VICKI RONGEY WILLARD, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br><br>v.<br><br><br>UP FINTECH HOLDING LIMITED, TIANHUA WU, JOHN FEI ZENG, YONGGANG LIU, LEI FANG, DAVID ERIC FRIEDLAND, VINCENT CHUN HUNG CHEUNG, BINSEN TANG, XIN FAN, JIAN LIU, XIAN WANG, CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK SECURITIES INC., AMTD GLOBAL MARKETS LIMITED, CHINA MERCHANTS SECURITIES (HK) CO., LIMITED, and TOP CAPITAL PARTNERS LIMITED,<br><br>Defendants. | CASE No.: 1:19-cv-10326-JMF<br><br><br><br>CLASS ACTION |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................ 1

II.   FACTS .............................................................................................................. 3

    A.   UP Fintech Processed Trade Data In Real Time And Generated And Submitted Daily Reports Of All Trades Under FINRA Rules. ................................................... 3

    B.   Defendants Had Actual Knowledge of the Declining Trading Volume for the First Quarter of 2019 at The Time of IPO. .................................................................. 6

    C.   Defendants Belatedly Revealed the Decline of Trading Volume and Commissions ......... 8

III.  ARGUMENT ..................................................................................................... 8

    A.   Plaintiffs Face a Minimal Pleading Burden under the Securities Act. .............................. 8

    B.   Item 303 Required Defendants To Disclose The Declining Trading Volume And Commissions For The First Quarter Of 2019 And Their Likely Impact. ........................ 10

       a.   Defendants Failed To Disclose (i) The January 2019 Trading Volume Decline And (ii) The Impact Of The January 2019 Declining Trading Volume and Commissions On Future Performance. ................................................................................................. 11

       b.   Defendants Failed To Disclose The Declining Trading Volume And Commissions That Had Already Occurred In The First Quarter Of 2019 Up To The Time Of IPO, Violating Item 303. ....................................................................................................... 13

    C.   The Company's Risk Factor Statements Were Misleading Because the Risks Had Already Materialized ..................................................................................................... 19

    D.   Defendants' Misrepresentations and Omissions Were Material ....................................... 23

    E.   Plaintiffs Adequately Allege Control Person Liability under Section 15 ......................... 25

IV.   CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Arfa v. Mecox Lane Ltd.*,
2012 WL 697155 (S.D.N.Y. Mar. 5, 2012) .............................................................. 16

*Asay v. Pinduoduo Inc.*,
No. 18-CV-7625 (PKC), 2020 WL 1530745 (S.D.N.Y. Mar. 30, 2020)................................. 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................................................... 9

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................ 20

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012)........................................................................... 15

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013)...................................................................... 1

Connecticut Bar Ass'n v. United States,
620 F.3d 81 (2d Cir. 2010)............................................................................... 25

*DeMaria v. Andersen*,
318 F.3d 170 (2d Cir. 2003)......................................................................... 22, 23

*Dodona I, LLC v. Goldman, Sachs & Co.*,
847 F. Supp. 2d 624 (S.D.N.Y. 2012)..................................................................... 23

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*,
551 F. Supp. 2d 210 (S.D.N.Y. 2008)..................................................................... 21

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000)............................................................................. 23

*Herman & Maclean v. Huddleston*,
459 U.S. 375 (1983)...................................................................................... 9

*Hutchison v. Deutsche Bank Sec. Inc.*,
647 F.3d 479 (2d Cir. 2011)............................................................................... 9

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010)..................................................................... 20

ii

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006) ........................................................................ 15

*In re Bank of Am. Sec. Corp. Derivatives & ERISA Litig.*,
757 F.Supp.2d 260 (S.D.N.Y.2010) ........................................................................... 14

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012) ........................................................................ 25

*In re Coty Inc. Sec. Litig.*,
No. 14-CV-919 (RJS), 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ...................... 15

*In re CPI Card Grp. Inc. Sec. Litig.*,
No. 16-CV-4531 (LAK), 2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) .................... 17

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013) ............................................................ 10, 11, 14

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) ..................................................................................... 20

*In re Jumei Int'l Holding Ltd. Sec. Litig.*,
No. 14CV9826, 2017 WL 95176 (S.D.N.Y. Jan. 10, 2017) ..................................... 19

*In re Morgan Stanley Info. Fund Sec. Litig.*,
592 F.3d 347 (2d Cir. 2010) ...................................................................................... 21

*In re Regeneron Pharm., Inc. Sec. Litig.*,
No. 03 CIV.3111 RWS, 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ....................... 21

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008) ........................................................................ 24

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005) ........................................................................ 20

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011) ................................................................................. passim

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ................................................................................................. 9, 20

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
900 F.2d 576 (2d Cir. 1990) ...................................................................................... 15

*Medina v. Tremor Videos, Inc.*,
2015 WL 1000011 (S.D.N.Y. Mar. 5, 2015) ............................................................ 19

iii

*Milman v. Box Hill Sys. Corp.*,
72 F. Supp. 2d 220 (S.D.N.Y. 1999)........................................................................... 14

*Nadoff v. Duane Reade, Inc.*,
107 F. App'x 250 (2d Cir. 2004) ................................................................................ 15

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
98 F.3d 2 (2d Cir. 1996)............................................................................................. 12

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
297 F.3d 1182 (11th Cir. 2002) ................................................................................. 11

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012)....................................................................... 10, 17, 23

*River Birch Capital, LLC v. Jack Cooper Holdings Corp.*,
No. 17CV9193, 2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019)................................... 15

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)....................................................................................... 19

*Silverstrand Investments v. AMAG Pharm., Inc.*,
707 F.3d 95 (1st Cir. 2013) ........................................................................................ 23

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009) .................................................................................... 20

*Stadnick v. Vivint Solar, Inc.*,
861 F.3d 31 (2d Cir. 2017).......................................................................................... 14

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015)................................................................ 10, 11, 13, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...................................................................................................... 9

*Yi Xiang v. Inovalon Holdings, Inc.*,
254 F. Supp. 3d 635 (S.D.N.Y. 2017)......................................................................... 18

## Statutes

15 U.S.C. § 77k............................................................................................................... 9

15 U.S.C. § 77o............................................................................................................... 9

## Rules

Fed. R. Civ. P. 12............................................................................................................ 25

