# Exhibit F



# Practical Guidance on Securities Offerings
## (including High Yield and Initial Public Offerings)
## in a Changing Environment

March 18, 2014



A Webinar Series for M&A
and Securities Professionals

WINSTON
& STRAWN

© 2014 Winston & Strawn LLP

# Today's Speakers



**Jim Junewicz**

Partner

Chicago /  New York

(312) 558-5257 / (212) 294-6700

jjunewicz@winston.com



**Karen Weber**

Partner

Chicago

(312) 558-8794

kweber@winston.com



The **Real Deal**

A Webinar Series for M&A
and Securities Professionals

© 2014 Winston & Strawn LLP

WINSTON & STRAWN

# IPO and HY Markets are Robust

<u>IPO's</u>

- 2013 best year for U.S. IPOs since 2008

- 183 IPOs by U.S. and foreign issuers in 2013 compared to 105 in 2012

- Second half of 2013 in U.S. stronger than first half; 65 v. 52 = 117

- Hilton Worldwide Holdings was largest IPO in 2013 with $2.3 billion of proceeds

<u>HY</u>

- Market for HY Debt increased to $683B in 2013 compared to $596B in 2008

- Corporate interest and default rates are near an all-time low

- Sprint Nextel set a record in 2013 with a HY Bond offering of over $6.5B



© 2014 Winston & Strawn LLP

# IPO Process                                                                            *

An IPO requires ongoing attention to a series of parallel and independent processes, including:

- Registration with Securities and Exchange Commission ("SEC");

- "Due Diligence" to ensure prospectus is correct

- Underwriting / Road Show

- Corporate "Housekeeping"

- Exchange Listing

Can take three months or more from start to finish.



© 2014 Winston & Strawn LLP                                     4

# IPO Process – Registration                         *

- **Preparation and Filing of Registration Statement on Form S-1**

  - Contents of Form S-1 a function of SEC Regulations (Regulations S-K and S-X) and market and industry practice.

- **SEC Review**

  - After the registration statement is filed, the next step is to receive and respond to SEC comments to the registration statement.

  - Issuers sometimes receive over 100 SEC comments.

  - Goal of experienced counsel is to look for ways to narrow differences with the SEC during review process.

© 2014 Winston & Strawn LLP                         5



# IPO Process – Underwriting/Road Show  *

**Road Show**

- Opportunity for the company to articulate its story and the investment opportunity face-to-face with investors.

- Usually 2 weeks for IPOs

- Electronic Road Shows.  Electronic road shows often used to reach retail investors.

- Contents of roadshow generally within "four corners" of the Form S-1 filing.

**Stock Exchange Listing**

- Consider, among other things, listing requirements and where peers/competitors are listed.

© 2014 Winston & Strawn LLP



# IPO Process - Corporate "Housekeeping"    *

- **Board**

  - Independence - NYSE / NASDAQ listing standards.

  - Committees – Audit, Compensation, Nominating and Corporate Governance.

- **Adoption of Certain Corporate Policies and Creation of Committees**

  - Code of business conduct and ethics, insider trading policy, Regulation FD policy, whistleblower policy, document retention policy, disclosure committee.

- **Compensation Issues**

  - Equity incentive plan, equity grant policy, director compensation policy, stock purchase plan, executive employment agreements.

- **Adoption of "shareholder protection" measures**

  - Staggered board

  - Delaware §203

- **Last chance for approval by "friendly" shareholders selected by founders**



© 2014 Winston & Strawn LLP

# IPO Timeline

| Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 |
|---|---|---|---|---|---|---|---|

**Week 1**
- Organizational meeting
- Begin due diligence and information gathering
- Begin drafting S-1

**Week 2**
- Continue due diligence
- Continue drafting S-1

**Week 3**
- Begin drafting roadshow presentation
- Deliver audited financials
- Prepare:
  - Underwriting agreement
  - Comfort letter
  - Legal opinions
  - Stock exchange application
- Continue due diligence and drafting S-1

