**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

VICKEY RONGEY WILLARD, Individually and
on Behalf of All Others Similarly Situated,

       Plaintiff,

       v.

UP FINTECH HOLDING LIMITED,
TIANHUA WU, JOHN FEI ZENG,
YONGGANG LIU, LEI FANG,
DAVID ERIC FRIEDLAND,
VINCENT CHUN HUNG CHEUNG, BINSEN
TANG, XIN FAN, JIAN LIU, XIAN WANG,
CITIGROUP GLOBAL MARKETS INC.,
DEUTSCHE BANK SECURITIES INC.,
AMTD GLOBAL MARKETS LIMITED,
CHINA MERCHANTS SECURITIES (HK)
CO., LIMITED, and TOP CAPITAL
PARTNERS LIMITED.

       Defendants.

Case No. 1:19-cv-10326-JMF

<u>CLASS ACTION</u>

---

**REPLY MEMORANDUM OF LAW ON BEHALF OF DEFENDANTS**
**UP FINTECH HOLDING LIMITED, CITIGROUP GLOBAL MARKETS INC.,**
**AND DEUTSCHE BANK SECURITIES INC., IN FURTHER SUPPORT OF**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................................1

ARGUMENT.....................................................................................................................2

I.    PLAINTIFF FAILS TO PLEAD ACTIONABLE MISSTATEMENTS ..............................2

II.   PLAINTIFF FAILS TO PLEAD ACTIONABLE OMISSIONS .........................................2

    A.   Plaintiff Fails to Plead Any Obligation to Make Intra-Quarter Disclosures......................2

    B.   Any Supposed Omissions Were Immaterial in Light of the Registration Statement's Extensive Warnings..................................................................................................4

    C.   Plaintiff Fails to Plead That UP Fintech Was Aware of Material Information That it Failed to Disclose ..................................................................................................5

    D.   Plaintiff Fails to Plead a Breach of Any Obligation Under Item 303 ..............................7

CONCLUSION.................................................................................................................11

i

# TABLE OF AUTHORITIES

**Page**

## Cases

*Arfa v. Mecox Lane Ltd.*,
  2012 WL 697155 (S.D.N.Y. Mar. 5, 2012) .................................................................9

*Asay v. Pinduoduo Inc.*,
  2020 WL 1530745 (S.D.N.Y. Mar. 30, 2020) ..............................................................2

*In re Bank of Am. Sec. Corp. Deriv. & ERISA Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010) .......................................................................10

*DeMaria v. Anderson*,
  318 F.3d 170 (2d Cir. 2003) .......................................................................................4

*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) ........................................................................9

*Lin v. Interactive Brokers Grp.*,
  574 F. Supp. 2d 408 (S.D.N.Y. 2008) ........................................................................5

*Litwin v. Blackstone Grp.*,
  634 F.3d 706 (2d Cir. 2011) .......................................................................................9

*Marcu v. Cheetah Mobile Inc.*,
  2020 WL 4016645 (S.D.N.Y. July 16, 2020) ..............................................................2

*Milman v. Box Hill Sys. Corp.*,
  72 F. Supp. 2d 220 (S.D.N.Y. 1999) ..........................................................................9

*Olkey v. Hyperion 1999 Term Tr., Inc.*,
  98 F.3d 2, 8 (2d Cir. 1996) .........................................................................................4

*Oxford Asset Mgmt., Ltd. v. Jaharis*,
  297 F.3d 1182 (11th Cir. 2002) ..................................................................................8

*Panther Partners Inc. v. Ikanos Comm., Inc.*,
  681 F.3d 114 (2d Cir. 2012) .......................................................................................9

*Rincon v. Covidien*,
  2017 WL 2242969 (S.D.N.Y. May 22, 2017) .............................................................5

*Stadnick v. Vivint Solar Inc.*,
  861 F.3d 31 (2d Cir. 2017) ....................................................................................4, 10

## Other Authorities

*Interpretation: Commission Guidance Regarding Management's Discussion and
  Analysis of Financial Condition and Results of Operations*, SEC Release Nos. 33-
  8350; 34-48960; FR-72 (Dec. 29, 2003). .................................................................3, 8

ii

Defendants UP Fintech Holding Limited ("UP Fintech" or the "Company"), Citigroup Global Markets Inc., and Deutsche Bank Securities Inc. respectfully submit this Reply Memorandum of Law in further support of their Motion to Dismiss the Amended Class Action Complaint ("Amended Complaint" or "AC").

