UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                   :

VICKI RONGEY WILLARD, *individually and on*   :
*behalf of all others similarly situated*, et al.,      :
                                                :

               Plaintiffs,            :

                                              :

      -v-                         :

                                              :           19-CV-10326 (JMF)

UP FINTECH HOLDING LIMITED, TIANHUA   :
WU, JOHN FEI ZENG, YONGGANG LIU, LEI   :
FANG, DAVID ERIC FRIEDLAND, VINCENT   :         OPINION AND ORDER
CHUN HUNG CHEUNG, BINSEN TANG, XIN   :
FAN, JIAN LIU, XIAN WANG, CITIGROUP   :
GLOBAL MARKETS INC., DEUTSCHE BANK   :
SECURITIES INC., AMTD GLOBAL MARKETS   :
LIMITED, CHINA MERCHANTS SECURITIES   :
(HK) CO., LIMITED, and TOP CAPITAL   :
PARTNERS LIMITED,                 :

                                             :

               Defendants.         :

                                             :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       This putative class action arises out of an initial public offering conducted by UP Fintech

Holding Limited ("UP Fintech"), an online brokerage firm that operates an app for Chinese-

speaking investors to buy and sell securities.  In particular, Lead Plaintiff Jian Ren brings claims

under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77o,

77k, against UP Fintech; various officers or directors of UP Fintech (collectively, the "Individual

Defendants"); and a handful of entities that were involved in underwriting the initial public

offering.  The Defendants that have been served and appeared in this action now move, pursuant

to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss Plaintiffs' claims.  For the

reasons that follow, that motion is granted.

## BACKGROUND

The following facts are drawn from the operative Complaint, documents attached to or incorporated by reference into the Complaint, and public disclosure documents that UP Fintech was required to file by law.  *See Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

UP Fintech is an online brokerage firm incorporated under the laws of the Cayman Islands and headquartered in China.  ECF No. 32 ("Compl."), ¶ 2.  It operates an app called "Tiger Trade" and an associated website, which allow Chinese-speaking investors to trade securities across multiple markets and currencies by offering trade order placement and execution, margin financing, account management, investor education, community discussion, and customer support.  *Id.*  UP Fintech is the largest online broker by U.S. securities trading volume focused on Chinese investors.  *Id.* ¶ 41.  UP Fintech has two primary sources of revenue: (1) customer commission fees for trades, which accounted for approximately 75% of revenues in 2018; and (2) "interest income or financing service fees relating to margin financing."  *Id.* ¶¶ 4, 42.  As a result, its revenues and profitability "significantly depend on the trading volume on its platform" — that is, on "the total value of securities traded during a specific period of time."  *Id.* ¶¶ 5, 43, 46 n.3.

In March 2019, UP Fintech conducted an initial public offering ("IPO") in the United States.  After a series of amendments, UP Fintech filed its Registration Statement on Form F-1/A on March 18, 2019.  *Id.* ¶ 44.  The Registration Statement was deemed effective the following day and, on March 20, 2019 — approximately two weeks before the end of Q1 2019 on March 31, 2019 — UP Fintech filed the final prospectus for the IPO.  *Id.* ¶¶ 7, 44; ECF No. 54-1 ("Registration Statement").  (Because the prospectus is incorporated into the Registration Statement, the Court refers to the two documents together as the "Registration Statement.")  The

Registration Statement explained that UP Fintech's "ability to earn commission fees, interest income or financing service fees largely depends on the number of customers on [its] trading platform and their trading volume."  Registration Statement 82; Compl. ¶ 46.  In a "Quarterly trends" section, UP Fintech touted its "continuous growth in revenues for the eight quarters from January 1, 2017 to December 31, 2018," noting that its "revenues from both trading commissions and financing service fees increased substantially during these periods," "[d]riven by the continued increases in the number of customers making trades, trading volume and margin financing balance."  Registration Statement 102; Compl. ¶ 48.  At the same time, it caveated this language by noting that "[r]evenues from brokerage commissions slightly decreased in the second quarter of 2018 due to the slight decrease of [its] trading volume as a result of market volatility.  [UP Fintech's] quarterly operating expenses also increased during these periods, generally consistent with the growth of [its] business expansion."  Registration Statement 102; Compl. ¶ 50.

      The Registration Statement also included charts with certain quarterly financial and operating metrics from Q1 2016 through Q4 2018.  *See* Registration Statement 15, 79-80, 102. Most relevant here, the charts reported trading volume and commissions by quarter (although, in the case of the commissions, not before Q1 2017).  The Complaint includes that data in a chart of its own, which is reproduced here as Figure 1:

**Figure 1**

| Quarter Ended | Trading Volume (US$mm) | Trading Volume % Change Quarter over Quarter | Commissions (US$mm) | Commissions % Change Quarter over Quarter |
|---|---|---|---|---|
| 31-Mar-2016 | 1,363.30 | | | |
| 30-Jun-2016 | 3,495.10 | 156.4% | | |
| 30-Sep-2016 | 5,085.70 | 45.5% | | |
| 31-Dec-2016 | 6,393.90 | 25.7% | | |
| 31-Mar-2017 | 12,494.00 | 95.4% | 2.166 | |
| 30-Jun-2017 | 13,988.40 | 12.0% | 3.229 | 49.1% |
| 30-Sep-2017 | 17,125.70 | 22.4% | 4.424 | 37.0% |
| 31-Dec-2017 | 19,687.80 | 15.0% | 5.244 | 18.5% |
| 31-Mar-2018 | 28,302.60 | 43.8% | 6.625 | 26.3% |
| 30-Jun-3018 | 21,395.30 | -24.4% | 5.182 | -21.8% |
| 30-Sep-2018 | 32,628.30 | 52.5% | 7.154 | 38.1% |
| 31-Dec-2018 | 36,895.20 | 13.1% | 7.082 | -1.0% |