Fed. R. Civ. P. 8 ............................................................................................................ 9

**Regulations**

17 C.F.R. § 229.303 ................................................................................................ 10, 17

17 C.F.R. § 230.408 .................................................................................................... 23

54 Fed.Reg. 430 .......................................................................................................... 24

68 Fed.Reg. 062 .......................................................................................................... 24

**Other Authorities**

*Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of
    Financial Condition and Results of Operations*,
    Securities and Exchange commission Release Nos. 33-8350, 34-38960; FR-72 (Dec. 19,
    2003) .................................................................................................................... 10, 11

## I.    INTRODUCTION[1]

At the time of UP Fintech Holding Limited's[2] IPO on March 20, 2019, 87% of the trading days within the first quarter of 2019 in the U.S. and Hong Kong securities markets had taken place[3], and only 8 trading days remained. UP Fintech – an automated electronic securities brokerage platform that touted its robust technology for collecting and centrally analyzing data in real time – had already learned of a material trend and uncertainty created by the sharply declining trading volume and commissions on its trade platform beginning January 2019. Defendants, however, failed to disclose this uncertainty and its likely material impact on the Company's future financial results in the Registration Statement. Instead of truthfully disclosing that trading volume and commissions had already materially declined in the quarter leading up to the IPO, Defendants merely warned investors that there was a potential risk that trading volume and commissions *might* decline in the future.

UP Fintech is the largest Chinese-language online trading platform in the world in terms of its trading volume in the U.S. market. Trading volume on UP Fintech's platform is critical to

---

[1] "Compl. ¶_" are paragraphs of the Amended Complaint. ("Complaint", Dkt. 32.) "Defs. Br. __" are pages of Defendants' Memorandum of Law in Support of their Motion to Dismiss ("Motion") the Amended Complaint (Dkt. 53). "Defs. Ex _" is exhibit to the Declaration of Michael B. Carlinsky in support of the Motion. (Dkt. 54.) "Pls. Ex. __" is exhibit to the Declaration of Jing Chen in Opposition to the Motion.

[2] "UP Fintech" or "Company" hereinafter.

[3] There were 61 trading days in the first quarter of 2019 on the US. stock market; 60 days on Hong Kong stock market. UP Fintech completed its IPO on the 54th trading day on the U.S. stock market and 53rd trading day on the Hong Kong stock market. Pls. Ex. A (Nasdaq 2019 trading calendar and Hong Kong Stock Exchange trading calendar of January to March 2019.). The Court may take judicial notice of the exhibits to the Declaration of Jing Chen in Opposition to the Motion because they are integral to or explicitly relied upon in the Complaint. *See City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (in evaluating a motion to dismiss in a securities action, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.") (citation omitted).

its profitability. In the Registration Statement, UP Fintech painted a rosy picture of trading volume growth and corresponding revenue growth. UP Fintech also touted its powerful technology that collected and centrally monitored trade data in real time. Its customer trades were automatically captured and reported in real time to UP Fintech's electronic trading platform and were centrally analyzed in its system. Under the rules of FINRA, of which UP Fintech is a member, it reported all trade information on the U.S. market every day to FINRA.

Relying on UP Fintech's representation of its real-time processing and analyzing power and its compliance duty under FINRA rules, a reasonable investor would naturally assume that UP Fintech had disclosed all material trends and uncertainties related to trading volume and commissions on its platform leading up to its IPO. Unbeknownst to investors, however, the trading volume and commissions on the UP Fintech platform had sharply declined in the three months before its IPO, which would materially impact its financial results for the first quarter of 2019 and beyond. As investors later learned, UP Fintech's trading volume for the first quarter of 2019 declined by 24% from the previous quarter and commissions declined by 9.63%. This news caused UP Fintech's share price to dramatically decline causing investors losses. In fact, its trading volume did not return to its pre-IPO level until a year after the IPO.

Section 11 of the Securities Act of 1933 ("Section 11") imposes strict liability for material misstatements and omissions in Registration Statements. Its purpose is to promote truthful and complete disclosure by companies conducting IPOs and to protect the integrity of the United States' securities market. Defendants' Motion to Dismiss mischaracterizes their obligations under the securities laws.

*First*, Defendants argue that the accurate historical data disclosed in the Registration Statement are not misleading. The Complaint doesn't allege the historical financial data are false.

2

It alleges it is incomplete and misleading for not disclosing UP Fintech's most recent quarter's declining trading volume and commissions at the time of the IPO. Reading the data that UP Fintech did disclose, in context, a reasonable investor would incorrectly view them as showing a strong upward trend in trading volume and commissions.

Second, Defendants misconstrue trading volume, an operating performance metric, as a financial statement item that requires auditing and is subject to substantial revision, and argue that intra-quarter disclosure of such information generally is not required. Defendants had a duty to disclose the declining trading volume and decreasing commissions under Item 303 as a material trend and uncertainty, and because the declining performance constituted a material irregular intervening event.

Third, the risk warnings in the Registration Statement are inadequate, generic and misleading because the risk warned of had already materialized.

The Complaint states a claim. The Court should let this case proceed to discovery.

## II.   FACTS

This is a federal securities class action on behalf of all persons other than Defendants who purchased UP Fintech securities pursuant and/or traceable to the Company's initial public offering on or about March 20, 2019 (the "IPO"), seeking to recover damages caused by Defendants' violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"). (Compl. ¶ 1.) The Defendants are UP Fintech, its CEO Tianhua Wu ("Wu"), CFO John Fei Zeng ("Zeng"), the members of its Board who signed the IPO Registration Statement, and the banks that underwrote the IPO. (*Id.* ¶¶ 16-37.)

### A.   UP Fintech Processed Trade Data In Real Time And Generated And Submitted Daily Reports Of All Trades Under FINRA Rules.