**Week 4**
- Finalize due diligence
- Continue drafting
  - underwriting agreement
  - comfort letters
  - legal opinion
  - roadshow presentation
  - stock exchange application
- File S-1 with SEC
- File with FINRA

**Week 5**
- Continue preparing:
  - underwriting agreement
  - comfort letter
  - legal opinions
  - roadshow presentation
- Obtain lock-up agreements

**Week 6**
- Continue preparing:
  - underwriting agreement
  - comfort letter
  - legal opinions
  - roadshow presentation

**Week 7**
- Finalize:
  - underwriting agreement
  - comfort letter
  - legal opinions

**Week 8**
- Receive SEC comments

| Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | Week 14 | Week 15 |
|---|---|---|---|---|---|---|

**Week 9**
- Respond to SEC comments and file Amendment No. 1
- File Amendment No. 1 with FINRA and respond to comments, if any

**Week 10**
- Finalize roadshow materials
- Roadshow rehearsals

**Week 11**
- Receive SEC comments on Amendment No. 1
- Finalize valuation, determine price range
- Respond to SEC comments and file Amendment No. 2
- Print preliminary prospectuses (if no material comments remain unresolved)

**Week 12**
- Commence roadshow
- Sales force meetings
- Receive SEC comments on Amendment No. 2
- Respond to SEC comments and file Amendment No. 3

**Week 13**
- Continue roadshow

**Week 14**
- Clear SEC and FINRA
- Clear stock exchange
- Request acceleration of effectiveness of S-1
- Bring down due diligence
- Pricing
- Sign underwriting agreement
- Deliver comfort letter
- File 424 prospectus with SEC

**Week 15**
- Bring down due diligence call
- Deliver legal opinions
- Deliver bring-down comfort letter
- Close

© 2014 Winston & Strawn LLP



# JOBS Act

- The Jumpstart Our Business Startups (JOBS) Act, signed into law on April 5, 2012, has significantly changed the IPO practice.

- Almost 2 years of experience with the JOBS Act.

- More than 80% of companies going public have taken advantage of JOBS Act provisions.

- JOBS Act provisions are also available for debt-only filers doing Exxon-Capital exchange offers.

© 2014 Winston & Strawn LLP

9



# Effect of JOBS ACT - EGC

- Created new category of issuer called an "emerging growth company" (EGC).

  - EGC is a company with annual revenue of less than $1.0 billion for its last fiscal year.

  - EGCs are found across many industries: technology, energy, healthcare, financial services, real estate, pharmaceuticals.

  - Many formerly public companies that went private are eligible for EGC status.

- 75% of issuers pricing an IPO after April 5, 2012 identified themselves as an EGC.

  - Companies with less than $250 million in annual revenue accounted for almost 85% of EGC IPOs.

© 2014 Winston & Strawn LLP



# EGC Accommodations

- Title 1 gave EGCs attractive new options, including:

  - Confidential SEC Review

  - Testing-the-Waters Communications

  - Scaled Financial Disclosure

  - Delay in Compliance with Sarbanes-Oxley section 404(b)

  - Sealed Executive Compensation Disclosure

  - Extended Phase-In for New GAAP Accounting Pronouncements

- Varying degrees of market acceptance.



# Popular JOBS Act Reforms

- ECGs may initiate SEC registration process confidentially.
  - Previously available to foreign issuers.
  - Must file publicly 21 days before start of roadshow.

- Significant advantages
  - Commence SEC review without revealing sensitive strategic information.
  - Resolve vexing comments outside of public view.
  - Withdraw draft S-1 if market conditions change.
- Drawback
  - Absence of dual IPO/M&A market track.

- Approximately 175 EGCs used the provision for confidential review in the first year.

- 10% of confidential submissions involve an EGC publicly announcing its confidential submission of a registration statement, which does not constitute gun-jumping if Rule 135 is followed.
  - May attract M&A suitors.
  - Employee communications.
  - Twitter "tweeted" that it submitted S-1 confidentially.