## PRELIMINARY STATEMENT

The Opening Brief made clear that Plaintiff cannot plead a claim for securities fraud based on *accurate* statements about the Company's historical performance, or on the notion that positive operating history guarantees future results. Defendants also made clear that no reasonable investor could view the Company's history as uniformly positive: (i) quarter-over-quarter results for trading volume and commissions demonstrated significant volatility and recent *declines*; (ii) the in-progress first quarter of 2019 pointed to a decline in commissions; and (iii) the Company warned that prior results had little predictive value because the historic volatility was likely to continue. The Opening Brief also made clear that the demand for an extraordinary intra-quarter disclosure is baseless, and that Company disclosures made any supposed omission immaterial.

The Opposition effectively acknowledges these shortcomings by narrowly relying on Item 303. This gambit fails on many levels. *First*, Plaintiff does not plead that results for the first quarter of 2019 diverged from what the Company's historical results predicted: volatility, wide swings from the previous quarter, and significant declines. *Second*, the Company's operating history and numerous, detailed risk warnings made any omission immaterial. *Third*, the time period at issue, including the six-week period between January 31, 2019—the latest date for which the Company disclosed commission revenues in the IPO offering materials—and the IPO is too short to constitute a "trend." And *finally*, Plaintiff pleads no *facts* that UP Fintech *knew* what its first-quarter 2019 results would be before disclosing them, much less before the quarter ended.

Plaintiff's claims should be dismissed in their entirety, with prejudice.

**ARGUMENT**

## I.    PLAINTIFF FAILS TO PLEAD ACTIONABLE MISSTATEMENTS

The Opposition does not deny Plaintiff's failure to plead a misstatement in the Registration Statement.  ECF No. 53 ("MTD") 10-14; *see also Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at \*4 (S.D.N.Y. July 16, 2020) (Furman, J.) ("[A] violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data.") (quotation omitted).

## II.    PLAINTIFF FAILS TO PLEAD ACTIONABLE OMISSIONS

### A.    Plaintiff Fails to Plead Any Obligation to Make Intra-Quarter Disclosures

As discussed in the Opening Brief, requiring intra-quarter disclosures is the rare exception (in distinguishable cases), rather than the rule, because in many instances it would cause inaccurate and misleading disclosures. MTD 14-15 (citing unanswered authority); *see also Asay v. Pinduoduo Inc.*, 2020 WL 1530745, at \*9 (S.D.N.Y. Mar. 30, 2020) ("reasonable investor" would understand that results for quarter preceding IPO were not included in prospectus, and prospectus warned investors about expenses that were ultimately disclosed with quarterly results).[1]

In support of its extraordinary demand, Plaintiff asserts that the Company could have disclosed trading volume before closing the books for the first quarter of 2019 because trading volume is not "a financial statement item that requires financial auditing."  ECF No. 55 ("Opp.") 13.  Importantly, Plaintiff does not dispute, and effectively concedes, that companies are entitled to await review and auditing of their financial metrics, which disposes of any claim that the

---

[1] The fact that Pinduoduo "disclosed that it expected its costs and expenses to increase," Opp. 13 n.7, matches UP Fintech's disclosure that increasing operating costs and labor expenses "***will decrease our profitability, perhaps materially***."  *See* MTD 5.  Similarly, UP Fintech's investors faced no "unknown uncertainty," Opp. 13 n.7, because the Company disclosed and warned about volatility, and declining first-quarter 2019 commissions and profitability.  Argument § II.B.  Indeed, Plaintiff pleads no facts as to *when* any alleged decline was known to the Company, nor when (if at all) it became a *material* decline.  *See* Argument § II.C.

Company should have disclosed commissions for the six weeks between February 1, 2019 and the IPO.  *See* Opp. 19.  Regardless, Plaintiff's theory ignores that trading volume is not a useful metric in isolation, but is important only insofar as it generates commissions, which in turn generate the Company's revenue.  Consequently, trading volume is indistinguishable from a financial metric, the decline of which is not subject to intra-quarter disclosure, according to Defendants' unchallenged authority.  *See* MTD 14-15 (gathering cases rejecting calls for intra-quarter disclosure of financial metrics).