Compl. ¶ 49.[1]  The charts in the Registration Statement did not include corresponding data for

Q1 2019, which was not yet over at the time.  But the Registration Statement included the

following note with respect to Q1 2019 in a section titled "Recent Developments":

> As of January 31, 2019, we had 83,546 customers with deposits and the account balance of such customers reached US$2,632.6 million, representing an increase of 11.7% from December 31, 2018.  We generated US$2.9 million of revenues for the month ended January 31, 2019, including US$2.2 million in commissions and US$0.6 million in financing service fees.  Our performance in January 2019 was partially affected by the generally quieter investment environment during the Chinese New Year season, given the fact that the vast majority of our client base are Chinese investors around the world.

Registration Statement 6-7; Compl. ¶ 52.

---

[1]     Figure 1 and Figure 2, below, are reproduced from the Complaint and include a typographical error in the column titled "Quarter Ended," to wit: "30-June-3018" should obviously read "30-June-2018."  *See* Compl. ¶¶ 49, 61.

On March 20, 2019, UP Fintech completed its IPO.  Compl. ¶ 6.  Citigroup Global

Markets Inc. ("Citigroup"), Deutsche Bank Securities Inc. ("Deutsche Bank"), AMTD Global

Markets Limited ("AMTD"), China Merchants Securities (HK) Co., Limited ("China

Merchants"), and Top Capital Partners Limited (which is apparently now known as Tiger

Brokers (NZ) Limited) ("Tiger Brokers"), all Defendants here, served as underwriters for the

IPO.  *Id.* ¶¶ 28-33; *see also* ECF Nos. 69-70.  (The Court will refer to these Defendants

collectively as the "Underwriter Defendants.")  UP Fintech sold thirteen million American

Depository Shares ("ADSs"), each of which represented fifteen shares of Class A common stock,

at a price of $8.00 per share and received total proceeds of $96.72 million after underwriting

discounts and commissions.  Compl. ¶ 6; *see also id.* ¶¶ 1, 45.  UP Fintech received an additional

$14.508 million, after underwriting discounts and commissions, from the Underwriter

Defendants' "full exercise of their overallotment option."  *Id.* ¶ 6.

On May 17, 2019, UP Fintech announced its unaudited financial results for Q1 2019 and,

according to the Complaint, disclosed "for the first time that the Company's commissions were

only $6.4 million in the first quarter of 2019, a 9.63% decrease from the $7.082 million reported

in the previous quarter — a sharp contrast to the rosy upward trend painted in the Registration

Statement."  *Id.* ¶ 59.  That decrease was caused by lower trading volume.  *See id.* ¶ 60.  Indeed,

according to UP Fintech's Form 6-K, the trading volume "had declined" between Q4 2018 and

Q1 2019 from $36,895.2 million to $27,862.8 million — in the words of the Complaint, a

"shocking 24.5% drop."  *Id.*  To underscore the point, the Complaint includes a chart —

reproduced as Figure 2 here — with data from the Registration Statement for Q1 2016 through

Q4 2018 and the corresponding data for Q1 2019:

**Figure 2**

| Quarter Ended | Trading Volume (US$mm) | Trading Volume % Change Quarter over Quarter | Commissions (US$mm) | Commissions % Change Quarter over Quarter |
|---|---|---|---|---|
| 31-Mar-2016 | 1,363.30 | | | |
| 30-Jun-2016 | 3,495.10 | 156.4% | | |
| 30-Sep-2016 | 5,085.70 | 45.5% | | |
| 31-Dec-2016 | 6,393.90 | 25.7% | | |
| 31-Mar-2017 | 12,494.00 | 95.4% | 2.166 | |
| 30-Jun-2017 | 13,988.40 | 12.0% | 3.229 | 49.1% |
| 30-Sep-2017 | 17,125.70 | 22.4% | 4.424 | 37.0% |
| 31-Dec-2017 | 19,687.80 | 15.0% | 5.244 | 18.5% |
| 31-Mar-2018 | 28,302.60 | 43.8% | 6.625 | 26.3% |
| 30-Jun-3018 | 21,395.30 | -24.4% | 5.182 | -21.8% |
| 30-Sep-2018 | 32,628.30 | 52.5% | 7.154 | 38.1% |
| 31-Dec-2018 | 36,895.20 | 13.1% | 7.082 | -1.0% |
| 31-Mar-2019 | 27,862.80 | -24.5% | 6.400 | -9.6% |

Compl. ¶ 61.  According to Plaintiffs, "at the time of the IPO," which was "just eight trading days before the end of the first quarter of 2019, the Company had already learned that its trading volume and commissions for the first quarter of 2019 were sharply declining," but failed to disclose these facts in the Registration Statement.  *Id.* ¶ 52.