UP Fintech, a China-based electronic brokerage platform serving Chinese-speaking investors around the globe, conducted its IPO on Nasdaq on March 20, 2019 and raised $111 million from U.S. investors. (Compl. ¶ 6.) Its subsidiary, US Tiger Securities, Inc., is a registered broker-dealer with the SEC and a member of FINRA. In its Registration Statement ("RS" hereinafter[4]), UP Fintech promoted itself as one of the most-utilized Chinese-language electronic securities brokerage platforms in the world. (Compl. ¶ 1.) In the first quarter of 2019, trading of U.S. equities contributed approximately 50% of UP Fintech's revenues, and trading of Hong Kong equities accounted for 20% of its revenues. (*Id*. ¶ 4.)  The Company boasted of its continuous revenue growth for the eight quarters resulting from increased trading volume, the most significant driver for its entire revenue and profitability. (*Id*. ¶¶ 6, 47, 48.) UP Fintech defined "trading volume" as "the total value of securities traded during a specific period of time". (RS at 8.) "[C]ommissions" are "based on the amount of transaction volume, or the number of shares, lots or contracts in each order, which generally vary in accordance with the type of products or services, timing of account activation, eligibility for discounts and other factors." (RS at 86.)

In the Registration Statement, UP Fintech attributed its success to its powerful system that processed and centrally monitored and analyzed an enormous amount of trade data at high speed in real time. (Compl. ¶¶ 41, 56, 57, 58, 65.) Its platform had the ability to receive, process and distribute stock quote data at speeds of up to 71,200 units per second. (RS at 133.) Customer trades were automatically captured and ***reported in real time*** to UP Fintech's trading platform. (*Id*.)

To maintain and enhance its operational efficiency, UP Fintech ***centrally*** monitored and supervised customer communications, analyzed customer data and "conduct[ed] ***ongoing***

---

[4] Defs. Ex. A

customer due diligence and account monitoring" and "*continuously monitor[ed] customer accounts* to detect … *patterns of day trading*, high frequency trading, inactive accounts, trading that has no economic purpose, trading in illiquid securities". (Compl. ¶ 56.; RS at 112, 134) (emphasis added.) UP Fintech CFO Defendant Zeng acknowledged the Company's awareness of its customer accounts' activities and trading volume in real time. (*Id.* ¶ 65.) The Company also "regularly review[ed] a number of metrics to *evaluate [its] business, measure [its] performance, identify trends*, formulate financial projections and make strategic decisions". (*Id.* ¶ 57; RS at 84) Moreover, Interactive Brokers – UP Fintech's shareholder and primary trade execution and clearing agent (Compl. ¶55, n 4; RS at 21) – instantaneously aggregated key trading data, including trading volume and commissions on Interactive Broker's platform. Interactive Brokers is an automated global electronic trading platform and a FINRA member, renowned for its efficiency in processing data. As UP Fintech noted, Interactive Brokers is one of the most powerful financial and technology giants in the world. (RS at 124.) UP Fintech relied on Interactive Brokers to perform trade execution and clearing services because UP Fintech lacked a clearing license in the U.S. (Compl. ¶ 55, n 4; RS at 21.) *See also* Pls. Ex. B. UP Fintech touted its strong partnership with Interactive Brokers and its reliance on Interactive Brokers' guidance for legal and compliance matters and risk management. (RS at 124.) Indeed, Defendant David Friedland ("Friedland"), while serving as UP Fintech's director since June 2018 and the time of UP Fintech's IPO, also is the regional head and managing director of Interactive Brokers' Asia Pacific operations. (*Id.* at 161.) In his over 30 years employment with Interactive Brokers, he assisted with the programming and development of Interactive Brokers' trading systems. (*Id.*) Defendant Friedland reviewed, signed and approved the Registration Statement. (Compl. ¶ 21.)

On the first day of every month, Interactive Brokers published monthly brokerage performance metrics for the previous month, summarizing the key performance information of all trades conducted by Interactive Brokers globally. *See e.g.* Pls. Exs. C, D. The metrics included daily average revenue trades ("DARTs", a metric in the brokerage industry that measures the number of trades per day that the broker generates revenue through commissions or fees), number of client accounts, average commission per cleared client order, among others.

**B. Defendants Had Actual Knowledge of the Declining Trading Volume for the First Quarter of 2019 at The Time of IPO.**

According to FINRA Rules 7400, UP Fintech reported all trades every day to FINRA's Order Audit Trail System ("OATS") by 8 a.m. Eastern Time the following calendar day. Pls. Ex. E (FINRA Rules 7400). The reports were required to include detailed information about each and every trade occurring on UP Fintech's platform, such as the number of shares in an order, any limit or stop price prescribed in the order, and the price at which the order is transmitted, etc. *Id.*

In the days before the IPO is completed and the final prospectus issued, an issuer and its underwriters conduct bring down due diligence sessions to confirm whether any material changes have occurred and whether the information in the registration statement verified by previous due diligence is still accurate and complete. *See* Pls. Ex. F (a typical IPO timeline); *see also* Pls. Ex. G (a typical bring down due diligence questionnaire). A final bring down due diligence call with the entire IPO team takes place immediately before the IPO closing to confirm no material changes have occurred since the registration statement was made effective. *See* Pls. Ex. E.

UP Fintech conducted its bring down due diligence in the week of March 20, 2019 when its system had centrally analyzed trade data collected from 87% of the trading days for the first quarter. Notably, during an interview on the day of the IPO, Defendant Tianhua Wu, when expressing UP Fintech's desire to become the "Interactive Brokers in the Chinese World",

6

specifically noted Interactive Brokers' performance data such as the number of client accounts and average stock value per client account as of the end of February 2019. Pls. Ex. B. Despite its knowledge of all trade data, including the sharply declining trading volume and commissions for the nearly complete first quarter, the Registration Statement only disclosed the commissions for January 2019. The Registration Statement stated:

> "As of January 31, 2019, we had 83,546 customers with deposits and the account balance of such customers reached US$2,632.6 million, representing an increase of 11.7% from December 31, 2018. We generated US$2.9 million of revenues for the month ended January 31, 2019, including US$2.2 million in commissions and US$0.6 million in financing service fees. ***Our performance in January 2019 was partially affected by the generally quieter investment environment during the Chinese New Year season,*** given the fact that the vast majority of our client base are Chinese investors around the world." (Compl. ¶ 52; RS at 6-7.) (emphasis added).

Given the Registration Statement did not disclose monthly commissions or other performance metrics for any previous months, investors were unable to compare the January 2019 commissions to prior months' or to understand whether it was an unusually slow January or Chinese New Year season. The text merely disclosed that Chinese New Year *affected* the commissions in January 2019 – exactly how, it didn't say. Rather than truthfully and completely explain how the trading slow-down that began in January 2019 and continued though the IPO was reasonably likely to impact the Company's first quarter results, the Company mentioned only January's decline in commissions and attributed it to the isolated one-time event of the Chinese New Year – falsely suggesting commissions would return to normal at the conclusion of the holiday. (Compl. ¶52.)