© 2014 Winston & Strawn LLP


WINSTON & STRAWN

# Popular JOBS Act Reforms

- Internal Controls Audit
  - EGCs are exempt from the internal controls audit required by Section 404(b) of the Sarbanes-Oxley Act.
  - EGCs generally take advantage of this provision.
  - Some management teams prefer not deferring Section 404(b) compliance.
- Executive Compensation Disclosure
  - No CD&A; top 3 employees (rather than top 5) required.
  - 75% of EGCs took advantage of this accommodation.
  - "Mini-CDA" may help marketing.



# Less Popular Reforms

- Testing-the-Waters communications are still evolving.

- Testing-the-Waters: EGCs can engage in oral/written communications with QIBs and institutional accredited investors before or after initial filing.

  - Testing-the-Waters provisions allows oral and written offers before S-1 filing.

    - Anathema pre-JOBS Act and still so for non-EGCs.

    - Would violate traditional notions of Section 5.

  - May solicit non-binding indications of interest at various prices.  Timing and content of meetings must be carefully thought out, since antifraud provisions continue to apply to the content of these communications.

  - SEC staff reviews test-the-waters communications and seeks copies of written material used.

    - Be careful about written materials

      - Subject to Rule 10b-5

      - May wish to wait until first round of SEC comments received

      - Alternatively, use of "high level" information likely to survive SEC comments

    - Consult with your underwriter first

- Started slow but gaining in traction, especially in high tech.

  - Helps gauge a company's "story" and IPO readiness.

  - "Dry run" for management pre-roadshow.

© 2014 Winston & Strawn LLP



# Less Popular Reforms                                          *

- "Scaled" Financial Disclosure
  - EGC can provide two, rather than three, years of audited financial statements and two, rather than five, years of selected financial data.
    - Issuers generally present three years because bankers feel it helps marketing (e.g., shows positive trend).
    - Avoids Rule 10b-5 issues if the third year is arguably material.
    - Two years prevalent if the third year is not meaningful, e.g. for start-ups.

  - Nearly all EGC IPOs with gross proceeds over $250 million provided three full years of audited financial statements and five years of selected financial data.

  - Of those that provided three years, approximately 1/3 provided fewer than five years of selected financial data.



© 2014 Winston & Strawn LLP                    15

# Less Popular Reforms                                                        *

- Extended Phase-In for New GAAP Rules.

  - EGCs not required to comply with new accounting rules until private companies must do so.

  - Must disclose decision to opt-in in S-1 filing; disclose risks; and discuss in accounting principles in MD&A.

  - 80% of EGCs opted-out of the accommodation for extended phase-in and elected to follow public company phase-in periods.

  - Reason: to promote comparability with peers.

© 2014 Winston & Strawn LLP                                16



# Recent Developments                                              *

- IPO advisors

  - Companies increasingly hiring advisor separate from underwriter, which are valuable advisors themselves.

  - Advisors state they can provide a separate and uniquely independent source of advice on pricing, marketing, etc.

  - Can create disclosure/FINRA questions.

© 2014 Winston & Strawn LLP



# How to ensure your IPO is a success

**Know your company and its market**

- Check competitors' public company reports and analyst reports.

- Check SEC comment letters for similar companies.

- Speeds SEC review.

**Be careful to avoid harmful pre-offering publicity**

- In short, restrict communications to ordinary course factual business communications and don't engage in interviews, meetings with analysts, speeches or promotional seminars.

- You can expect the SEC to google your company to see what you have been saying.

- Press releases, media interviews, website disclosure of upcoming offering may result in SEC delays and expand D&O liability.
  - Playboy interview of Google founders attached to prospectus
  - Unpleasant and embarrassing "rescission" risk factor

- Positive statements about company prospects may have same effect.