Furthermore, intra-quarter disclosure of trading volume alone—without disclosure of its impact on quarter-end audited commission fees or revenues—is immaterial and potentially misleading.  As Plaintiff argues, trading volume is *not* "perfectly correlated" with commissions. *See* Opp. 7-8.  Indeed, as alleged, the quarter-over-quarter percentage changes in trading volume differ markedly from quarter-over-quarter percentage changes in commissions in almost every quarter, and in the last quarter before the IPO the trading volume *increased* while commission revenues *decreased*.  *See id.*  Thus, even if possible, intra-quarter disclosure of trading volume would likely *fail to predict* the quarter's commission fees and revenue, *see* AC ¶ 42, and so be incomplete and misleading.  *See id.* ¶ 61, MTD 5.  Plaintiff's disclosure demand finds no support in the SEC's Item 303 guidance, *see* Opp. 10 & n.6, which provides that issuers should "eliminate immaterial information that does not promote understanding of companies' financial condition."[2]

The Opposition offers no reason to depart from the SEC's disclosure regime, and fails to explain how adherence to that regime here could be actionable under the securities laws.

---

[2] *See Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, SEC Release Nos. 33-8350; 34-48960; FR-72 (Dec. 29, 2003), *available at* https://www.sec.gov/rules/interp/33-8350.htm#P18_1728.

**B.       Any Supposed Omissions Were Immaterial in Light of the Registration Statement's Extensive Warnings**

The materiality of a purported omission is determined by evaluating the Registration Statement "as a whole," *DeMaria v. Anderson*, 318 F.3d 170, 180 (2d Cir. 2003). Here, the Registration Statement's cautionary language and disclosure of the Company's historical information made clear that any reasonable investor must anticipate volatility and down quarters. *See* MTD 4-7. The alleged non-disclosure of up-to-the-minute information for the last six weeks of the first quarter of 2019—even if it were possible—was therefore immaterial. *Id.* 15-16.

Plaintiff responds that the Company's detailed cautionary language was "misleading because the declines had already materialized." Opp. 20. To start, the Amended Complaint nowhere pleads that this cautionary language was misleading. *See* Argument § I. Regardless, Plaintiff fails to explain how the Company's cautionary language was rendered *materially* misleading by the lack of intra-quarter disclosures. Indeed, Plaintiff does not address Defendants' extensive authority, which shows that courts regularly dismiss Section 11 claims demanding up-to-the-minute financial disclosures where robust investor warnings render any supposed omissions immaterial as a matter of law. *See* MTD 16; *see also Stadnick v. Vivint Solar Inc.*, 861 F.3d 31, 38-39 (2d Cir. 2017) ("reasonable investor" would have no "solid expectations" of third-quarter performance, given historical "pattern of fluctuation"). By contrast, neither of Plaintiff's cases on this point addresses materiality under Section 11, *see* Opp. 20, and in both cases plaintiffs sufficiently alleged that defendants *knew* the risks about which they were warning had already materialized. *See* MTD 17-18; Argument § II.C.

Plaintiff's strategy of "conveniently dismiss[ing] as boilerplate anything in the prospectus that undermines their argument" likewise fails. *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 8 (2d Cir. 1996). The Company's warnings about its limited operating history, expanding net

4

losses in 2017 and 2018, that trading volume was "prone to significant and unpredictable fluctuations," MTD 12-13, and that rising expenses "*will decrease our profitability, perhaps materially*," *id.* 5, are specific to UP Fintech. And Plaintiff cannot argue that UP Fintech sought to "assure" investors that results would always be positive, AC ¶¶ 47, 49, and dismiss as "generic" warnings that the Company absolutely *could not make that assurance*. *See* Opp. 20-21.[3] Thus, any omission of information concerning the first quarter of 2019 was immaterial and inactionable.