The trading price of UP Fintech ADSs fell from $6.98 per share on May 16, 2019, to close at $5.77 per share on May 17, 2019 — "a decline of more than 17%" and "of 28% from the $8 IPO [share] price."  *Id.* ¶ 66.  As of November 6, 2019, the company's stock had lost 49% of its value from the IPO price.  *Id.*  On that date, a putative class action was filed against the company and several Individual Defendants.  ECF No. 1.  Following the appointment of Jian Ren as Lead Plaintiff, ECF No. 24, Plaintiffs filed the operative Complaint on March 24, 2020, which added as Defendants the rest of the Individual Defendants as well as the Underwriter Defendants.  Plaintiffs' principal allegation is that Defendants violated Sections 11 and 15 by

failing to disclose in the Registration Statement (1) trading volume figures for January 2019; (2) the impact of January 2019's trading volume and commission revenue on future performance; and (3) trading volume and commission revenue figures for the period between January 2 and March 19, 2019.  *See* ECF No. 55 ("Pls.' Opp'n"), 11-17.  All Defendants — with the exception of AMTD and China Merchants, which have not yet appeared — now move to dismiss the Complaint for failure to state a claim.[2]

## STANDARD OF REVIEW

In evaluating a Rule 12(b)(6) motion, a court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).  A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555.  If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

In general, Section 11 of the Securities Act "requires only 'ordinary notice pleading . . . subject only to the "short and plain statement" requirements of Federal Rule of Civil Procedure

---

[2]     Although the pending motion to dismiss was initially filed by only UP Fintech, Citigroup, and Deutsche Bank, ECF No. 52, Tiger Brokers and the Individual Defendants subsequently joined in the motion, *see* ECF Nos. 71, 78.

8(a).'" *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 506 (S.D.N.Y. 2013) (quoting *Litwin v. Blackstone Grp., L.P.,* 634 F.3d 706, 715 (2d Cir. 2011)). But where claims brought under Section 11 "sound in fraud," they "are governed by the heightened pleading requirements of Rule 9(b)." *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 902 F. Supp. 2d 476, 484 n.10 (S.D.N.Y. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)). Here, however, the Complaint explicitly disclaims "any allegation of fraud, recklessness or intentional misconduct." Compl. ¶ 100; *accord id.* ¶ 110. Accordingly, Plaintiffs here "need not satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) or the Private Securities Litigation Reform Act." *In re Coty Inc. Sec. Litig.*, No. 14-CV-919 (RJS), 2016 WL 1271065, at *4 (S.D.N.Y. Mar. 29, 2016) (Sullivan, J.) (citing *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012)); *accord Fed. Hous. Fin. Agency*, 902 F. Supp. 2d at 484 n.10.

## DISCUSSION

### A. Applicable Law

#### 1. Sections 11 and 15 of the Securities Act

Section 11(a) of the Securities Act applies to any signatory to a registration statement, director of the issuer, or underwriter. 15 U.S.C. § 77k(a); *see Tongue*, 816 F.3d at 209. "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347,

358-59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).  "Section 11 . . . imposes strict liability on issuers and signatories, and negligence liability on underwriters, for material misstatements or omissions in a registration statement."  *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 99 (2d Cir. 2017) (internal quotation marks omitted).  "Section 15 imposes joint and several liability on every person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under § 11.  To establish § 15 liability, a plaintiff must show a primary violation of § 11 and control of the primary violator by defendants."  *Wyo. State Treasurer v. Moody's Inv'rs Serv., Inc.* (*In re Lehman Bros. Mortg.-Backed Sec. Litig.*), 650 F.3d 167, 185 (2d Cir. 2011) (internal quotations marks, brackets, citation, and footnote omitted).

There are three potential bases for liability under Section 11: "(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading."  *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011).  Although the Complaint asserts that "[t]he Registration Statement contained untrue statements of material fact," Compl. ¶ 45; *see also id.* ¶ 102, Plaintiffs effectively abandon that assertion in their memorandum of law and, instead, put all of their proverbial eggs in the material-omission basket, *see* Pls.' Opp'n 10-25.[3]  Significantly, "[t]o state a plausible section 11 claim based on an alleged omission, a complaint must pass two distinct hurdles: it must identify an omission that is [both] (1) unlawful *and* (2) material."  *In re ProShares Tr. Sec.*

---

[3]    That is just as well because "it is well established that 'a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data,'" *Schaffer v. Horizon Pharma PLC*, No. 16-CV-1763 (JMF), 2018 WL 481883, at \*9 (S.D.N.Y. Jan. 18, 2018) (quoting *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016)); *accord Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004) (summary order), and Plaintiffs explicitly concede that "[t]he Complaint doesn't allege the historical financial data are false," Pls.' Opp'n 2; *see also* Compl. ¶¶ 47-52.

*Litig.*, 728 F.3d 96, 101 (2d Cir. 2013) (emphasis added).  "Materiality is an 'inherently fact-specific finding,' that is satisfied when a plaintiff alleges 'a statement or omission that a reasonable investor would have considered significant in making investment decisions.'"  *Litwin*, 634 F.3d at 716-17 (citation omitted) (first quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 236 (1988); then quoting *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161-62 (2d Cir. 2000)).  "In evaluating a prospectus" for this inquiry, a court must "read it 'as a whole.'"  *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (quoting *Olkey v. Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996)).