Even worse, it omitted to mention the declining trading volume that had occurred from January 2, 2019 to March 19, 2019 and its impact on the Company's first quarter results. (Compl. ¶52.) UP Fintech's commissions are not perfectly correlated to trading volume. (*See* RS at 86 ("[i]n 2016, 2017 and 2018, the average rate of commissions as a percentage of trading volume was

7

0.0323%, 0.0238% and 0.0272%, respectively")); *see also* Pls. Ex. H (chart showing the ratios of quarterly commissions over the corresponding quarterly trading volumes in 12 quarters from 2017-2019). Its commissions were influenced by other factors besides trading volume too. (See RS at 82 ("[o]ur commissions *largely* depend on the number of customers on our trading platform *and* our customers' trading volume")) (emphasis added). Therefore, by looking at the January 2019 commissions, an investor could not determine the amount of trading volume or the magnitude and direction of its change (whether it increased or decreased and in what amount) in that month. Even less could an investor determine the amount of trading volume or the magnitude or direction of its change for the first quarter of 2019 based on the disclosure of January commissions. Nowhere in the Registration Statement did Defendants alert investors that the Company's primary source of revenue had already fallen materially in the substantially complete first quarter as of the IPO.

### C. Defendants Belatedly Revealed the Decline of Trading Volume and Commissions

On May 17, 2019, two months after its IPO, UP Fintech disclosed for the first time that the Company's commissions declined by 9.63% from the previous quarter because "[i]nvestors were relatively risk averse at the beginning of this year which leads to moderated trading activities". (Compl. ¶ 60.); Pls. Ex. I.  At the time, UP Fintech still didn't disclose the exact amount of the trading volume decline. (*Id.*) Five months after its IPO, the Company finally revealed that the trading volume for the first quarter of 2019 had declined by 24.5% from the previous quarter. (*Id.*)

By the time this action was filed, UP Fintech's stock lost 49% of its value from the IPO price – devastating investors.

### III.    ARGUMENT

### A. Plaintiffs Face a Minimal Pleading Burden under the Securities Act.

Section 11 of the Securities Act places "a relatively minimal burden on a plaintiff." *Herman & Maclean v. Huddleston*, 459 U.S. 375, 382 (1983). Section 11 imposes liability if any part of a registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statement therein not misleading." 15 U.S.C. § 77k.[5] To state a Section 11 claim, a plaintiff need only establish one of the following: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading." *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011). In contrast to Section 10(b) claims, "plaintiffs alleging violations of Sections 11 and 12(a)(2) [do] not need [to] plead scienter, reliance, or loss causation." *Id.* Because Section 11 has no scienter requirement, "[l]iability against the issuer of a security is *virtually absolute*, even for innocent misstatements." *Herman & MacLean*, 459 U.S. at 382. Section 15 of the Securities Act extends joint and several liability to controlling persons. 15 U.S.C. § 77o.

Claims under the Securities Act must satisfy only the notice pleading standards of Federal Rule of Civil Procedure 8, which requires a "short and plain statement" of the claim showing that the pleader is entitled to relief. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011). To survive a motion to dismiss under Rule 12(b)(6), a complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In ruling on a 12(b)(6) motion, a court must accept all well-pled factual allegations as true, draw all reasonable inferences in plaintiff's favor, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

---

[5] The IPO Prospectus was incorporated into Up Fintech's Form F-1 registration statement.

9

551 U.S. 308, 320-22 & n.4 (2007).

**B.   Item 303 Required Defendants To Disclose The Declining Trading Volume And Commissions For The First Quarter Of 2019 And Their Likely Impact.**

Under Item 303 of Regulation S-K, an issuer has a duty to disclose any trend, event or uncertainty that is "known and existing at the time of the IPO" that "was reasonably likely to have a material impact" on the issuer's financial condition. *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121 (2d Cir. 2012) (quoting *Litwin*, 634 F.3d at 716); (see also Compl. ¶¶ 67-76.). Moreover, an issuer also has a duty to disclose "whether, and to what extent" that known trend, event or uncertainty "might reasonably be expected to materially impact ... future revenues." *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 510 (S.D.N.Y. 2013) (citing *Panther Partners Inc.*, 681 F.3d at 121 (quoting *Litwin*, 634 F.3d at 716).) Instruction 3 to Item 303 requires that the Company's discussion and analysis "focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." *Id.* (quoting 17 C.F.R. § 229.303(a), instruction 3). The SEC instructs the Company to "identify and discuss key performance indicators, including non-financial performance indicators, that their management uses to manage the business and that would be material to investors."[6] This would obviously include trading volume in UP Fintech's case. "[F]ailing to comply with Item 303 by omitting known trends or uncertainties from a registration statement or prospectus is actionable under Sections 11 and 12(a)(2) of the Securities Act of 1933." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).

---

[6] *Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Securities and Exchange Commission Release Nos. 33-8350; 34-38960; FR-72 (Dec. 19, 2003), *available at* https://sec.gov/rules/interp/33-8350.htm#P18_1728.

As the Eleventh Circuit has explained, "Item 303(a)(3)(ii) essentially says to a registrant: If there has been an important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus. The obvious focus is on preventing ***the latest reported results*** from misleading potential investors, thereby promoting a more accurate picture of the registrant's future prospects." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1192 (11th Cir. 2002). Because Item 303 disclosures are mandatory, "a reasonable investor would interpret the absence of an Item 303 disclosure to imply the nonexistence of [such] known trends or uncertainties." *Stratte-McClure*, 776 F.3d at 102.

> a. *Defendants Failed To Disclose (i) The January 2019 Trading Volume Decline And (ii) The Impact Of The January 2019 Declining Trading Volume and Commissions On Future Performance.*

First, the Defendants failed to explain the impact of the known commissions decline in January 2019 on future performance such as the first quarter 2019, violating Item 303. *See Facebook*, at 510 (an issuer also has a duty to disclose "whether, and to what extent" that known trend, event or uncertainty "might reasonably be expected to materially impact ... future revenues."). Without knowing the commissions amount for any previous months, and particularly for a prior January, a reasonable investor could not conduct a meaningful comparison to determine the significance of January 2019 results. Also, a reasonable investor could not accurately estimate the *expected* commissions for the entire quarter given the Company attributed the commissions decline to a one-time event of the Chinese New Year.