© 2014 Winston & Strawn LLP

18


WINSTON & STRAWN

# How to ensure your IPO is a success     *

**Acquisitions/dispositions before IPO can trigger special financial disclosure requirements**

- Signing an acquisition agreement before IPO can result in requirement to include audited financial statements for acquired company.

- "Pro forma" financials also may be required.

- Consider these requirements if contemplating acquisition prior to IPO and prepare required financials early so process not delayed.



© 2014 Winston & Strawn LLP                    19

# How to ensure your IPO is a success          *

- "Cheap Stock" issues
  - SEC requires disclosure of stock sales within 3 years of S-1 filing
  - Must include date and price per share
  - Sales below fair market value can raise "cheap stock" issues and result in earnings charges and SEC delays
  - Carefully document and support pre-IPO stock sales
  - Consider peer valuation or obtain third party valuation
  - Experienced counsel consider whether to raise proactively with the Staff

© 2014 Winston & Strawn LLP



# How to ensure your IPO is a success

- Be aware of recent SEC disclosure initiatives.
  - Check comment letters

- For example, "cyber security" may be an issue for high tech companies.

- 503(c) of Regulation S-K: cybersecurity threats/incidents must be disclosed if they "are among the most significant factors that make an investment in the company speculative or risky."
  - Must "adequately describe the nature of the material risk and specify how each risk affects the registrant."

© 2014 Winston & Strawn LLP



# How to ensure your IPO is a success

- Find independent directors early.

- Take advantage of your friendly shareholder base while you can.

  - Compensation plans and arrangements.

  - Charter provisions.

© 2014 Winston & Strawn LLP



# How to ensure your IPO is a success

It's <u>Your</u> Prospectus and <u>Your</u> Deal

- Every company is unique.  Make sure prospectus captures what is special about <u>your</u> company.

© 2014 Winston & Strawn LLP



# HY Process                                                             *

- HY bond rated below investment grade: BB (S&P) or lower

The process for a HY bond offering is similar to the IPO process.

- Principal differences are that (i) no SEC registration precedes the road show and (ii) the roadshow is usually one week or less, rather than two weeks for IPOs.
- As a result, the time to market is far shorter.
- Weeks rather than months.

HY bonds are typically privately placed (i) inside the United States exclusively to "qualified institutional buyers" or "QIBs" in reliance on Rule 144A under the Securities Act and (ii) outside the United States in reliance on Regulation S under the Securities Act.

Certain of the key documents that require drafting and/or negotiation include:

- Offering Memorandum
- Indenture
- Purchase Agreement



© 2014 Winston & Strawn LLP                24

# HY Process  *

**Offering Memorandum**

- Disclosure document intend to provide investors with all material information necessary to make informed decision as to whether or not to invest in the bonds.

- Although no specific disclosure requirements apply, OM generally follows S-1 form to meet market expectations.

- Includes Description of Notes, Risk Factors, Description of the Business (including strengths and strategies), MD&A, historical financials, director and executive officer bios, etc.

- Also, often the notes will eventually be registered in an A/B exchange transaction whereby the privately placed notes are exchanged for registered notes.  Neither the company nor the initial purchasers are typically comfortable issuing the notes pursuant to an offering memorandum that differs much from the prospectus by which the notes will eventually be registered.

© 2014 Winston & Strawn LLP



# HY Process *

**Indenture**

- Legal contract entered into by issuer of the bonds, any guarantors of the bonds and a bond trustee, as trustee for the holders of the bonds from time to time.

- Contains key terms of the bonds such as the interest rate, maturity date, pledge, promises, representations, covenants and other terms of the bonds.

- The "covenant package" is negotiated with the goal of ensuring adequate protections for the future holders of the bonds while preserving the necessary operating financial flexibility to allow the issuer to execute its business plan.

- The terms of the indenture will be summarized in the offering memorandum in the "Description of the Notes" section.