C.      **Plaintiff Fails to Plead That UP Fintech Was Aware of Material Information That it Failed to Disclose**

Plaintiff fails to plead a single *fact* indicating the Company knew, at the time of the IPO, more about its first-quarter 2019 results than it disclosed in the Registration Statement (*i.e.*, commissions for January 2019). *See* MTD 17-18; *see also Lin v. Interactive Brokers Grp.*, 574 F. Supp. 2d 408, 416 (S.D.N.Y. 2008) ("allegedly omitted facts" must be "known or knowable") (quotation omitted). Plaintiff responds by (i) merely reiterating out-of-context sentence fragments from the Registration Statement and (ii) loading the Opposition with unpleaded (and still insufficient) assertions, which "serve only to illustrate the deficiencies" in the Amended Complaint. *Rincon v. Covidien*, 2017 WL 2242969, at *2 (S.D.N.Y. May 22, 2017) (Furman, J.) ("[A] plaintiff may not amend his or her complaint by asserting new facts or theories for the first time in opposition to . . . [a] motion to dismiss.") (internal quotation omitted).[4]

---

[3] Plaintiff's assertion that trading volume and commissions are material, *see* Opp. 24-25, misses the point: no reasonable investor could believe UP Fintech's results would be perpetually positive, and so any omissions were rendered immaterial.

[4] Plaintiff asserts that this Court may "take judicial notice of the exhibits" attached to the Opposition "because they are integral to or explicitly relied upon in the Complaint." Opp. at 1 n.3. In fact, the Amended Complaint expressly relies *only* upon Exhibit I—a UP Fintech press release—and cites a web link to the Chinese-language version of Exhibit B.

5

In particular, the Opposition asserts that UP Fintech "collected, centrally analyzed, and reported trade data in real time," Opp. 18, citing Amended Complaint Paragraphs 41, 56-58, and 65. Paragraph 41 does not address this topic; Paragraphs 56-57 plead the out-of-context statements from the Registration Statement addressed in the Opening Brief, *see* MTD 17-18; Paragraph 58 is a conclusory statement premised on the inadequate allegations in Paragraphs 56-57; and Paragraph 65 pleads a statement by CFO John Zeng that proves only that, before the end of a quarter, the Company could make only vague generalizations about potential results. *See* AC ¶ 65.[5]

Plaintiff's unpleaded assertions on this topic—which should be disregarded—include (i) that UP Fintech would have conducted "bring down due diligence" shortly before the IPO, and (ii) that Interactive Brokers ("IB") collected trade information.[6] *See* Opp. 18. Plaintiff offers no facts concerning the results of UP Fintech's "bring down due diligence"—even assuming UP Fintech followed the IPO procedures described in a six-year-old presentation by an unaffiliated law firm and an undated Westlaw questionnaire, *see* Pl. Exs. F, G—nor that this process enables a company to disclose meaningful quarterly numbers prior to the close of a quarter. Notably, Exhibits C and D—reports by IB concerning market-wide trade data—indicate that trading volume *declined* by 11% in January and 3% in February, further suggesting to investors that first-quarter 2019 would be a down quarter for online brokerages.[7] Plaintiff similarly asserts, for the first time

---

[5] Plaintiff claims that Defendants "indicate that they did have knowledge of February trading data at the time of [the] IPO," Opp. 18 n. 11, but the Opening Brief makes no such assertion.

[6] Plaintiff acknowledges the Opposition's assertions about IB are unpleaded, arguing that "[e]ven the alleged facts" about IB are sufficient to infer knowledge about first-quarter results at the time of the IPO. *See* Opp. 18 n.10. But the sole allegation about IB in the Amended Complaint is that it "perform[ed] execution, clearing and settlement services" for UP Fintech. AC ¶ 55 n.4.

[7] Plaintiff argues that "Defendant Pang" was aware of IB's "global trading data for February 2019 at the time of the IPO," *see* Pl. Ex. B. The Amended Complaint nowhere pleads this information. Regardless, Exhibit B explains only that Mr. Wu "hoped to benchmark against [IB]," *id.* at 1, which says nothing about Company knowledge. And there is no "Defendant Pang."

in the Opposition, that UP Fintech "knew that trading volume had declined dramatically for January 2019" because the Company reported daily trade data to FINRA.[8]  Opp. 11.  But neither the Opposition nor the Amended Complaint alleges any facts indicating that individual trade information reported to FINRA is, or can be, aggregated or disclosed in a way that is meaningful and not misleading, in real-time, by the Company.[9]

### D.    Plaintiff Fails to Plead a Breach of Any Obligation Under Item 303

Plaintiff cannot rely on Item 303 to salvage its claims.  As discussed above, Plaintiff fails to plead any disclosure obligation, material omission, or knowledge of the results of the ongoing first quarter of 2019.  Plaintiff's claim—which requires allegations that the Company *knew* of a trend that might materially affect the Company's financial condition—fails on these bases.