"[W]hen a district court is presented with a Rule 12(b)(6) motion, a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Litwin*, 634 F.3d at 717 (internal quotation marks omitted).  "Nevertheless, the materiality hurdle remains a meaningful pleading obstacle . . . [and] the Supreme Court has been '"careful not to set too low a standard of materiality," for fear that management would "bury the shareholders in an avalanche of trivial information."'"  *ProShares Tr.*, 728 F.3d at 102 (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011)).  More specifically, then, a court considering a material-omission claim must assess "whether there is a *substantial* likelihood that the disclosure of the omitted material would have been viewed by the *reasonable* investor as having *significantly* altered the total mix of information already made available."  *Id.* (internal quotation marks and brackets omitted).  "It is not sufficient to allege that the investor might have considered the misrepresentation or omission important."  *Id.* (quoting *Ganino*, 228 F.3d at 162).  "In other words, 'plaintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight' because 'Section 11 claims

cannot be based on a "backward-looking assessment" of the registration statement.'" *Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 545-46 (S.D.N.Y. 2017) (brackets omitted) (quoting *Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*, No. 08-CV-7062 (PAC), 2010 WL 4642554, at *11 (S.D.N.Y. Nov. 17, 2010)).

### 2. Item 303 of SEC Regulation S-K

Here, Plaintiffs' principal contention is that Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, required Defendants to disclose the Q1 2019 declines in trading volume and commissions and that, by failing to do so in the Registration Statement, they violated Sections 11 and 15 of the Securities Act, *see* Compl. ¶¶ 46-58, 67-76; Pls.' Opp'n 10-19.[4]  Item 303 requires a registrant to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(ii); *accord Hutchison*, 647 F.3d at 484-

---

[4]      The Complaint also alleges material omissions in violation of "Item 503" of Regulation S-K.  Compl. ¶¶ 77-78.  But "[o]n March 20, 2019, the SEC adopted amendments to certain disclosure requirements in Regulation S-K, moving what was previously Item 503 to Item 105." *In re Proshares Tr. II Sec. Litig.*, No. 19-CV-886 (DLC), 2020 WL 71007, at *9 n.7 (S.D.N.Y. Jan. 3, 2020) (citing FAST Act Modernization and Simplification of Regulation S-K, 84 Fed. Reg. 12,674, 12,688-89 (Apr. 2, 2019)).  One stray reference in a parenthetical aside, *see* Pls.' Opp'n 23-24, Plaintiffs do not even advert to Item 105 (or Item 503) in their memorandum of law.  Accordingly, any such claims are deemed abandoned.  *See Jennings v. Hunt Cos.*, 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) ("A district court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed." (internal quotation marks omitted) (collecting cases)).  In any event, where, as here, "Plaintiffs advance no arguments unique to Item [105], focusing instead primarily on Defendants' disclosure obligations under Item 303," *Hutchison*, 647 F.3d at 484 n.4, and "[t]he same facts underlying [the] Item 303 violation . . . also support [the alleged] Item [105] violation," the "court's rationale for determining the former may also support the same determination of the latter," *In re Barclays Bank PLC Sec. Litig.*, No. 09-CV-1989 (PAC), 2017 WL 4082305, at *9 (S.D.N.Y. Sept. 13, 2017), *aff'd*, 756 F. App'x 41 (2d Cir. 2018) (summary order).  Accordingly, to the extent Plaintiffs continue to maintain any claims under Item 105, the Court's analysis of Plaintiffs' Item 303 claims applies equally to them.

85.[5]  "[F]ailing to comply with Item 303 by omitting known trends or uncertainties from a

registration statement or prospectus" is indeed "actionable under Section[] 11."  *Stratte-McClure*

*v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).  Significantly, however, Item 303 does not

call for disclosure of any "trend" or "uncertainty."  Instead, it "imposes a disclosure duty where a

trend, demand, commitment, event or uncertainty is both [1] presently known to management

*and* [2] reasonably likely to have material effects on the registrant's financial condition or results

of operations."  *Litwin*, 634 F.3d at 716 (emphasis added) (internal quotation marks omitted);

*accord In re Ply Gem Holdings, Inc. Sec. Litig.*, 135 F. Supp. 3d 145, 150 (S.D.N.Y. 2015).  Put

differently, "the essential obligation imposed by Item 303 is to explain in the prospectus '[i]f

there has been an important change in [the] company's business or environment that significantly

or materially decreases the predictive value of [the] reported results' so as to prevent 'the latest

reported results from misleading potential investors.'"  *Lowinger v. Pzena Inv. Mgmt., Inc.*, 341