Second, at the time of the IPO, Defendants knew that trading volume had declined dramatically for January 2019 because of their obligation to report daily trading data to FINRA and their admitted knowledge of declining commissions. Rather than disclose it and its impact on

11

the first quarter performance (and likely impact on subsequent quarters) under Item 303, Defendants tried to hide the real trend and uncertainty and buried this information in the half-truthful discussion of Chinese New Year. "A prospectus will violate federal securities laws if it does not disclose material objective factual matters, or buries those matters beneath other information, or treats them cavalierly". *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) (citation omitted) (internal quotation omitted).

Trading volume was one of the key operating performance metrics that UP Fintech used to evaluate "[its] business, measure [its] performance, identify trends, formulate financial projections and make strategic decisions" (RS at 84). In fact, trading volume is the Company's most important operating performance metric. (*See Id.* at 23 ("[o]ur revenues and profitability depend on trading volume")); (s*ee also Id.* at 23 ("[o]ur revenues depend substantially on our customers' trading volume")). In fact, almost all of UP Fintech's revenues were driven by the trading volume on its platform. (*See Id.* at 82 ("[o]ur ability to earn commission fees, interest income or financing service fees largely depends on the number of customers on our trading platform and their trading volume.")); (*see also Id.* at 86 (revenue source breakdown) (commission, interest income and financing service fees comprised of 98.8% of its revenues for 2016, 99.5% for 2017, 97.1% for 2018)). The Registration Statement extensively discussed trading volume and used this metric to evaluate the Company's historic performance and its ranking in the brokerage industry. (*See* e.g. *Id.* at 1 -3, 15, 80, 84, 86, 97-99, 102, 113, 116-118.) The Company also warned that a decline in trading volume for any reason would immediately impact its revenue and business. (*See Id.* at 23.)

Given trading volume's importance for UP Fintech's business and the Company's knowledge of its decline in trading volume in January 2019, Defendants' failure to disclose the

decline and its impact on  first quarter results (and subsequent quarters) under Item 303 "is

actionable under Sections 11 and 12(a)(2) of the Securities Act of 1933." *Stratte-McClure*, at 101.

> b. *Defendants Failed To Disclose The Declining Trading Volume And Commissions That Had Already Occurred In The First Quarter Of 2019 Up To The Time Of IPO, Violating Item 303.*

Defendants Had The Duty To Disclose Known Trend and Uncertainty in the Quarter in Progress

First, Defendants mischaracterize their omission to disclose trading volume as spanning

only six weeks from January 31, 2019 to the March 20, 2019 IPO. In fact, the Complaint alleges that

the Registration Statement failed to disclose the trading volume from January 2, 2019 to March 19,

2019, which constitutes 11.5 weeks, nearly the entire first quarter of 2019.

Second, trading volume is an operating performance metric, not a financial statement item

that requires financial auditing. (See RS at 84 where trading volume was listed as one of the key

operating data, separate from the table of financial numbers such as revenue and cost and expenses.)

Neither is it subject to any significant revision. C.f. *Asay v. Pinduoduo Inc.*, No. 18-CV-7625

(PKC), 2020 WL 1530745, at *9 (S.D.N.Y. Mar. 30, 2020) (the complaint failed to allege whether

the financial reports were audited or were later subject to significant revision.)[7]. In fact, the trading

volume information is readily available in UP Fintech's central system and in FINRA's OATS

system. *See* Pls. Ex. E. The host of cases that Defendants rely on to argue that interim financial

---

[7] Defendants conflate the duty to disclose financial results in *Asay*, 2020 WL 1530745, at *9 with the duty to disclose a trend or uncertainty in UP Fintech's operations under Item 303. Further, the facts in *Pinduoduo* are distinguishable because in *Pinduoduo* defendants disclosed that the company had a sixteenfold increase in sales and marketing expenses. The company also disclosed that it expected its costs and expenses to continue to increase. To a reasonable investor, no new unknown uncertainty existed as to the company's existing trend of increasing sales and marketing expenses at the time of its IPO. In contrast, investors here had no knowledge of the material decline of trading volume and commissions that had already taken place on UP Fintech's platform in the first quarter of 2019. All they knew at the time of the IPO was the Company's continuous revenue growth for the eight quarters due to the increased trading volume, the most significant factor for its profitability, and resulting commissions. (*See* Compl. ¶¶ 6, 47, 48.)

data are not required to be disclosed[8] are inapposite as these were audited financial statement items. Here, Defendants had a duty under Item 303 to disclose the trend and uncertainty created by this declining operating performance metric. By February 28, 2019, two-thirds of the first quarter had passed. Defendants had known by then that the declining trading volume was reasonably expected to have a material impact on the first quarter's results. Therefore, their duty under Item 303 was triggered by the end of February at the latest. *See Litwin*, 634 F.3d at 716 (Item 303's disclosure requirements are triggered whenever the impact of a known trend is expected to be "material"); see also *In re Facebook, Inc. IPO Securities and Derivative Litigation*, 986 F. Supp. 2d at 513 ("[d]efendants' duty under Item 303 was triggered before the [r]egistration [s]tatement became effective when Facebook was aware of the material negative impact on Facebook's revenues").

Even if, *arguendo*, the trading volume is regarded as akin to a financial statement item, "intra-quarter updates may be required[ ] if intervening events trigger a duty to disclose." *In re Bank of Am. Sec. Corp. Derivatives & ERISA Litig.,* 757 F.Supp.2d 260, 304 (S.D.N.Y.2010). Here, the omissions are material and should have been disclosed because the omissions "significantly alter[ed] the 'total mix' of information made available" about UP Fintech's operating performance in the first quarter of 2019. *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 36 (2d Cir. 2017) (quotation omitted) (citation omitted).

Ten days before its IPO, Facebook became aware of a material negative impact on its revenues as a result of increasing mobile usage. The court denied Facebook's' motion to dismiss, holding that "[t]hat Facebook identified the trend intra-quarter is of no issue; under Item 303, [d]efendants were required to disclose the issues even though it arose intra-quarter. *Id.* at 513; see also *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999) (rejecting the

---

[8] (*See* Defs. Br. at 14-15.)