**Purchase Agreement**

- Similar to underwriting agreements used in IPOs

© 2014 Winston & Strawn LLP

26



# HY Timeline

| Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 |
|--------|--------|--------|--------|--------|--------|--------|

**Week 1**
- Begin drafting ratings agency presentations
- Set up appointments with ratings agencies
- Organizational meeting
- Begin due diligence and information gathering
- Begin drafting offering memorandum ("OM")
- Begin drafting indenture ("DON" in the OM)
- Review ratings agency presentations with the Issuer

**Week 2**
- Drafting session for OM
- Continue drafting and negotiating DON
- Begin drafting roadshow presentations
- Finalize ratings agency presentations
- Rehearse and send presentations to ratings agencies
- Ratings agency meeting

**Week 3**
- Drafting session for OM
- Continue drafting and negotiating DON
- Draft roadshow presentation
- Ratings agency's analysts prepare internal analyses

**Week 4**
- Deliver audited financials and begin drafting comfort letter
- Request meeting with high yield analysts
- Finalize OM (including DON) and Indenture
- Receive ratings

**Week 5**
- Roadshow rehearsals
- Meet with high yield analysts
- Send OM to financial printer
- Negotiate Purchase Agreement

**Week 6**
- Mail OM to investors
- Begin roadshow
- Finalize Purchase Agreement

**Week 7**
- End roadshow
- Pricing and closing
- Funding

© 2014 Winston & Strawn LLP



# JOBS Act and HY

- Affected HY deals too, but not nearly as much as IPOs

- Rule 144A changed to allow for the general solicitation of offerees but all <u>purchasers</u> must still be QUIBs or accredited investors

- As a result, press releases announcing the launch of a HY may now name underwriters without jeopardizing exemption from SEC registration

- Notwithstanding new flexibility, practice has not changed much

© 2014 Winston & Strawn LLP

28



# HY Deal Trends

- Low interest rates driving investment grade buyers into HY resulting in significant market changes.

- HY issuers have exploited increased demand by seeking better terms

- Elimination of covenants for "BB" issuers.
  - BB is new BBB.
  - No debt incurrence test; no restricted payments (dividends) restriction.

© 2014 Winston & Strawn LLP                                    29



# HY Deal Trends

- Looser covenants in HY deals even if not rated BB.

- Lien tests have secured leveraged ratio; rare years ago.

- Some sponsor backed deals permit unlimited dividends if leverage ratio met; rare just one year ago.

© 2014 Winston & Strawn LLP



# HY Deal Trends

- "Private for Life".

- More and more companies are doing HY bond deals without the obligation to register the notes.

- Saves companies the expense of SEC registration.

- Avoids disclosure of SEC-mandated information (e.g., compensation) for companies that are not already SEC filers.

- Companies that are SEC filers can avoid supplying financial information for non-guarantor subs (S-X 3-10).

- Shorter holding period under Rule 144 seems to mitigate any coupon penalty.


WINSTON & STRAWN

# PIKs returning

- "Pay in Kind" notes have re-surfaced.

- "Toggle" feature enables issuers to decide to use cash or more notes to pay interest.

© 2014 Winston & Strawn LLP



# HY Deals

- Negotiating covenants

  - "Cherry picking" the "best" provisions from numerous other deals can produce marketing problems without corresponding benefit; it's not good lawyering for issuer or underwriter counsel.

    - Can prolong negotiations; delay launch; and frustrate clients.

  - On other hand, covenant package must be right for issuer.

    - Hard to change later on.

  - Counsel for both issuers and banks should anticipate what flexibility the issuer will need now and in future.

© 2014 Winston & Strawn LLP

33



# Questions?





**Jim Junewicz**

Partner

Chicago /  New York

(312) 558-5257 / (212) 294-6700

jjunewicz@winston.com

**Karen Weber**

Partner

Chicago

(312) 558-8794

kweber@winston.com



The Real Deal

A Webinar Series for M&A
and Securities Professionals

© 2014 Winston & Strawn LLP

34

WINSTON
&STRAWN

# Thank you

© 2014 Winston & Strawn LLP