Furthermore, there was no trend to disclose.  The Opening Brief established that: (i) the Company had never been profitable; (ii) its 2018 loss was five times its 2017 loss; (iii) UP Fintech expressly disclosed that rising expenses "*will*" further diminish profitability; (iv) Plaintiff's claim that the Company sought to assure investors of "continuous and unfailing growth" was contrary to disclosed, recent historical performance[10] *and* extensive warning language; (v) trading volume and commissions were subject to wide and recent swings, AC ¶ 61 (chart), MTD 6; and (vi) commission revenue in January 2019 pointed to a down quarter.

---

[8] Plaintiff's assertion that real-time trading volume data is "readily available" in UP Fintech's "central system" and in "FINRA's OATS system" is also unpleaded.  *See* Opp. 13.

[9] Plaintiff's speculation concerning FINRA reporting is also wrong.  All or virtually all Company trades during the relevant period were executed by a New Zealand subsidiary, which is not obligated to, and does not, report data to FINRA.

[10] Plaintiff again argues that Defendants sought to downplay the drop in trading volume and commissions before the IPO by stating that "[t]he impact of fluctuation and changes of market conditions . . . was not apparent historically due to rapid growth of our business historically."  Opp. 16.  Plaintiff ignores the portion of the Opening Brief demonstrating that, in context, this statement was a *warning* to investors *not* to rely on past results.  *See* MTD 13-14; Reg. 102.

Plaintiff's authority and these facts makes clear that the Registration Statement breached no Item 303 obligation. *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182 (11th Cir. 2002), provides that a prospectus should discuss "an important change in your company's business or environment that significantly or materially *decreases the predictive value of your reported results*." *Id.* at 1192 (emphasis added). Plaintiff pleads no such change in UP Fintech's business, and the facts outlined above indicate that the results of the first quarter of 2019 were not a "change," but completely *consistent* with the Company's myriad investor warnings, history of volatility, January 2019 commission data, and the failure of trading volume to predict commissions and revenues. Indeed, the Company's revenue actually *increased* in the first quarter of 2019—which again was consistent with the prior eight quarters, *see* Opp. 4—and further indicates the miniscule predictive value of six weeks of commission data.[11] And, as discussed above, Plaintiff fails to plead that any purported trend was "known" to management. *See* Argument § II.C (failure to allege knowledge); *id.* § II.A (SEC guidance does not support Plaintiff).

Plaintiff criticizes the Company's *voluntary* disclosure of downward-trending, January 2019 commissions, claiming the Company attributed it to the "Chinese New Year" and thus implied commissions would increase during the rest of the quarter. Opp. 7. But Plaintiff also argues that this statement was too vague to indicate even whether commissions were expected to be "higher or lower." Opp. 22. Thus, according to Plaintiff, no reasonable investor could have relied on this statement to somehow guarantee a positive first quarter. Further, Plaintiff offers no reason that the Company would make a voluntary disclosure of *unfavorable* data along with a false statement to mitigate its effect. More plausible is that UP Fintech did what it said: "provided the

---

[11] The Company's revenue has continued to increase, rising to $12.9 million, $15.3 million, and $20 million in the second, third, and fourth quarters of 2019, respectively, and to $23.2 million in the first quarter of 2020. *See* Carlinsky Decl. Ex. E (excerpts of relevant SEC filings).

8

preliminary results . . . for the purpose of providing investors with the most current information that our company is able to provide under the time constraints." *See* Def. Ex A ("Reg.") 7; *see also* Opp. 21. And a reasonable investor multiplying the January 2019 commission data by three, *see* MTD at 7, 13, would have understood that the only available commission data for the first quarter of 2019 indicated the strong potential for a decline from the prior quarter.

Plaintiff also fails to address adequately that an Item 303 "trend" does not arise in a few weeks. Indeed, each of Plaintiff's cases involved (i) non-conclusory allegations that company executives were aware of a supposed trend; and (ii) significant changes in *how the company did business*. *See Panther Partners Inc. v. Ikanos Comm., Inc.*, 681 F.3d 114, 121-122 (2d Cir. 2012) (knowledge of defects in microchips sold to customers accounting for 72% of company revenue in 2005); *In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 512-13 (S.D.N.Y. 2013) (pre-IPO internal projections and analyst discussions showed awareness of negative trend caused by use of Facebook on mobile devices and certain product decisions); *Litwin v. Blackstone Grp.*, 634 F.3d 706, 711 (2d Cir. 2011) (Blackstone knew portfolio company lost contract with largest customer); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999) (plaintiff "specifically charge[d] that at the time of the Offering Defendants had actual . . . knowledge that Box Hill's products were not being well received by customers"). Plaintiff here fails to allege internal projections or discussions indicating awareness of an undisclosed trend or change in UP Fintech's business. At most, Plaintiff alleges a potential revenue decline during a portion of one quarter, which is not a "trend" under Item 303. *See* MTD 19 (gathering cases).[12]