F. App'x 717, 720 (2d Cir. 2009) (summary order) (quoting *Oxford Asset Mgmt., Ltd. v. Jaharis*,

297 F.3d 1182, 1192 (11th Cir. 2002)).  The "'reasonably [likely]' standard suggests that there

---

[5]      Strictly speaking, "Item 303 does not apply to foreign corporations" such as UP Fintech.
*Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18-CV-9848 (PGG), 2020 WL 5757628, at *7
n.5 (S.D.N.Y. Sept. 27, 2020) (internal quotation marks omitted).  That said, "the SEC has stated
that its interpretations of Item 303 apply to Management Discussion & Analysis [MD&A]
disclosures drafted pursuant to Item 5 of Form 20-F, which does apply to foreign corporations."
*Id.* (internal quotation marks and brackets omitted).  The requirements of Item 5 of Form 20-F
are, in turn, incorporated into Form F-1, on which UP Fintech filed its Registration Statement.
*See Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 413 n.9 (S.D.N.Y. 2020); Form F-1, Part I,
Item 4(a), Sec. & Exch. Comm'n, https://www.sec.gov/files/2017-03/formf-1.pdf (requiring
information required by Part I of Form 20-F).  Accordingly, like the parties, the Court will treat
Form F-1 "as calling for the same disclosure as Item 303 of Regulation S-K."  *Jianpu Tech.*,
2020 WL 5757628, at *7 n.5 (internal quotation marks omitted); *accord Johnson v. Sequans
Commc'ns S.A.*, No. 11-CV-6341 (PAC), 2013 WL 214297, at *11 (S.D.N.Y. Jan. 17, 2013); *see
also Shetty v. Trivago N.V.*, 796 F. App'x 31, 33 & n.4 (2d Cir. 2019) (summary order)
(analyzing a Section 11 claim based on an alleged omission in violation of Item 303 involving a
Form F-1 registration statement).

must [be] a fairly substantial probability that the known risk at issue will materialize and have a material impact — if not a more-likely-than-not standard, then something not too much below that."  *Holbrook v. Trivago N.V.*, No. 17-CV-8348 (NRB), 2019 WL 948809, at *12 (S.D.N.Y. Feb. 26, 2019) (quoting *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 88 (S.D.N.Y. 2017)), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31.

## B.  Analysis

Defendants make a colorable argument that the alleged declines in trading volume and commissions between January and March 2019 did not last long enough to qualify as "trends" for the purposes of Item 303.  *See* ECF No. 53 ("Defs.' Mem."), at 19; ECF No. 67 ("Defs.' Reply"), at 9-10; *Nguyen*, 234 F. Supp. 3d at 546 ("[E]vents occurring within a two month period of time do not establish a 'trend' for purposes of the discloses [sic] required by Item 303." (collecting cases)); *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015) ("The two- and five-month periods preceding defendants' public filings were insufficient to establish a reportable trend in device performance given the pleaded volatility of the smartphone market."), *aff'd sub nom. Cox v. Blackberry Ltd.*, 660 F. App'x 23 (2d Cir. 2016) (summary order).  They argue even more forcefully that the allegations in the Complaint fail to raise a plausible inference that Defendants knew of the alleged trends, as required for an Item 303 violation.  *See* Defs.' Mem. 17-18; Defs.' Reply 5-7; *see also In re Jumei Int'l Holding Ltd. Sec. Litig.*, No. 14-CV-9826 (WHP), 2017 WL 95176, at *4 (S.D.N.Y. Jan. 10, 2017) ("A plaintiff relying on Item 303 to establish a § 11 claim must plead, with some specificity, facts establishing that defendant had actual knowledge of the purported trend." (internal quotation marks

omitted)).[6]  Ultimately, however, the Court need not and does not address either of these arguments because it concludes that Plaintiffs' claims fail for other reasons.

First, duration aside, Plaintiffs fail to plausibly allege that the alleged declines in trading volume and commissions even constituted a "trend," such that disclosure was required by Item 303.  They conspicuously fail to allege the existence of any causal event or moment in time that the declines allegedly began.  And their own allegations, drawn from the Registration Statement itself, make plain that there were significant fluctuations in both metrics on a *quarter-to-quarter* basis.  *See* Compl. ¶¶ 49, 61.  Moreover, as Plaintiffs themselves acknowledge, *see* Pls.' Opp'n 7-8, trading volume and commission revenue were not even directly correlated with one another — nor with overall revenue growth — so disclosure of intra-quarter trading volume data could itself be incomplete and misleading.  In Q4 2018, for example, the last full quarter before the Registration Statement was filed, commission revenue *declined* notwithstanding a 13.1% increase in trading volume.  Compl. ¶ 49.  And in Q1 2019, total revenue ultimately grew relative to the previous quarter — despite the drops in trading volume and commission revenue that Plaintiffs characterize as "shocking."  *Compare* ECF No. 56-9, at 1 (UP Fintech's May 17, 2019 Form 6-K reporting $9.6 million in total revenue for Q1 2019), *with* Registration Statement

---

[6]       In contending that they plausibly allege the requisite knowledge, Plaintiffs argue that UP Fintech "touted its powerful technology that collected and centrally monitored trade data in real time," Pls.' Opp'n 2, and cite several bases to believe that the company acquired real-time knowledge of trading volume and commissions, *see id.* at 5-6 (referencing Interactive Brokers' monthly brokerage performance metrics); *id.* at 6 (referencing FINRA regulations); *id.* (referencing "bring down due diligence sessions").  But these allegations appear nowhere in the Complaint and "it is well-settled that a claim for relief may not be amended by the briefs in opposition to a motion to dismiss."  *Hou Liu v. Intercept Pharm., Inc.*, No. 17-CV-7371 (LAK), 2020 WL 1489831, at *17 (S.D.N.Y. Mar. 26, 2020) (internal quotation marks and brackets omitted).  "If anything, therefore," Plaintiffs' memorandum of law in opposition to Defendants' motion "serve[s] only to illustrate the deficiencies in" the Complaint.  *Rincon v. Covidien*, No. 16-CV-10033 (JMF), 2017 WL 2242969, at *2 (S.D.N.Y. May 22, 2017).