14

defendants' argument that they had no duty to disclose sales results for a quarter in progress where prior to the issuer's initial public offering, the defendants had knowledge of a trend that had already had a material negative impact on the issuer's net sales).

Here, Plaintiffs adequately allege that nearly three months of declining trading volume and commissions had already occurred before the IPO. This trend and resulting uncertainty were reasonably likely to have a material impact on UP Fintech's financial condition because at the time of the IPO, 87% of the trading days had passed. Therefore, Defendants had the duty to disclose under Item 303. They were also required to disclose "whether, and to what extent" that known trend, event or uncertainty "might reasonably be expected to materially impact ... future revenues." *Facebook*, at 510. In fact, UP Fintech's quarterly trading volume did not recover to its pre-IPO level until the first quarter of 2020. Its commissions did not recover to its pre-IPO level until the fourth quarter of 2019. *See* Pls. Ex. H. Defendants cite several cases for the proposition that disclosures of accurate historic financial performance are not actionable.[9] (Defs. Br. at 10.) Defendants miss the point. "The central issue … is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mislead a reasonable investor about the nature of the [securities]" *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990). In the Registration Statement, Defendants depicted a rosy picture of strong historic growth in trading volume and revenue. (Compl. ¶ 6.) In the 12 quarters preceding the IPO, trading volume had been growing quarter over

---

[9] *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004), *In re Coty Inc. Sec. Litig.*, No. 14-CV-919 (RJS), 2016 WL 1271065, at *8 (S.D.N.Y. Mar. 29, 2016), *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006), *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012), and *River Birch Capital, LLC v. Jack Cooper Holdings Corp.*, No. 17CV9193, 2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) are inapposite here because the issue here is omission to disclose the known trend and uncertainty, rather than representation of historic data on their own.

quarter for 11 quarters except for one quarter in 2018. (*Id*. ¶ 49.) The Company also downplayed that single under-performing quarter stating they have never felt any impact from fluctuations in performance because they have historically experienced rapid growth. (*See Id*. ¶ 50 *and see also* RS at 102 ("[t]he impact of fluctuation and changes of market conditions, however, was not apparent historically due to the rapid growth of our business historically")). Most importantly, that one of twelve prior quarters didn't show strong growth is hardly an adequate disclosure that the current quarter has suffered a substantial trading volume and commissions decline. UP Fintech boasted of its powerful technology that collected and centrally analyzed trade data in real time. It also extensively discussed the importance of high trading volume to its success. In this context, because Item 303 disclosures are mandatory, a reasonable investor would naturally interpret the non-disclosure of an adverse trend in trading volume "to imply the nonexistence of [such] known trends or uncertainties." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 102 (2d Cir. 2015).

Defendants misconstrue *Arfa v. Mecox Lane Ltd.*, 2012 WL 697155, at *9-10 (S.D.N.Y. Mar. 5, 2012). "The Second Circuit has noted that the aim of Item 303 is to explain irregularities in offering documents and prevent a company's last reported financial results from misleading potential investors." *Id.*, at *9. (internal citation omitted). The *Mecox Lane* court dismissed the Item 303 claims because the undisclosed data were consistent with the historic disclosed trend. Nothing was irregular to warrant a disclosure under Item 303. In contrast, here, the declining trading volume on UP Fintech was an irregularity that would materially impact first quarter results. To prevent from misleading investors, UP Fintech should have disclosed this irregular decline in the Registration Statement.

Furthermore, Defendants incorrectly read the word "trend" under Item 303 as referring only to events of extended duration. (*See* Defs. Br. at 19.) Such narrow interpretation contravenes

16

the text of Item 303 and case law on this issue. Item 303 requires description of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). The trend or uncertainty includes any event, not merely one of extended duration, whether more or less than three months as Defendants suggest. A company must disclose *any* trend, any event or any uncertainty that is reasonably likely to have a material impact on its business -regardless of its duration. *See Panther Partners (*a product defect that could make the company lose major clients in the quarter in progress at the time of IPO is a trend); *see also Facebook* (the trend referring to customers changing from using desktop Facebook to mobile Facebook which might cause revenue to decline in the quarter in progress at the time of IPO); *see also Litwin v. Blackstone Group., L.P.* (loss of its exclusive contract with its biggest customer constituted a trend). Lastly, Defendants mischaracterize the duration of the downward trend (Defs. Br. at 19), the alleged trend and uncertainty in the Complaint lasted longer than six weeks.  It spanned 11.5 weeks in January, February and March or 87% of the first quarter of 2019 at the time of the IPO- and had a material effect that lasted a full year *after* the IPO.

Plaintiffs allege a plausible inference that Defendants had actual knowledge of the decline in trading volume and commissions

To establish that the trends were known, a plaintiff need only plead facts sufficient to create a "plausible inference" that Defendants knew of the undisclosed trends and uncertainties. *Panther Partners Inc.*, 681 F.3d at 121; *see also In re CPI Card Grp. Inc. Sec. Litig.*, No. 16-CV-4531 (LAK), 2017 WL 4941597, at *4 (S.D.N.Y. Oct. 30, 2017)

The Registration Statement repeatedly represented UP Fintech's robust system that collected, processed and centrally monitored trade data in real time. *Supra* II.A. FINRA, of which UP Fintech is a member, requires UP to report *all* trades on its platform every day. *Supra* II.B.

17

They not only had the information, they analyzed and provided to FINRA daily and was able to access this trading information across its entire platform.