---

[12] Plaintiff argues that *Arfa v. Mecox Lane Ltd.*, 2012 WL 697155 (S.D.N.Y. Mar. 5, 2012) is inapposite because "the declining trading volume on UP Fintech['s platform] was an irregularity that would materially impact first quarter results." Opp. 16. As above, Plaintiff fails to adequately allege any purported omission of declining trading volume was material or known to the Company, much less inconsistent with prior results, and so, per *Arfa*, there is no breach of Item 303.

Plaintiff argues that the decline in trading volume actually took place over "11.5" weeks, rather than the six-week period between disclosure of the Company's commission revenues and the IPO. Opp. 13. As discussed above, Plaintiff's demand for disclosure of trading volume cannot support its claims, *see* Argument § II.A, and the relevant time gap for commission data was indeed just six weeks (February 1, 2019 through the IPO). In any case, Plaintiff pleads no facts indicating when, during the referenced 11.5-week period, the supposed trading volume decline even began, much less when (if ever) it became material.

Finally, Plaintiff asserts that even if trading volume were an ordinary "financial statement item," its non-disclosure can trigger a disclosure obligation under Item 303 for UP Fintech. Opp. 14. Plaintiff's authority, which involves completely different circumstances, does not support this claim. In *In re Bank of Am. Sec. Corp. Deriv. & ERISA Litig.*, 757 F. Supp. 2d 260 (S.D.N.Y. 2010), plaintiff alleged "in a non-conclusory manner" the omission of losses at Merrill Lynch that were "well known to [Bank of America's] executives" and "amounted to *$1 billion per week.*" *Id.* at 306 (emphasis added). If anything, this case demonstrates that the intra-quarter disclosure Plaintiff demands is reserved for such extraordinary circumstances as billion-dollar losses during the Great Recession. Plaintiff also cites *Stadnick*, which found that a "pattern of fluctuation" in two metrics, "neither [of which] fluctuated in the same direction for two successive quarters," would mean that "***[a] reasonable investor . . . would not have harbored any solid expectations based on prior performance***." 861 F.3d at 38-39 (emphasis added). The Opening Brief made clear that UP Fintech's results also fluctuated significantly over short periods of time, and that investors had no reason to expect that to cease going forward. Both cases therefore counsel strongly against any disclosure obligation under Item 303.

**CONCLUSION**

For the reasons discussed herein and in the Opening Brief, UP Fintech and the Underwriter Defendants respectfully seek dismissal of the Amended Class Action Complaint, with prejudice.

Dated: July 29, 2020
New York, New York

By: */s/ Michael B. Carlinsky*
   Michael B. Carlinsky
   Jacob J. Waldman
   **QUINN EMANUEL URQUHART**
   **& SULLIVAN, LLP**
   51 Madison Avenue, 22nd Floor
   New York, NY 10010
   Telephone:  (212) 849-7000
   michaelcarlinsky@quinnemanuel.com
   jacobwaldman@quinnemanuel.com

   Xiao Liu
   **QUINN EMANUEL URQUHART**
   **& SULLIVAN, LLP**
   Unit 502-503, 5th Floor, Nordic House
   3 Fengyang Road, Xuhui District
   Shanghai 200031
   Telephone: (86) 21 34018600
   xiaoliu@quinnemanuel.com

*Attorneys for Defendant UP Fintech Holding Limited*

By: */s/ Susannah S. Geltman*
   Susannah S. Geltman
   Anthony C. Piccirillo
   **SIMPSON THACHER &**
   **BARTLETT LLP**
   425 Lexington Avenue
   New York, NY 10017
   Telephone:  (212) 455-2000
   sgeltman@stblaw.com
   anthony.piccirillo@stblaw.com

*Attorneys for Defendants Citigroup Global Markets Inc. and Deutsche Bank Securities Inc.*

11