79 (reporting $9.5 million in total revenue for Q4 2018). At bottom, therefore, the gravamen of Plaintiffs' claim is that Defendants were required to report fluctuations in trading volume and commission revenue in real time. Item 303, however, does not require such real-time disclosures. *See, e.g.*, *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 529, 536-39 (S.D.N.Y. 2020) (rejecting a claim that the defendant "was required to disclose real-time churn or low engagement rates in addition to providing quarterly subscription totals and net gains or losses, which are the end results notwithstanding intra-quarter churn"); *Arfa v. Mecox Lane Ltd.*, No. 10-CV-9053 (RWS), 2012 WL 697155, at *9 n.1 (S.D.N.Y. Mar. 5, 2012) (rejecting "the proposition that the [d]efendants were obligated to disclose the results of a quarter in progress"); *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 539-40 (S.D.N.Y. 2010) (rejecting an attempt "to hold [the] [d]efendants liable for [the] failure to disclose financial information about the third quarter before that quarter had concluded . . . [because] '[t]he disclosure structure set out by the SEC . . . recognizes how unworkable and potentially misleading a system of instantaneous disclosure out [of] the normal reporting periods would be'" (quoting *In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.,* 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001)).

In re Facebook — on which Plaintiffs rely, *see, e.g.*, Pls.' Opp'n 10-11, 14-15, 17 — does not suggest otherwise. In that case, the court held that Item 303 required the disclosure of the impact on revenue of a trend of increasing numbers of mobile users of Facebook's product even though the trend arose in the middle of a quarter. But in doing so, the court noted that the existence, and the defendants' knowledge, of both the trend itself and its impact on Facebook's revenue were specifically alleged through "the [c]ompany's changes in its internal projections and subsequent calls to [analysts]." *In re Facebook*, 986 F. Supp. 2d at 512. And on reconsideration, the court emphasized that "the facts of [the] case [we]re highly unique," its

"holdings . . . were narrow," and "[t]he uniqueness of th[e] case undermines [any] contention that [its decision] opens the door for issuers and underwriters to be subject to suit for not providing intra-quarter updates in regular SEC filings." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 538 (S.D.N.Y. 2014) (internal quotation marks omitted). Plaintiffs here, by contrast, make no such allegations of changes in internal projections based on the partial Q1 2019 data.  That is, they fail to plausibly allege that the decrease in trading volume and commission revenue during Q1 2019 was "a persistent trend that w[ould] materially impact [UP Fintech's] revenues or income, much less that [UP Fintech] reasonably expected it to be such a trend when it issued the Registration Statement." *Stadnick v. Vivint Solar, Inc.*, Nos. 14-CV-9283, 14-CV-9709 (KBF), 2015 WL 8492757, at *13 (S.D.N.Y. Dec. 10, 2015), *aff'd*, 861 F.3d 31 (2d Cir. 2017).

Second, considering the Registration Statement as a whole and drawing all reasonable inferences in Plaintiffs' favor, the Court concludes that any omission was not material because it is not substantially likely that a reasonable investor would have viewed the allegedly missing data — trading volume for the weeks between January 2 and March 19, 2021, and commission revenue for the weeks between February 1 and March 19, 2021 — as "*significantly* alter[ing] the total mix of information already made available." *ProShares Tr.*, 728 F.3d at 102 (internal quotation marks and brackets omitted).  The Complaint alleges that the Registration Statement "painted a rosy picture of the continuous *and unfailing* upward trend of [UP Fintech's] trading volume," Compl. ¶ 6 (emphasis added); "attempted to assure investors of the continuous *and unfailing* growth in its trading volume," *id.* ¶ 47 (emphasis added); "reassure[d] investors that [UP Fintech's] customer base and trading volume would continuously grow quarter over quarter *in a consistent and predictable* manner," *id.* ¶ 49 (emphasis added); and "boost[ed] investors'

16

confidence in the *uninterrupted* upward trend that [UP Fintech's] trading volume had been and would continue to experience," *id.* ¶ 51 (emphasis added).  But significantly, these words appear nowhere in the Registration Statement; instead, they are Plaintiffs' own characterizations. Equally important, the characterizations are belied by the Complaint and Registration Statement themselves.

As the Complaint alleges, the Registration Statement disclosed a 24.4% drop in trading volume in Q2 2018 — at that point, only three quarters earlier.  *Id.* ¶ 49.  (Notably, this drop is nearly identical to the 24.5% drop in trading volume that UP Fintech ultimately experienced in Q1 2019 and that Plaintiffs contend should have been disclosed in the Registration Statement prior to the quarter's end.  *Id.* ¶ 61.  Thus, Plaintiffs' characterization of the latter drop as "shocking," *id.* ¶¶ 8, 60, appears somewhat overwrought.)  It also reported the corresponding 21.8% drop in commission revenue in Q2 2018.  *Id.* ¶ 61.  The Registration Statement further disclosed a 1.0% drop in commissions in Q4 2018 — the immediately preceding quarter.  *Id.* Thus, any reasonable investor reading the Registration Statement would have been well aware that UP Fintech's growth in trading volume (and commission revenue) was not actually "unfailing."  Similarly, although trading volume and commission revenue grew in *most* of the quarters disclosed, the data disclosed by the Registration Statement showed dramatic swings from quarter to quarter, *see, e.g*, *id.* ¶ 49 (showing growth in trading volume of 25.7%, 95.4%, and 12.0% in consecutive quarters) — and thus did not suggest "consistent and predictable" growth, as Plaintiffs allege, *see, e.g.*, *DeMaria*, 318 F.3d at 180-81 (rejecting a Section 11 claim where the "[p]laintiffs allege[d] that the prospectus [misleadingly] reported promising revenue growth of no less than 25% per quarter and that" interim results of the quarter in progress