Furthermore, Plaintiffs allege sufficient facts, taken as a whole, to plausibly infer that Defendants knew of a trend and uncertainty created by the declining trading volume that was reasonably likely to have a material impact on UP Fintech's first quarter performance: (i) Defendant Zeng acknowledged that the Company was aware of its customer accounts' activities and trading volume in real time and centrally analyzed them. (Compl. ¶ 65.); (ii) the Company collected, centrally analyzed, and reported trade data in real time. (*Id.* ¶¶ 41, 56, 57, 58, 65; RS at 112, 133, 134); (iii) the bring down due diligence required UP Fintech and its executives to verify any new material development before the Registration Statement was declared effective. Pls. Exs. E, F; (iv) Interactive Brokers, a shareholder and strategic partner of UP Fintech, aggregated global trade data instantaneously as shown by the reports of key performance metrics on the first day of every month that included the data from the last day before the report. *See* Pls. Exs. C, D.[10]; (v) Defendant Friedland was a senior executive at both UP Fintech and Interactive Broker and had access to Interactive Brokers' trading data. He reviewed, signed and approved the Registration Statement. (Compl. 21.); (vi) Defendant Pang knew of Interactive Brokers' global trading data for February 2019 at the time of IPO. *See* Pls. Ex. B. [11]

---

[10] Even the alleged facts relating to Interactive Brokers alone are sufficient to raise any plausible inference. *See Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635 (S.D.N.Y. 2017) (finding plausible inference of actual knowledge by the corporate defendant because Deloitte, a third party, had the relevant knowledge of the tax reforms that would impact the corporate defendant and that corporate defendant, as a client of Deloitte, would have been informed by Deloitte of these events in a specific news alert).

[11] Defendants also indicate that they did have knowledge of February trading data at the time of IPO, but they dispute its materiality. *See* Defs. Br. at 16 ("Even if the Company could have disclosed reliable information about February 2019 in its Registration Statement—and Plaintiffs plead nothing suggesting it could have—any omission is immaterial in light of other available information"). Materiality is addressed in III.D *infra*.

At the very least, Defendants had actual knowledge of its declining trading volume in January and February which constitutes the majority of the first quarter given CEO Defendant Pang's knowledge of the trade data of Interactive Broker – UP Fintech's primary trade execution and clearing agency.

Item 303 required Defendants to disclose the trend of declining trading volume and commissions and the uncertainty it created for UP Fintech because it was reasonably like to impact UP Fintech's first quarter (and later) results.[12]

### C. The Company's Risk Factor Statements Were Misleading Because the Risks Had Already Materialized

Defendants argue that the risk warnings and cautionary language about market volatility and significant potential for down quarters in the future adequately apprised investors that trading volume and commissions had already declined substantially in the first quarter of 2019 (*See* Defs. Br. at 12-13.) Defendants are wrong.

*First*, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

At the time of UP Fintech's IPO, 87% of the trading days in the first quarter of 2019 had taken place. Only 8 trading days had yet to come. The decline in trading volume and commissions had transpired and already impacted the Company's first quarter performance.

Therefore, UP Fintech's risk warnings that "more declines could occur in the future" (Defs. Br. at 13), that "'revenues and profitability' would be 'prone to significant and unpredictable

---

[12] Defendant rely on *In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14CV9826, 2017 WL 95176, at *4 (S.D.N.Y. Jan. 10, 2017) *Medina v. Tremor Videos, Inc.*, 2015 WL 1000011, at *2–3 (S.D.N.Y. Mar. 5, 2015) to argue that the results of the first quarter of 2019 cannot be used in hindsight to show knowledge at the time of IPO. As argued above, without relying on the first quarter results, Plaintiffs sufficiently allege that Defendants had actual knowledge of the declining trading volume at least for January and February.

fluctuations'" (Defs. Br. at 13; RS at 23), that "[a] weakness in equity markets, such as a slowdown causing reduction in trading volume … 'would have a material adverse effect' on the Company" (*Id.*), that "period to period comparisons of our revenues and operating results may not be meaningful, and future revenues and profitability may be subject to significant fluctuations or declines" (*Id.*), were misleading because the declines had already materialized. After all, "there is an important difference between warning that something '*might*' occur and that something '*actually* had' occurred." *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 103 (D.C. Cir. 2015) (emphasis in original); *see also In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400 (S.D.N.Y. 2005) (inadequate warnings of an already-transpired risk support liability for misleading statements); s*ee also In re Van der Moolen,* 405 F.Supp.2d at 400, 415 (statements purporting to warn that a company's business "could" be negatively impacted "if" it failed to comply with industry regulations were materially misleading where the company was violating industry regulations at the time it issued those purported warnings). [13]

*Second*, "generic risk disclosures are inadequate to shield defendants from liability for failing to disclose known specific risks." *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010).

The Registration Statement warns that the Company had "limited operating history" (Defs. Br. at 12; RS at 16), that the Company had net loss in 2017 and 2018 (*Id.*), and that "[w]e cannot assure you that we will grow at the same rate and succeed in introducing new services and products

---

[13] Similarly, the Ninth Circuit found actionable a company's warning that "speaks entirely of as-yet-unrealized risks and contingencies. Nothing alerts the reader that some of these risks may already have come to fruition." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008); *see also Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009) (finding actionable a statement that "speaks about the risks of product liability claims in the abstract, with no indication that the risk 'may already have come to fruition.'"), *aff'd*, 563 U.S. 27 (2011).

as we did in the past" (*Id*.). Such cautionary language is generic and doesn't meaningfully warn investors of the decline in trading volume UP had already experienced in the first quarter. See *In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 CIV.3111 RWS, 2005 WL 225288, at \*18 (S.D.N.Y. Feb. 1, 2005) (holding that generic disclaimer concerning hypothetical future risks about the company's products, programs, finances, and business were "insufficiently precise and [would] not insulate Defendants' statements from liability pursuant to the bespeaks caution doctrine"); *see also Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) (holding that the party may not rely on the generic disclaimer of "no assurance that loans could be sold successfully in the secondary market" to avoid liability when the party was aware of an actual danger or cause for concern for liquidity).

*Third*, contrary to Defendants' argument, the discussion of the Company's January 2019 commissions (Defs. Br. at 13) not only failed to adequately warn investors that revenue for the first quarter of 2019 was likely to be lower than the previous quarter but was very misleading.

Defendants' representations must be read in context. "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of "defendants' representations, taken together and in context." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010).

The Registration Statement, in relevant part, stated:

"As of January 31, 2019, we had 83,546 customers with deposits and the account balance of such customers reached US$2,632.6 million, representing an increase of 11.7% from December 31, 2018. We generated US$2.9 million of revenues for the month ended January 31, 2019, including US$2.2 million in commissions and US$0.6 million in financing service fees. ***Our performance in January 2019 was partially affected by the generally quieter investment environment during the Chinese New Year season,*** given the fact that the vast majority of our client base are Chinese investors around the world." (RS at 6-7; Compl. ¶ 52.).) (emphasis added).