"indicated a dramatic reversal of this trend" where data showed fluctuations in quarterly revenue growth between 19% and 32%).

What's more, these data were accompanied by cautionary language warning of volatility in trading volume on a quarterly basis and the risks that such volatility might pose to UP Fintech's revenue growth.  The very first risk factor listed in the Registration Statement noted that UP Fintech "ha[d] a limited operating history and [its] historical financial, operating results and growth rates may not be indicative of future performance" and warned the reader to "consider [UP Fintech's] prospects in light of the risks and uncertainties that a fast-growing company with a limited operating history may be exposed to or encounter."  Registration Statement 16.  The Registration Statement also disclosed that UP Fintech "ha[d] not been profitable since [its] inception" and that its net losses had increased significantly in the most recent fiscal year.  *Id.*  The Risk Factors section went on to explain that UP Fintech's "business may be harmed by global events beyond [its] control, including overall slowdowns in securities trading" and that its "revenues and profitability depend on trading volume and are prone to significant and unpredictable fluctuations."  *Id.* at 23.  It then listed a variety of factors that "may reduce the trading activity level in [the] securities trading industry and adversely affect [UP Fintech's] business and results of operations and cash flows" and noted that "[e]vents in global financial markets in recent years resulted in substantial market volatility."  *Id.*  Although recent years had seen "increased customer trading volume," the Registration Statement declared, "any sustained downturn in general economic conditions or global equity markets could result in reduced customer trading volume and revenues" and "[s]evere market fluctuations or weak economic conditions could reduce [UP Fintech's] trading volume and revenues and have a material adverse effect on [its] profitability."  *Id.*  "As a result, *period to period comparisons of*

*[UP Fintech's] revenues and operating results may not be meaningful, and future revenues and profitability may be subject to significant fluctuations or declines.*"  *Id.* (emphasis added).

In addition to these general statements, the Registration Statement explained — just below the chart depicting quarterly data in a variety of metrics — that UP Fintech had "experienced continuous growth in revenues for the eight quarters from January 1, 2017 to December 31, 2018[, d]riven by the continued increases in the number of customers making trades, trading volume and margin financing balance."  *Id.* at 102.  But it also acknowledged that "[r]evenues from brokerage commissions slightly decreased in the second quarter of 2018 due to the slight decrease of [UP Fintech's] trading volume as a result of market volatility."  *Id.*  More broadly, the Registration Statement further explained:

> [UP Fintech's] results of operations are subject to fluctuation and changes in market conditions.  [UP Fintech's] business is subject to influences from market factors such as market liquidity, interest rate and investor sentiment.  The impact of fluctuation and changes of market conditions, however, was not apparent historically due to the rapid growth of [UP Fintech's] business historically.  Due to [UP Fintech's] limited operating history, the trends that [UP Fintech] ha[s] experienced in the past may not apply to, or be indicative of, [its] future operating results.

*Id.*; *see id.* 103 (noting that UP Fintech "ha[d] not experienced seasonality in [its] business" but that, because the "brokerage business only began operations in 2015, volatility that may be inherent in the online brokerage industry could be masked by [UP Fintech's] rapid growth").  Considered in context, these statements were a clear warning to investors: that trading volume and revenue were volatile and subject to significant fluctuations due to factors beyond UP Fintech's control; that this volatility had been largely masked by UP Fintech's strong growth to date; and that the company could not guarantee that would continue to be the case.

In sum, the Registration Statement disclosed that UP Fintech had seen dramatic swings in trading volume and commission revenue on a quarter-to-quarter basis, including a decline in trading volume in Q2 2018 that matched the decline UP Fintech ultimately suffered in Q1 2019

and declines in commission revenue in two of the three prior quarters, including the immediately preceding one.  Additionally, these data were accompanied by fulsome warnings that figures like trading activity and commission revenue were highly volatile and subject to factors beyond UP Fintech's control; that this volatility had been largely masked to date by UP Fintech's strong growth and there was no guarantee that that would continue; and that investors could not draw meaningful information through period-to-period comparisons.  "In light of this total mix, a reasonable investor would not have considered the omitted interim financial information" — assuming arguendo that it was available and even known to Defendants — "material" and, thus, "the omissions are not actionable under Section 11."  *Barclays Bank PLC*, 2017 WL 4082305, at *15 (internal quotation marks omitted); *see Stadnick*, 861 F.3d at 39 (finding the alleged omission of recent income available to shareholders and earnings-per-share metrics immaterial for purposes of Section 11 where the omitted information "was consistent with a pattern of fluctuation" and "critically, [the] registration statement contained ample warnings and disclosures that explained shareholder revenue and earning fluctuations"); *see also, e.g.*, *Asay v. Pinduoduo Inc.*, No. 18-CV-7625 (PKC), 2020 WL 1530745, at *10 (S.D.N.Y. Mar. 30, 2020) ("When a company's offering documents include repeated warnings about a specific business vulnerability, there is no basis to conclude that the company failed to fulfill its affirmative disclosure obligations under Item 303." (internal quotation marks omitted)); *In re N2K, Inc. Sec. Litig.*, 82 F. Supp. 2d 204, 209-10 (S.D.N.Y.) (holding that a prospectus was "not made materially misleading by the defendants' omission of its financial data for the first quarter of 1998" where the "prospectus [wa]s replete with warnings and explanations of risks associated with the company's past financial history and future expectations"), *aff'd,* 202 F.3d 81 (2d Cir. 2000).