21

*Firstly*, UP Fintech didn't say whether commissions (or trading volume) were higher or lower as a result of Chinese New Year, only that its "performance was affected". Defendants contributed the unstated effect on performance to the once-a-year event of the Chinese New Year. Such statement is too vague to adequately apprise investors of its impact on the first quarter of 2019, particularly given the Registration Statement stating that "[the Company has] not experienced seasonality in [its] business". (Compl. ¶ 51; RS at 103). In fact, in the first quarter of 2018, UP Fintech experienced a significant quarter-over-quarter increase in both commissions (+26.3%) and trading volume (+43.8%) as compared to the fourth quarter of 2017. (Compl. ¶ 63.) In the first quarter of 2017 – in which the Chinese New Year also took place – UP Fintech also experienced significant quarter-over-quarter increases in trading volume (+95.4%) compared to the previous fourth quarter of 2016. (*Id.*) *Secondly*, without being completely and accurately informed, a reasonable investor would naturally infer that the "affect" on commissions in January 2019 was merely temporary and would not have any unexpected impact on the first quarter's or later performance. "The SEC's general regulations expressly provide that '[i]n addition to the information expressly required to be included in a registration statement, there shall be added such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading.'" *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (citing 17 C.F.R. § 230.408).[14]

---

[14] Relying *DeMaria*, Defendants argue that there is no duty to make intra-quarter disclosure prior to IPO. The 2nd Circuit, however, did not hold intra-quarter disclosure was not required *per se*. Rather, it rejected such duty only because non-disclosure of the interim data did not render the registration statement misleading since the 18% increase from the prior quarter and a 134% increase from the corresponding period of the prior year in the net revenue for the then in progress quarter at the time of the IPO was consistent with the previous growth.

Defendants *ex post* suggestion of a simple three-times multiplication of January's commissions to estimate the entire first quarter's performance (Defs. Br. at 7, 13) is baseless. The Registration Statement expressly attributed the January commission level to an isolated seasonal event. Chinese New Year occurs once a year and therefore, should have no effect on February or March revenue. Thus, that "simple multiplication" to estimate the first quarter's performance is inaccurate. Indeed, the Registration Statement provided no other monthly results to compare the January 2019 commissions to, making it impossible for investors to know whether it represented an increase or a decline or the magnitude of the change. It is Defendants' duty to "ensure that those statements were accurate and complete." *Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 646 (S.D.N.Y. 2012).

Therefore, the discussion of the Company's January 2019 commissions, although accurate on its own, is misleading in the context. "A prospectus will violate federal securities laws if it does not disclose 'material objective factual matters,' or buries those matters beneath other information, or treats them cavalierly." *DeMaria*, 318 F.3d at 180 (citation omitted).

### D. Defendants' Misrepresentations and Omissions Were Material

A "complaint may not properly be dismissed … on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (alteration in original).

"Item 303's disclosure obligations, like materiality under the federal securities laws' anti-fraud provisions, do not turn on restrictive mechanical or quantitative inquiries." *Panther Partners Inc.*, 681 F.3d at 122; *see also Silverstrand Investments v. AMAG Pharm., Inc.*, 707 F.3d 95, 105 (1st Cir. 2013) (the "analysis under Items 303 and 503 cannot be limited to simple arithmetical

23

computations"). Rather, a court must consider "both 'quantitative' and 'qualitative' factors in assessing an item's materiality." *Litwin*, 634 F.3d at 717-18. Moreover, "[w]here the principal issue is materiality, an inherently fact-specific finding, the burden on plaintiffs to state a claim is even lower." *Id.* at 718.

"[O]ne factor affecting ... materiality is whether the misstatement or omission relates to a segment that plays a 'significant role' in the registrant's business." *Litwin*, 634 F.3d at 720. The SEC's commentary on Item 303 further supports this reading of *Litwin* and *Panther Partners*. In its 1989 SEC Release, the SEC stated that if "[m]anagement is unable to determine that a material effect ... is not reasonably likely to occur," then "MD & A disclosure of the effects of [the known trend, development or uncertainty], quantified to the extent reasonably practicable, would be required." 54 Fed.Reg. at 22,430; *see also* 2003 SEC Release, 68 Fed.Reg. at 75,062 ("Quantitative disclosure ... may be required to the extent material if quantitative information is reasonably available.").

The Registration Statement shows that the omitted information of declining trading volume and commissions is material. Trading volume is the most important operating metric in determining the Company's performance. (*See* e.g. RS at 1 -3, 5, 15, 23, 80, 84, 86, 97-99, 102, 113, 116-118.) Almost all UP Fintech's revenues, including commission, interest income and financing service fees, hinge on the performance of trading volume. *Supra* III.B.a. Failing to disclose the declining trading volume as of the IPO and the resulting commissions and their impact on the first quarter, therefore, is a material omission. *Litwin,* at 720.  That UP Fintech's share price declined upon the later disclosure of the declining trading volume and commissions indicates that investors did find the omitted information material. *See In re Take-Two Interactive Sec. Litig.*, 551

F. Supp. 2d 247, 292 (S.D.N.Y. 2008) (while a plaintiff is *not required* to allege a share price decline on disclosure of the omitted facts to plead materiality, such a decline *does suffice*).

**E. Plaintiffs Adequately Allege Control Person Liability under Section 15**

Defendants do not dispute control person liability under Section 15 and have therefore waived their right to challenge it. *See* Fed. R. Civ. P. 12(g); *Connecticut Bar Ass'n v. United States,* 620 F.3d 81, 91 n.13 (2d Cir. 2010) ("Issues raised for the first time in a reply brief are generally deemed waived.").

**IV.    CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety. Should the Court grant the motion, Plaintiffs respectfully request leave to file an amended complaint.[15]

---

[15] *See In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 772 (S.D.N.Y. 2012) (granting motion to dismiss without prejudice and granting plaintiffs leave to amend the complaint to supplement Section 11 allegations).

Dated: June 22, 2020                                   Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/Laurence M. Rosen
Laurence M. Rosen
Phillip Kim
Jing Chen
275 Madison Ave, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenleal.com
          pkim@rosenlegal.com
          jchen@rosenlegal.com

*Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2020, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/Laurence M. Rosen

27