In arguing otherwise, Plaintiffs contend that the Registration Statement's warnings about volatility were misleading "because the declines [in trading volume and commissions] had already materialized,"  Pl.'s Opp'n 20, and the fact "that one of twelve prior quarters didn't show strong growth is hardly an adequate disclosure that the current quarter has suffered a substantial trading volume and commissions decline," *id.* at 16.  To the extent there was any declining trend in commissions, however, it appears to have begun during Q4 2018 — and therefore *was* disclosed.  *See* Compl. ¶ 49; *see also Asay*, 2020 WL 1530745, at *10 ("The doubling of marketing expenses in the second quarter of 2018 is consistent with the trend disclosed . . . .").  Moreover, the Registration Statement's "Recent Developments" section did disclose total revenue and commission revenue for the month of January 2019, which would have made clear to a reasonable investor that the company was on track to show significant declines for the quarter.  *See* Registration Statement 6-7.  Plaintiffs respond that the Registration Statement misleadingly attributed the January 2019 dip to "the generally quieter investment environment during the Chinese New Year season," Registration Statement 7, thereby suggesting that the problem was isolated, *see* Pls.' Opp'n 22.  But the Registration Statement merely stated that UP Fintech's "performance in January 2019 was *partially* affected by the generally quieter investment environment during the Chinese New Year season," Registration Statement 7 (emphasis added), and Plaintiffs do not suggest, let alone show, that that was untrue.[7]

_____

[7]     To the extent that Plaintiffs make the related, but distinct argument that Defendants had a duty to disclose the drop in trading volume and commission revenue in Q1 2019 so as to make the Registration Statement not misleading, Pls.' Opp'n 15-16, it fails for largely the same reasons.  "[I]n assessing whether an omission of interim financial information violated Section 11, the test in this Circuit has been that set forth in *DeMaria*," in which the Second Circuit "held that a duty to disclose such information arises if a reasonable investor would view the omission as 'significantly alter[ing] the "total mix" of information made available.'"  *Stadnick*, 861 F.3d at 36 (quoting *DeMaria*, 318 F.3d at 180).  In other words, a registrant is required to disclose

In short, in light of the dramatic quarter-to-quarter swings in trading volume and commission revenue the Registration Statement (accurately) disclosed and its warnings about the volatility of such metrics, a reasonable investor would not have viewed the additional six weeks of commissions and eleven weeks of trading volume data that Plaintiffs cite as substantially altering the total mix of information. That is, the alleged omissions were not "material" for purposes of Section 11. It follows that Plaintiffs' claims under both Section 11 and Section 15 fail and must be dismissed. *See, e.g.*, *Hutchison*, 647 F.3d at 490 ("To establish § 15 liability, a plaintiff must show a primary violation of § 11 and control of the primary violator by defendants." (internal quotation marks omitted)); *Arfa*, 2012 WL 697155, at *13 ("When," as here, "a complaint does not allege a primary violation of Section 11, there can be no control person liability."); *accord Nguyen*, 234 F. Supp. 3d at 548; *Coty*, 2016 WL 1271065, at *11.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. Neither AMTD nor China Merchants were ever served with the summons and Complaint, despite the operative Complaint having been filed on March 24, 2020, and thus they did not join in the present motion. That said, the claims against them are presumably subject to dismissal for the reasons set forth above. Accordingly, no later than **two weeks from the date of this Opinion and Order**, Plaintiffs shall show cause why the Complaint should not be dismissed as to AMTD and China Merchants, either for failure to serve or for the reasons set forth above.

The only remaining question is whether Plaintiffs should be granted leave to amend, which Plaintiffs request in passing in a single sentence at the end of their opposition brief. *See*

interim information only where its omission would be materially misleading. For the reasons discussed above, that was not the case with respect to the data at issue here.

Pls.' Opp'n 25 & n.15.  Although leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), it is ultimately "within the sound discretion of the district court to grant or deny leave to amend," *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007).  A district court may deny leave to amend where amendment would be futile.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).  In light of the Court's reasoning, there is nothing to suggest that, if the Court were to grant leave to amend, Plaintiffs would be able to state a valid claim.  *See, e.g.*, *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (per curiam) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend.").  Accordingly, the Court DENIES Plaintiffs' request for leave to amend as futile.

The Clerk of Court is directed to terminate ECF No. 52.

SO ORDERED.

Dated: March 17, 2021
     New York, New York

                                                          JESSE M. FURMAN
                                            United States District Judge